```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA


DAVID RUDOVSKY              :        CIVIL ACTION
LEONARD SOSNOV              :
                            :
        v.                  :
                            :
WEST PUBLISHING CORPORATION :
et al.                      :        NO. 09-0727-JF
- - - - - - - - - - - - - - - -
                        Courtroom 15A
                   Philadelphia, Pennsylvania
                        April 14, 2009
                          - - - - -


        BEFORE:  HONORABLE JOHN P. FULLAM, Sr. J.


                        - - - - -
                    EXCERPTS FROM
              PRELIMINARY INJUNCTION HEARING
                      - - - - -


APPEARANCES:

For the Plaintiffs:        RICHARD L. BAZELON, ESQUIRE
                           MATTHEW R. SKOLNIK, ESQUIRE
                           NOAH H. CARLSON, ESQUIRE
                           Bazelon, Less & Feldman, PC
                           1515 Market Street
                           Suite 700
                           Philadelphia, PA 19102

For the Defendant:         JAMES F. RITTINGER, ESQUIRE
                           AARON M. ZEISLER, ESQUIRE
                           Satterlee Stephens Burke & Burke
                           230 Park Avenue
                           New York, NY 10169

                           MATTHEW J. BORGER, ESQUIRE
                           Klehr Harrison Harvey Branzberg
                               & Ellers, L.L.P.
                           260 South Broad Street, 4th Floor
                           Philadelphia, PA 19102


       Proceedings recorded by electronic sound recording,

          transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

Courtroom Deputy:          Rosalind Burton-Hoop

ESR Operator:              Dennis Taylor

Transcribed by:            DRUMMOND TRANSCRIPTION SERVICE
                           HADDON HEIGHTS, NEW JERSEY 08035

                           - - - - -

Proceedings recorded by electronic sound recording,

transcript produced by transcription service.

1          (In open court - 1:42 p.m.)

2          COURTROOM DEPUTY:  All rise.  Court is now in

3     session.  The Honorable John P. Fullam, presiding.

4          THE COURT:  Good afternoon.

5          ALL COUNSEL:  Good afternoon, your Honor.

6          THE COURT:  Be seated, please.

7          This is the case of Rudovsky and others versus West

8     Publishing Company, and others.

9          Does somebody wish to start talking?

10         MR. BAZELON:  Your Honor, good afternoon, I'm

11    Richard Bazelon, and I represent the plaintiffs in this case.

12         I want to thank your Honor for hearing us this

13    afternoon.  I'm prepared to put on my case.  I'm prepared to

14    give you a summary, I'm prepared to do whatever it is your

15    Honor would -- how ever you prefer to start.

16         THE COURT:  Well, I like to think that it's your

17    case, so you do what you think is the right thing to do.

18         MR. BAZELON:  Call my first witness.

19         MR. RITTINGER:  Well, your Honor, may we be heard on

20    some oral argument before the witness is called.

21         THE COURT:  What do you want to argue about?

22         MR. RITTINGER:  Well, your Honor, this is a motion

23    for a preliminary injunction.

24         THE COURT:  I know.

25         MR. RITTINGER:  And it seems to me that, first of

1  all, the order that was submitted, West has already

2  voluntarily taken virtually all of the actions that are

3  requested for on this preliminary injunction hearing.

4      Your Honor, I could go through that but we have

5  published a new supplement.  Last evening I asked Mr. Bazelon

6  to tell me what it is that he was still seeking in the

7  preliminary injunction motion --

8      THE COURT:  That seems reasonable.  Mr. Bazelon, why

9  don't you tell us what you're still seeking.

10     MR. BAZELON:  Yes, your Honor, but just to finish

11  what Mr. Rittinger began.  He asked me, your Honor, what

12  injunctive relief I was seeking and I wrote him back and

13  spelled out the injunctive relief we were seeking.  I got a

14  response from Mr. Rittinger saying, he had no interest in

15  discussing injunctive relief for settlement, he was only

16  asking me so he could assess his plans to bring a Rule 11

17  motion.  So that was the extent on my discussion with Mr.

18  Rittinger.

19     THE COURT:  Other than that, you're practically in

20  agreement?

21     MR. BAZELON:  Right, exactly.

22     MR. RITTINGER:  Well, your Honor, we tried a month

23  ago to reach an agreement with Mr. Bazelon.  I've

24  unfortunately concluded that that is not possible because each

25  time we get to something, something else comes up, but I do

1  have before me his e-mail, in which he now tells me what he's

2  going to ask this Court to do in a preliminary injunction

3  motion.

4  THE COURT:  Is there some reason why you two are the

5  only two who know what you want?  Why doesn't somebody tell

6  the Court what you want?

7  MR. BAZELON:  Your Honor, the relief that we are

8  seeking, your Honor, at this point in time is that -- the

9  treatise that was written by David Rudovsky and Leonard Sosnov

10  appears both in hardbound form and on WESTLAW.

11  Dealing with WESTLAW first, the problem is that the

12  only statement that West is willing to make concerning our

13  clients and their lack of involvement post the pocket part

14  used in 2007-2008 is on a page known as the scope page.  Your

15  Honor, almost no one goes to the scope page, so that it's

16  really a useless disclosure, and I have spelled out for Mr.

17  Rittinger and for West what it is we want on WESTLAW; they

18  have never responded, but I'm happy to tell your Honor what it

19  is.

20  On WESTLAW, as I understand it, at the beginning of

21  each section there's a statement as to how current the

22  treatise is on WESTLAW, and then there is an identification of

23  the authors, namely, Mr. Rudovsky and Mr. Sosnov, and then

24  there is at the beginning of each section an asterisk or other

25  indication of a footnote, and the footnote is a footnote about

1   each author.  What we have asked is to include in that

2   footnote the statement as to essentially the period of time in

3   which they authored the treatise and when they stopped

4   authoring the treatise.  We've never gotten a response other

5   than, you know, the Rule 11 stuff that Mr. Rittinger enjoys

6   talking about.

7           So that's the first thing.

8           The second, your Honor, is that there's been an

9   interesting history here.  Initially West would do nothing

10  when we brought this to their attention.  We filed a complaint

11  and they sent a letter to subscribers in March of 2009, which

12  for reasons we have pointed out was grossly inadequate.  Then

13  we brought a preliminary injunction motion; they decided to do

14  a rush, rush, super rush job to get out a new supplement, and

15  yesterday they told us that it was sent out Friday night.

16          It's almost a 400-page document, your Honor,

17  obviously --

18          THE COURT:  You have memorized it, I assume?

19          MR. BAZELON:  Yes, I've memorized it, your Honor,

20  chapter and verse.

21          As I understand their communication to us, they sent

22  it out with a one-page document called "Shelving Instructions"

23  or "Shelf Instructions."  That document does not reflect the

24  fact that Mr. Rudovsky and Mr. Sosnov had no role in this most

25  recent update, and there's no indication in this cover letter

1   or this shelving instruction that the subscriber can get a

2   refund if he or she wishes; that is, the subscriber, your

3   Honor, paid for the pocket part that he, or she, or it

4   received in December of 2008.  That, your Honor, was the

5   pocket part which we call the sham pocket part for 2008-2009.

6        THE COURT:  How much did the subscriber pay?

7        MR. BAZELON:  I think about $46.50.

8        So that was sold on the basis of Mr. Rudovsky and

9   Mr. Sosnov's name, because their name appeared on the title

10   page as the primary authors of the entire pocket part, which

11   we believe was a false attribution, a misrepresentation.

12        Now, that this new document has come out, we believe

13   that the subscriber who already paid, based at least

14   substantially on a false attribution of authorship, should

15   have the opportunity of saying if the original authors, who

16   are the reason that we have subscribed, are not doing the

17   pocket part, thanks, but no thanks, we want to return this and

18   we want a credit.  But they're not advised in this document

19   that has just been sent out --

20        THE COURT:  As I understand it, Mr. Berger's office

21   is not involved with the class action on behalf of

22   subscribers?

23        MR. BAZELON:  They are not, your Honor, but the

24   problem here is we suggest twofold:  Number one, that the

25   document was sold on the basis of our clients' names, and,

1    number two, that there is a public interest here with respect

2    to not using our -- Mr. Rudovsky's and Mr. Sosnov's -- name

3    falsely and not providing a remedy.  So that is relief we have

4    sought.

5          Now, your Honor, with respect to the new replacement

6    pocket part, which we only received yesterday afternoon and we

7    have not had a chance to make a detailed review, but in doing

8    some spot-checking we have noticed what I would call some

9    fairly remarkable omissions, which certainly raise a very

10    substantial prospect that this was thrown together in a less

11    than professional way.  How less than professional, I don't

12    know without, you know, a review I can't do in less than 24

13    hours, but it certainly does not suggest that anyone would

14    have any reason to have any confidence in this new replacement

15    pocket part, but we will present that in testimony.

16          THE COURT:  Is Mr. Rudovsky being blamed for that

17    latest edition?

18          MR. BAZELON:  He's not being -- in the latest

19    edition, on the cover page, he is not being blamed, there is

20    attribution.  He and Mr. Sosnov are identified as the authors

21    through, I think, the pocket part of 2007-2008, which is

22    correct, and then the editorial staff after that -- that's the

23    answer to your question.

24          THE COURT:  Right.  So what's wrong with that?

25          MR. BAZELON:  What's wrong with it is that --

1    THE COURT:  Who cares whether it's got all kinds of

2  gaps in it or not?

3    MR. BAZELON:  What is wrong with it, Judge, is that

4  the original pocket part has already been sold.  This

5  replacement is giving to the subscribers a replacement for

6  what they've already paid for, and what they paid for was the

7  sham 2008-2009 pocket part based on, we believe, largely Mr.

8  Rudovsky's and Mr. Sosnov's name, and, therefore, the

9  subscribers having bought we believe largely on the basis of

10  those names and that attribution, ought to be told expressly

11  that they have the right to return and get a refund.  We

12  believe Mr. Rudovsky and Mr. Sosnov have standing because it

13  was -- the 2008-2009 pocket part was attributed to them.

14    THE COURT:  Okay, that's your position.

15    MR. RITTINGER:  Your Honor, if I might?

16    First of all, the customer letter that we sent out

17  in March offers every person who got the first supplement an

18  opportunity for a refund.  We haven't had one request.  We

19  never had one complaint about this, either have the plaintiffs

20  as far as I know, but it was offered to them before it even

21  went out in a customer letter, which also, your Honor, covers

22  everything that he asks for in the preliminary injunction

23  motion as well.

24    As a matter of fact, to show what we're dealing with

25  here, he actually asks your Honor, as part of the order of the

1   letter, that we should require that the people send back the

2   old supplement and we should pay for their postage and

3   handling.  The customer letter that we sent out a month

4   earlier, they don't have to do that, just ask for it, and the

5   shelving instructions are to throw it away.

6           So he's asking for something that is more onerous

7   really to the customers, who he doesn't represent, than what's

8   asked for.  There really is just no basis for a preliminary

9   injunction motion here.  If there ever was, there isn't any

10  more, your Honor.

11          And if I could just have a minute to give a little

12  bit of a background.

13          THE COURT:  Go right ahead.

14          MR. RITTINGER:  Your Honor, putting aside what West

15  did, and whether West did it unilaterally or it did it as a

16  result of -- that really isn't anything for today.  West is --

17  I hope your Honor would agree -- a reputable publisher, and I

18  can't come to court before your Honor and say that we are

19  proud of the supplement that we've replaced, that would be

20  disingenuous.  However, your Honor, at the appropriate time,

21  if it is in this court or some other court, assuming we think

22  at a minimum there has to be an amendment to the complaint to

23  get there, we will show that this pocket part was not a sham.

24  It didn't measure up to what our standards are, and we put

25  something out that we do think now does measure up to our

1 standards.

2 But let's look at what happened here, your Honor,

3 and the record is filled with it, your Honor, there can't

4 really be no legitimate dispute about it. They complained,

5 all right? They complained in a letter in which they failed

6 to mention the existence of the 2000 agreement. They then,

7 almost immediately, served a complaint that followed the form

8 of the letter and set forth the causes of action that are

9 contained in the letter; those are all tort claims and they

10 all have to do with the misuse of name or advertising, or

11 using the names in a context where they didn't do the

12 supplement themselves, your Honor.

13 Now, the first discussions that I had about this

14 was, what about the agreement? The response that I got was

15 the agreement doesn't apply. Now, your Honor, at that time I

16 was not aware, believe me, and I still don't know although

17 I've asked the question, whether or not counsel and the

18 plaintiffs were aware of the 2000 agreement; I thought they

19 were because it now turns out, your Honor, though, if you look

20 at what happened causes of actions were submitted that don't

21 mention the 2000 agreement and talk about the unauthorized use

22 of names. At a minimum in presenting this to the Court it

23 seems to me that there's an obligation to advise that there's

24 an agreement that calls for this.

25 THE COURT: I wish, sir, I don't know, I'm perhaps

1    influenced by what you just filed, but in this motion that you

2    just filed, relief to file a reply to plaintiffs' supplemental

3    memorandum.  I've read the reply that you propose to file and

4    I'm disheartened by the tone of it, and you seem to be

5    following in that same tone here today.  I'm much less

6    interested in whether you have a valid reason to be angry with

7    your opposing counsel, and much more interested in the merits

8    of the case.  I don't take kindly to briefs which attack

9    opposing counsel and make snide comments right and left, and

10   yours do, and you're doing the same thing here today, you're

11   more critical of your opponent than you are of the facts of

12   the case.

13           MR. RITTINGER:  But your Honor, you have to look at

14   the merits of this case --

15           THE COURT:  I'm trying to.

16           MR. RITTINGER:  -- in the context of the 2000

17   agreement.  At some point in time --

18           THE COURT:  What does the 2000 agreement say that

19   helps you?

20           MR. RITTINGER:  Well, the 2000 agreement, first of

21   all, it says that we can use their name or likeness.

22           THE COURT:  It gives you license to falsely

23   attribute something to them?

24           MR. RITTINGER:  No, it gives us the right to use

25   their name on a supplement, even one that they don't prepare

1   themselves, the actual supplement and I can read the language

2   on that, your Honor.

3      THE COURT:  Well, you mean that it authorizes you to

4   say that they prepared the supplement, when they didn't?

5      MR. RITTINGER:  Well, first of all, your Honor, you

6   have to look at what the supplement is.  Remember the

7   supplement is -- they prepared the basic body of that

8   supplement, and it's updated every year, and if they choose

9   not to update it, we can continue to use their names.

10      And, your Honor, I'll read from the -- it's

11   paragraph three of (b), Upkeep, Supplements, Revisions and New

12   Editions.

13      "Authors will provide upkeep to the work on an

14      annual basis or as otherwise agreed to by publishers

15      and authors, including, but not limited to supplements,

16      revisions or new editions of the work in order to keep

17      it current and marketable.  All references to the work

18      in this Agreement also apply to such upkeep as well as

19      to the original unless otherwise provided."

20      THE COURT:  Such upkeep being upkeep that they

21   provide.

22      MR. RITTINGER:  Yes, your Honor, but then -- now I'm

23   at 3-2, right?  Yes, 3-2, Use of Author's Names.

24      "Publisher will have the right to use author's

25      names in connection with the work and upkeep of the

1      work.  If the work or upkeep is prepared by a person,

2      other than authors, publishers may identify that person

3      on the new material and any related advertising and

4      give him or her authorship credit in addition to or in

5      lieu of credit to the authors."

6      And on that basis, your Honor, -- and it's a regular

7  practice in the publishing industry -- if the original authors

8  don't do an update and someone else does, they both get

9  credit.

10      THE COURT:  Obviously.

11      MR. RITTINGER:  Your Honor, the problem with this,

12  and what we were faced with when we saw this was, we couldn't

13  understand why there was no mention of the 2000 agreement.

14  So, when we presented the 2000 agreement, the first reaction

15  we got was that it wasn't -- the part that we had was only

16  signed by the plaintiffs, not by us, and the reaction we got

17  was that it was a purported agreement.

18      And, your Honor, if you look at the moving affidavit

19  that was put in on this case, it was by Professor Rudovsky and

20  it talks about the 1987 agreement being the agreement that

21  governs all publications up to the 2000 supplemental

22  agreement.  Your Honor, that it seems to me makes it clear

23  that they had forgotten about the existence of the 2000

24  agreement.  I understand why the 2000 supplement doesn't

25  apply, because it only relates to that supplement and nothing

1   more.

2        But, your Honor, with all due respect it would seem

3   to me that anybody reading the papers that were submitted to

4   this Court would not understand that there was an agreement in

5   place that gave us the right -- we certainly for purposes of

6   an argument say -- "that to use their names on a supplement

7   even though they didn't prepare the supplement." (sic)  And I

8   don't believe that the Court would ever get that notion out of

9   anything that was presented to your Honor.

10       And that's the point that I was trying to make, and

11  I have gone back to counsel on several occasions, your Honor,

12  and said, please tell me when did you find out about the 2000

13  agreement?  I think that's a perfectly rational question to

14  ask under the circumstances of what was presented to the

15  Court, your Honor.

16       THE COURT:  Let's hear the other point of view on

17  that precise point.  What have you got to say about this 2000

18  agreement?

19       MR. BAZELON:  Your Honor, what I have to say about

20  the 2000 agreement is that none of the causes of action that

21  we are asserting are asserted under contract and we don't

22  believe that contract is relevant to the plaintiffs.

23       Beyond that, your Honor, --

24       THE COURT:  Well, he says that the 2000 agreement

25  gives them the right to do what they're doing -- or what

1    they've done.

2           MR. BAZELON:  Well, your Honor, you have said it

3    better than I could, and that is, that the notion that this is

4    a license to falsely attribute authorship is -- I don't know

5    how to describe it, your Honor, I'll use words I should use

6    because they'd be pejorative -- but it's nonsensical and the

7    provision that Mr. Rittinger refers to which says that the

8    publisher shall have the right to use the author's name in

9    connection with the work and also says that they can give

10   credit to another author, as well as to -- who performs work

11   -- as well as to Mr. Rudovsky and Mr. Sosnov.  I mean, all

12   that provides, your Honor, is that people who do work --

13          THE COURT:  They may tell the truth?

14          MR. BAZELON:  It's honest attribution, your Honor,

15   and we're not arguing to the contrary.

16          What we are here, you know, objecting to is the

17   false attribution of work, which happens also to be sham work,

18   to the original authors.

19          You know, Mr. Rittinger argues that because the

20   2008-2009 pocket part contains contents of prior pocket parts

21   it is, you know, truthful to say that Mr. Rudovsky and Mr.

22   Sosnov are the authors, but, your Honor, the reason you get --

23   if you're a subscriber -- a 2008-2009 pocket part is to get an

24   annual update.  So, who has done that is the critical thing,

25   that's what differentiates it from the past updates.  And this

1    pocket part would lead any subscriber to believe that the

2    primary responsibility for the current, that is 2008-2009

3    update, are Mr. Rudovsky and Mr. Sosnov and that is simply a

4    false attribution.

5           Now, they say in small print below, "and the

6    publisher's staff," in small print but there's no

7    differentiation --

8           THE COURT:  I understand, but we're getting to the

9    ultimate merits here now.

10          MR. BAZELON:  I'm sorry.

11          THE COURT:  I'm much more interested in what

12    preliminary relief you think you're entitled to right now.

13          MR. BAZELON:  The preliminary relief, your Honor,

14    that I think I'm -- may I answer one other thing, your Honor,

15    before I -- just very briefly.

16          Mr. Rittinger referred to the March 2009 letter that

17    was sent out and he said that the subscribers were given the

18    opportunity to do exactly, you know, what we are now asking.

19    I want to read you what it says because I want to suggest to

20    you that it's highly ambiguous.

21          The 2009 letter on this point says, and I'm quoting:

22          "We are in the process a preparing a new 2009 pocket

23        part which will be shipped to you free of charge.  If

24        you are not satisfied with the information provided,

25        please contact Customer Service at," telephone number,

1    "and reference this letter to receive a credit for the

2    2008-2009 pocket part", close quote.

3         Now, your Honor, it says if you are not satisfied

4    with the information provided.  The previous sentence, which

5    starts a new paragraph, refers to the 2009 pocket part which

6    is going to be sent out.  The most natural reading of this to

7    a subscriber is you wait until you get the new supplement

8    we're going to send out and then if you're not satisfied this

9    is what you can do.

10        But when they sent it out, they say Friday night,

11   they don't reference this and any subscriber, I would

12   respectfully submit, that subscribers are not sitting around

13   having this March 2009 letter on their wall waiting for the

14   new replacement part to come in, and then go back to the

15   letter and see what they want to do.

16        The way that West should have done this in fairness

17   to the subscribers, and to Mr. Rudovsky and Mr. Sosnov, is to

18   put a notice with this replacement pocket part that it's not

19   done by the original authors and if you want a credit you can,

20   you know, send it back at our expense and we'll give you a

21   credit.

22        So, we believe that that relief, and this answers

23   partly the question you asked, your Honor, we do want that

24   relief for the customers in terms of a very prompt notice that

25   says expressly that Professors Sosnov and Rudovsky have --

1   although they were the original authors -- they have not

2   participated in this update and that within 60 days if you

3   want a refund, you return it at our expense and you'll get a

4   refund or a credit.  That's the first.

5          The second thing, your Honor, just to finish, and

6   I'm sorry to interrupt you, I apologize.

7          But the other is the WESTLAW, because they've

8   basically done nothing that has any effect to remedy the false

9   attribution with respect to WESTLAW, and I think I've

10  discussed that.

11         THE COURT:  Does the record contain what you get on

12  WESTLAW?  In other words, I can't picture what you get on

13  WESTLAW.

14         MR. BAZELON:  Your Honor, we have a witness who's

15  going to testify and he has the screen shots --

16         THE COURT:  Oh, okay.

17         MR. BAZELON:  -- and we're going to present that.

18         THE COURT:  Now, before we get any further, I'm

19  curious as to why this case has not been settled long ago?  It

20  seems to me that proceeding further with litigation has the

21  great potential for embarrassment on both sides.  I would

22  think that Professor Rudovsky and his companion, his fellow

23  author, would not want it to be generally known how very

24  little they get paid for this.  It seems to me that's more of

25  an adverse reflection on their scholarship than almost

1   anything else.

2           MR. BAZELON:  It's a public service, your Honor.

3           THE COURT:  And I just don't understand why there's

4   a resistance to correcting the error, which seems to be fairly

5   obvious here.

6           MR. RITTINGER:  Well, your Honor, I've alluded to

7   it.  I've tried.  I mean, I'm happy to have a settlement

8   conference with your Honor, but I've tried, it cannot be done

9   because every time we got some place something more was put on

10  the table and that's the bottom line.

11          But, your Honor, I would like to first of all, in

12  order to move this we'll do what they want on WESTLAW, we'll

13  do it, we'll put the footnote on WESTLAW, it's not a big deal,

14  but we're not going to -- we've already sent out a letter and

15  we are not going to send out another letter.  The treatise

16  clearly indicates exactly what they say -- I'm talking about

17  the treatise -- the new supplement clearly indicates what they

18  want.  Putting that footnote on the bottom of WESTLAW is not a

19  big deal and we can do it, we can have it done in a day, so

20  that's not a problem.

21          But, your Honor, I do think it's worth noting that

22  this is a preliminary injunction hearing.  I don't have to

23  tell your Honor, it's extraordinary relief, and what we're

24  really asking for is a mandatory injunction without any

25  showing of irreparable harm.  Mr. Bazelon makes reference to

1    the fact that people don't have it on their wall.  They can't

2    introduce one single person who's complained about this; where

3    is the damage?  And yet we've gone through all of this.

4            MR. BAZELON:  Your Honor, would you like me to

5    respond?

6            THE COURT:  Go head.

7            MR. BAZELON:  Your Honor, one of the -- your Honor,

8    I think well knows that in issues concerning reputation that

9    damage is presumed with certain kinds of defamation, certain

10   kinds of assertions, certain kinds of false attribution.

11   People don't come up to you, if you are the subject of this

12   and say, guess what, I think less of you.  But the law is

13   knowledgeable enough to know that that's what happens and also

14   to know that the damage to reputation is irreparable harm.

15           The other thing is, your Honor, that --

16           THE COURT:  Just as a matter of curiosity, how do

17   you propose damage -- how do you propose to prove damage to

18   reputation?

19           MR. BAZELON:  Well, we proposed, among other things,

20   to show that this is the type of damage which gives rise to --

21   the type of injury which gives rise to damages without a

22   showing of special damages, and that we're going to show it by

23   the extent of injury to reputation which flows from this kind

24   of, you know, falsely attributing authorship of a sham product

25   to two extremely reputable, highly thought of scholars in the

1 legal field.

2      THE COURT:  So highly thought of that nobody would

3 ever dream of thinking less of them because of a mistake of

4 this kind?

5      MR. BAZELON:  Well, your Honor, one would hope that,

6 but unfortunately if your name is, you know, associated with a

7 sham product, a product where whoever authored it doesn't

8 bother to give negative history, so you can mis-cite

9 authority, doesn't cite the new Supreme Court opinions in the

10 same cases cited earlier, doesn't reference the fact that

11 review has been granted by the Supreme Court of Pennsylvania,

12 that doesn't include new rules.  I mean, that is such a, you

13 know, a gross oversight, to attribute it to standing scholars

14 is -- I suggest, does give rise to real damages.

15      Beyond that, your Honor, one of the problems is, is

16 the very fact that you don't know what the problem with this

17 pocket part is if you're a reader.  You don't know necessarily

18 that all of these problems exist.  So it's not as though

19 somebody who picks it up immediately knows, but one of the

20 reasons why this is so damaging is that when you do find out

21 it's because somebody else recognizes that you've done

22 something wrong, and somebody may be misled, including the

23 court or a client -- I'm sorry.

24      THE COURT:  You would agree that this is an argument

25 which would be particularly pertinent if you were representing

1  a class of purchasers?

2      MR. BAZELON:  I would have standing if I were

3  representing a class of purchasers, but I believe I also have

4  standing --

5      THE COURT:  I'm not suggesting that you don't have

6  standing, but I'm suggesting that it bears primarily upon the

7  damage done to the class of purchasers rather than to your

8  clients.

9      MR. BAZELON:  Your Honor, I hear what you're saying

10  and I respectfully disagree with the Court.

11     THE COURT:  That seems reasonable, people do all the

12  time.

13     MR. BAZELON:  No, probably not, audacious.

14     THE COURT:  Well, what do you want to do?  Do you

15  want to go ahead with evidence, is that what you want to do?

16     MR. BAZELON:  Your Honor, if we can't resolve it

17  otherwise, I do.

18     MR. RITTINGER:  Your Honor, first of all, the pocket

19  part that he's talking about doesn't exist any more, it's been

20  replaced and this is a motion for a preliminary injunction.  I

21  mean, it has been mailed out with the instructions to get rid

22  of it.

23     THE COURT:  You're representing that ever subscriber

24  who subscribed to the challenged pocket part is also a

25  subscriber to the new pocket part?  Are there any subscribers

1    who only update it once every ten years or --

2          MR. RITTINGER:  Oh, no, anybody who got -- the

3    intent was -- I mean, I assume, your Honor, I haven't looked

4    at the two lists of subscribers, but anybody who was a

5    subscriber to the first supplement got the new supplement.

6    That was the mailing list, to my understanding, that was used.

7          Your Honor, we're talking about irreparable harm and

8    injunctive relief, for what at this point in time?

9          THE COURT:  That's what we're about to find out, I

10   assume.

11         MR. BAZELON:  Yes, your Honor, I assume that if Mr.

12   Rittinger is going to rely on what was sent out Friday night,

13   he's going to have a witness here to tell the Court about that

14   document and how it was prepared so we know what it is, and

15   not just tell the Court something was sent out and because he

16   says something was sent out, with no further description, that

17   moots an issue.

18         Beyond that, your Honor, I also want to point out

19   that in this replacement pocket part that was sent out, on the

20   third page there is -- it's entitled "Related Products from

21   West," and it lists it looks like about ten publications.  One

22   of them is the publication that we're talking about here

23   today, Pennsylvania Criminal Procedure, Law Commentary and

24   Forms, David Rudovsky and Leonard Sosnov.  It doesn't say

25   anything about they're no longer providing pocket parts,

1    they're no longer updating.  They are advertising the work

2    without any limitation on the basis of the names of Rudovsky

3    and Sosnov.  So, this is continuing, your Honor.

4         THE COURT:  And what is that document you're holding

5    in your hand?

6         MR. BAZELON:  I am holding in my hand page three,

7    it's actually three small (i) of the document that was

8    e-mailed to us yesterday afternoon, described in the cover

9    e-mail as the replacement pocket part consisting of, I think,

10   close to 400 pages -- and this is on the third page.

11        THE COURT:  And that's a list of other publications?

12        MR. BAZELON:  It's a list of about ten publications

13   involving Pennsylvania law topics.

14        So not only was this -- in effect, the sale of this

15   product took place in December 2008, when the sham pocket part

16   was sent out, because that's when the customers paid for it.

17   And now, in addition, even when this comes out there's a

18   restatement, an advertising of the treatise, based solely on

19   the names of Mr. Rudovsky and Mr. Sosnov.

20        So, I suggest, you know, Mr. Rittinger -- I should

21   say West -- want to come in here and tell the Court, oh, you

22   know, nothing else is relevant.  We say we threw something

23   together and sent it out on Friday night, no other issues in

24   the case, Judge; I respectfully suggest that that's not what

25   the record shows.

1          MR. RITTINGER:  Your Honor, this is the book.

2          THE COURT:  The midnight mailing on Friday night?

3          MR. RITTINGER:  I'm sorry?

4          THE COURT:  What is the midnight mailing on Friday

5     night?

6          MR. RITTINGER:  That was the supplement that we sent

7     out.  I mean, it wasn't a midnight mailing on Friday night, it

8     went out on a Friday.  I found -- that happened to be Easter

9     weekend, and I found out on Monday and I immediately sent it

10    to Mr. Bazelon with the suggestion that maybe he ought to

11    withdraw the preliminary injunction motion; he didn't.

12         But, your Honor, this is a listing of ten or eleven

13    West Pennsylvania publications, which they do every place.  It

14    names the publication, which in this case is Pennsylvania

15    Practice, it was authored by them, and it says that.  It

16    doesn't say anything about the supplements at all, nor do any

17    of the other ones say anything about the supplements, but when

18    they buy this they're going to get this and they're also going

19    to get this, the supplement, and the supplement is going to

20    say exactly what they wanted it to say, that -- and I can read

21    it, your Honor, but we know what it is.  It's going to say

22    that this supplement was prepared by the staff, everything

23    else was prepared by the authors.

24         THE COURT:  Okay.  Everybody has finished talking?

25    If you want to present evidence, go ahead.

1    MR. BAZELON:  Yes, your Honor, I'd like to call my

2    first witness, Douglas Frenkel.

3    (None of the witnesses' testimony was transcribed.)

4    (Transcript picks up after all testimony at 4:03 p.m.)

5    MR. BAZELON:  Plaintiff rests, your Honor.

6    THE COURT:  It's your turn.

7    MR. RITTINGER:  Your Honor, we would move for

8    judgment, denying the motion for a preliminary injunction on

9    the grounds that a *prima facie* case has not been made.

10    Your Honor, the requirements for a preliminary

11    injunction are well known to this Court, and it is our

12    position and I believe the evidence, that they have failed

13    with respect to all of the requirements.

14    A preliminary injunction is an extraordinary remedy.

15    As I understand what is left, that they are asking for a

16    letter to go out to subscribers that says virtually the same

17    thing as a letter that's already gone out.  There has been no

18    showing of irreparable harm.

19    We have a motion to dismiss pending.  We don't

20    believe that there's any showing of a likelihood of success on

21    the merits, and certainly at this point, the balance of the

22    equities favors the defendant where again we would be forced

23    to go out to our customers in a situation where we've already

24    gone out and taken unilateral corrective action.

25    So, your Honor, we would move for denial of the

1    preliminary injunction.

2            THE COURT:  Part of the problem, of course, is that

3    what you consider corrective action is extremely ambiguous and

4    impossible to understand, as well as ungrammatical.

5            This letter says, "Dear Criminal Procedure Law,

6    Commentary and Forms, Pennsylvania Practice Subscriber," which

7    seems like a strange salutation.  Then it says, "In December,

8    2008, our records indicate," well, for heaven's sake, that's

9    not what you meant to say, is it?  Then it says, "The book and

10   the prior pocket parts was authored by David Rudovsky and

11   Leonard Susnov.  We wish to bring to your attention the

12   following."

13           And the fourth paragraph -- third paragraph,

14   whatever it is, "After thorough review we've determined that

15   the 2008-2009 pocket part does not reflect all changes in the

16   law that have occurred since the prior year's update."  That's

17   an understatement.  "Due to this, all citations should be

18   checked for later developments."  What the heck does that

19   mean?  Just don't rely on what we said?

20           And the final paragraph, "We are in the process of

21   preparing a new 2009 pocket part which will be shipped to you

22   free of charge.  If you are not satisfied with the information

23   provided, please contact Customer Service, and reference this

24   letter to receive a credit for the 2008-2009 pocket part."

25   What does that mean?  It doesn't say anything about getting

1  your money back, does it?

2      MR. RITTINGER:  Your Honor, I think most lawyers

3  would read it that way.

4      THE COURT:  If they're not satisfied with the new

5  2009 pocket part, they can write in and get a credit for the

6  previous pocket part; what does that mean?

7      MR. RITTINGER:  I think it means what it says, your

8  Honor.

9      THE COURT:  Well, they have to be dissatisfied with

10  the 2009 pocket part before they get their money back?

11      MR. RITTINGER:  No, your Honor, I don't think that's

12  what it says, but if your Honor reads it that way, I do not

13  believe that that is what it says.

14      THE COURT:  What do you think it says?

15      MR. RITTINGER:  I think it offers a refund -- first

16  of all, your Honor, I don't think there's any basis for

17  granting an injunction, a mandatory injunction, for something

18  like that which cannot be compensated for by money damages.

19      The burden here is for the plaintiff to show

20  irreparable harm, not irreparable harm to the subscribers.  We

21  have every intention of fulfilling our obligations to our

22  subscribers, your Honor.

23      THE COURT:  I'm suggesting that maybe this is an

24  opportunity to minimize your damages, but if you don't want to

25  do it, that's your problem.

1    MR. RITTINGER:  If your Honor is suggesting that we

2  should send a clarification saying that anybody who wants a

3  refund for the 2008-2009 supplement, I think that's something

4  that West would do voluntarily -- if your Honor reads that as

5  being unclear, because it certainly was not intended that way.

6    THE COURT:  Okay.  Now where is the irreparable

7  immediate harm?

8    MR. BAZELON:  The irreparable immediate harm, your

9  Honor, is that this pocket part has been sold substantially on

10  the basis of Professor Rudovsky and Professor Sosnov's name.

11  That there needs to be a clear statement separately received

12  along with an offer of a refund in order to remedy that

13  damage.  You know, basically West has made this sale by a

14  misrepresentation, a false attribution, and it needs to be

15  corrected both from the point of view of the authors and the

16  subscribers.  And it's continued not only, you know, it even

17  flows through into the new replacement on page three, where

18  they are listed as the authors.

19    And, your Honor, reputational interest has always

20  been and is generally regarded as an interest which justifies

21  injunctive relief to protect reputation.  Having been

22  associated with this sham product, and I believe we've

23  demonstrated that it's a sham product, been accused

24  essentially of being the authors of it, and basically West

25  having sucked the subscribers into this and foisted what

1 really amounts to a fraud on the subscribers, this relief is

2 necessary and the damage is irreparable.

3 　　　　Your Honor, I want to say one other thing and that

4 is that we have a situation here where West's defense to what

5 we are asking for is a new pocket part that they say they sent

6 out.  There is not a scintilla of evidence that that has

7 happened, and that is not just a form complaint or objection

8 on my part.  If somebody were here to give testimony, I could

9 cross-examine that person about that pocket part.  I can't

10 cross-examine somebody who's not here but West should not have

11 the right to have this Court issue an order based on something

12 that they say took place on Friday night, and have no witness

13 here to give evidence as to what happened and what this

14 alleged replacement part is.

15 　　　　THE COURT:  Have you been shown the alleged

16 replacement part?

17 　　　　MR. BAZELON:  We received an e-mail on Friday from

18 counsel with counsel's statement that this -- I'm sorry, we

19 received an e-mail on Monday afternoon, yesterday afternoon,

20 with counsel's statement that this was sent out on Friday

21 night.  That's not testimony, it's not evidence; we're here at

22 a hearing to present evidence, West is presenting no evidence,

23 they've called no witnesses, and I think we have proven our

24 case.

25 　　　　One more reason we've proven it is that there is no

1   case on the other side.  In fact, it really raises the

2   question of whether we should still be pressing for the relief

3   in the form of a sticker to be sent out.  At least in the

4   event that what counsel said is not true -- I'm not saying

5   it's not true -- but if that's in fact the case, I don't want

6   to give up my right to relief because there is no evidence in

7   the case, West has presented no evidence.

8          THE COURT:  Perhaps there may be at some point?

9          MR. RITTINGER:  I'm sorry, your Honor?

10          THE COURT:  Do you have any evidence that the pocket

11   parts --

12          MR. RITTINGER:  Well, Your Honor, we put in an

13   affidavit that said that it was going to be sent out by April

14   15th.  I would ask for a continuance to be able to bring a

15   witness in tomorrow.  I did not think that that would be

16   legitimately disputed.

17          THE COURT:  Okay, let's recess till tomorrow.  Ten

18   o'clock tomorrow morning.

19          MR. BAZELON:  Thank you, your Honor.

20          (Recess from 4:12 p.m. to 4:25 p.m.)

21          (Back on the record.)

22          COURTROOM DEPUTY:  All rise.  Court is now in

23   session.

24          THE COURT:  This is a resumption of the recently

25   concluded hearing.

1          MR. BAZELON:  Your Honor, thank you for your

2     patience.  I think Mr. Rittinger and I have come to an

3     agreement which will avoid our having to impose on the Court

4     tomorrow.

5          THE COURT:  What might that turn out to be?

6          MR. RITTINGER:  That is, your Honor, that Mr.

7     Bazelon is accepting my representation that the 2008-2009 new

8     supplement was mailed to subscribers on Friday evening with

9     the shelving instructions that have been marked as an exhibit

10    and that they were mailed to the same subscriber list that

11    receive the March customer letter.

12         I am going to go back and check because we did not

13    -- I cannot represent with absolute certainty that the same

14    people who got the customer letter were the exact same people

15    who got the original supplement, but I'm going to check on

16    that and I'm going to give him a list of the subscribers,

17    which will be treated under an appropriate confidentiality

18    order.

19         MR. BAZELON:  But, your Honor, with the

20    understanding that I can supplement the record, under seal,

21    with respect to that list and that I will get it in the next

22    day or two.

23         THE COURT:  The problem that I see is that your

24    stipulation does not include a representation that the thing

25    was mailed out postage fully prepaid.

1          MR. RITTINGER:  Well, I can get that --

2          THE COURT:  You didn't say anything about the

3     postage prepaid.

4          MR. RITTINGER:  I can give that representation, your

5     Honor.

6          MR. BAZELON:  And just to be absolutely clear, this

7     representation by counsel is a representation by West.

8          MR. RITTINGER:  Oh, yes.

9          THE COURT:  Yes, yes, yes.  So that if it turns out

10    to be untrue, you can sue West some more.

11         Okay, I'll take it under advisement and dispose of

12    this motion shortly -- not today, but very soon.

13         MR. BAZELON:  Thank you, your Honor.

14         MR. RITTINGER:  Thank you, Judge.

15    (Hearing adjourned at 4:27 p.m.)

16

17

18

19              C E R T I F I C A T I O N

20         I certify that the foregoing is a correct transcript

21    from the electronic sound recording of the proceedings in the

22    above-entitled matter.

23    _____

24    Rita A. Dougherty - 4/22/09

25    DRUMMOND TRANSCRIPTION SERVICE