**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DAVID RUDOVSKY and | : CIVIL ACTION – |
| LEONARD SOSNOV, | : JURY TRIAL DEMANDED |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : NO. 09-CV-727 |
| | : |
| WEST PUBLISHING CORPORATION, | : |
| WEST SERVICES INC., AND | : |
| THOMSON LEGAL AND REGULATORY | : |
| INC. t/a THOMSON WEST | : |
| | : |
| Defendants. | : |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

Richard L. Bazelon, Esquire (I.D. No. 02505)
Noah H. Charlson, Esquire (I.D. No. 89210)
Michael F.R. Harris, Esquire (I.D. No. 56948)
BAZELON LESS & FELDMAN, P.C.
1515 Market Street, Suite 700
Philadelphia, PA 19102
(215) 568-1155

Dated: May 4, 2009

Dockets.Justia.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ................................................ 1

II.   BACKGROUND FACTS ............................................................................................... 3

      A.    FACTS ALLEGED IN THE AMENDED COMPLAINT ..................................... 3

      B.    THE MARCH 2009 LETTER AND THE "REPLACEMENT" 2008-09
            POCKET PART ................................................................................................. 8

III.  ARGUMENT ................................................................................................................ 11

      A.    LEGAL STANDARDS APPLICABLE TO DEFENDANTS' MOTION
            TO DISMISS .................................................................................................. 11

      B.    THIS 'LEGAL ACTION' DOES NOT 'ARISE UNDER' ANY
            CONTRACT, AND THEREFORE DOES NOT COME WITHIN THE
            VENUE SELECTION CLAUSE IN THE 2000 AGREEMENT ........................ 12

      C.    REGARDLESS OF WHETHER OR NOT THE 2000 AGREEMENT
            APPLIES TO THE 2008-2009 POCKET PART, THE DEFENDANTS'
            MOTION TO DISMISS MUST BE DENIED .................................................... 16

      D.    THE DEFENDANTS' REMAINING ARGUMENTS LACK MERIT .............. 19

            1.    The Defendants' Arguments About Counts II Through VI Merely
                  Rehash their Meritless Arguments About the 2000 Agreement .............. 19

            2.    Plaintiffs Have Pleaded Viable Claims Under the Lanham Act .............. 21

                  a)    False Endorsement ........................................................................ 21

                  b)    False Advertising ......................................................................... 23

IV.   CONCLUSION ............................................................................................................. 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544, 555 (2007)............................................................................................11

*Cheever v. Academy Chicago Ltd.,*
  685 F. Supp. 914 (S.D.N.Y. 1988).............................................................................15

*Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,*
  709 F.2d 190 (3d Cir. 1983), *cert. denied*, 464 U.S. 938 (1983)................................16

*Conley v. Gibson,*
  355 U.S. 41 (1957)......................................................................................................11

*Crescent International, Inc. v. Avatar Community, Inc.,*
  857 F.2d 943 (3d Cir. 1988)........................................................................................16

*Dardovitch v. Haltzman,*
  190 F.3d 125 (3d Cir. 1999)........................................................................................19

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
  539 U.S. 23, 123 S. Ct. 2041 (2003)..........................................................................18

*Doe v. Friendfinder Network, Inc.,*
  540 F. Supp. 2d 288 (D.N.H. 2008)............................................................................22

*Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc.,*
  267 F. Supp. 963 (W.D. Pa. 1967)
  *judgment aff'd* 395 F.2d 457 (3d Cir. 1968) ..............................................................23

*Facenda v. N.F.L. Films, Inc.,*
  542 F.3d 1007, 1019-20 (3d Cir. 2008) ........................................................21, 22, 23

*John Wyeth & Bro. Ltd. v. CIGNA International Corp.,*
  119 F.3d 1070 (3d Cir. 1997).........................................................................12, 13, 16

*Phillips v. Audio Active Ltd.,*
  494 F.3d 378 (2d Cir. 2007)................................................................................13, 14

*Phillips v. County of Allegheny,*
  515 F.3d 224 (3d Cir. 2008).........................................................................11, 12, 20

*Pinker v. Roche Holdings Ltd.*,
  292 F.3d 361 (3d Cir. 2002)....................................................................................12

*In re Rockefeller Center Prop., Inc. Sec. Litigation*,
  311 F.3d 198 (3d Cir. 2002).........................................................................3, 12, 20

*Yarmouth-Dion, Inc. v. D'ion Furs, Inc.*,
  835 F.2d 990 (2d Cir. 1987)...............................................................................22, 23

## STATE CASES

*Jordan v. SEI Corp.*,
  1996 WL 296540 (E.D. Pa. 1996) .......................................................................12, 13

*MDM Group Associates, Inc. v. Resort Quest Int'l, Inc.*,
  2007 WL 2909408, No. 06-cv-01518 at * 7 (D. Colo. Oct. 1, 2007) .........................18

*Wild v. Jungle Media Group*,
  2004 WL 834695 (E.D. Pa. 2004) ....................................................12, 13, 15, 16, 20

## FEDERAL STATUTES

15 U.S.C. § 1125(a)(1)..............................................................................................21, 23

Fed. R. Civ. P. 12(b)(6).................................................................................................20

## STATE STATUES

42 Pa. C.S.A. § 8316......................................................................................................2

## MISCELLANEOUS

5 J. Thomas McCarthy, *The Rights of Publicity and Privacy,* §5:31 (2009).....................22

Restatement (Second) of Contracts, § 206........................................................................19

iii

Plaintiffs David Rudovsky, Esquire ("Rudovsky") and Leonard Sosnov, Esquire ("Sosnov"), by and through their undersigned counsel, respectfully submit this memorandum of law in opposition to defendants' motion to dismiss the amended complaint.

## I.    <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

In 1988, plaintiffs David Rudovsky and Leonard Sosnov authored a treatise on Pennsylvania criminal law and procedure. Defendant West[1] published the treatise as part of its "Pennsylvania Practice" series. In 2001, the plaintiffs authored a second edition of the treatise, which was again published by West. From 1988-2007, except for the year of the second edition, the plaintiffs prepared (and West published) pocket parts for the treatise.

In 2008, West proposed to cut the plaintiffs' compensation for preparation of the annual pocket part in half. The plaintiffs declined. In December, 2008, without any prior notice to the plaintiffs, West published and sent to all subscribers to the treatise a document entitled "2008-2009 Pocket Part." West prominently displayed on the front page of the document that it was "by" David Rudovsky and Leonard Sosnov, and then in smaller print "The Publisher's Staff." West falsely represented, advertised and marketed the 2008-09 Pocket Part as having been authored by Rudovsky and Sosnov, and as having been endorsed and sponsored by Rudovsky and Sosnov.

Contrary to West's representations, Rudovsky and Sosnov had nothing to do with the preparation of the so-called "2008-2009 Pocket Part." To make matters worse, the publication was not a bona fide revision or update; it contained no new cases of any consequence, failed to

---

[1] Plaintiffs' use of the term "West" in this Memorandum refers individually and collectively to the defendants in this case.

1

address negative history in cases, failed to identify relevant rule changes, and generally failed to update or account for changes in law.

By these actions, West has misappropriated the names of David Rudovsky and Leonard Sosnov, and has severely damaged their reputations. To remedy West's wrongdoing, the plaintiffs bring this action for violations of the Lanham Act (Counts I and II), unauthorized use of the plaintiffs' names, under 42 Pa. C.S.A. § 8316 (Count III), defamation (Count IV), and invasion of privacy (Counts V and VI).

West's motion to dismiss the plaintiffs' amended complaint is based almost entirely on two theories. First, West argues that the plaintiffs' claims are barred by the terms of a 2000 agreement. Second, West argues that this case should be transferred to Minnesota pursuant to a venue selection clause in that same 2000 agreement.

West's arguments fail as a matter of law. First, even if the 2000 Agreement did apply to the 2008-09 Pocket Part, that Agreement does not give defendants *carte blanche* to use plaintiffs' names in connection with a sham publication that plaintiffs did not author, and which harms their good reputations. Second, the 2000 agreement was expressly superseded by a 2007 agreement between the plaintiffs and West – and, thus, does not apply to the 2008-09 pocket part at issue in this case. Third, the narrowly-worded venue selection clause – which refers only to actions "arising under" the 2000 agreement – does not apply here because none of the claims made by the plaintiffs is based upon the agreement or even sounds in contract. Finally, to the extent that there is any ambiguity created by the conflict between the 2000 and 2007 agreements, such ambiguity must be resolved against West both because (1) West drafted both agreements, and (2) at the motion to dismiss stage, the Court must draw all reasonable inferences in favor of the plaintiffs.

In addition to relying upon the 2000 agreement, West also half-heartedly argues that the individual counts of the amended complaint fail to state causes of action upon which relief can be granted. However, the arguments in this section of West's brief simply rehash West's earlier, meritless arguments about the 2000 Agreement. The plaintiffs have more than adequately pleaded all of the required elements of their claims. As the Court has already stated, "[o]n the basis of the evidence thus far available, it seems clear plaintiffs have established a right to some form of remedy – damages to reputation come to mind." April 23, 2009 Memorandum, p. 2. (A copy of the Court's April 23, 2009 Memorandum is attached as Exhibit A hereto).

Accordingly, the Court should deny the defendants' motion to dismiss the amended complaint.

## II.    BACKGROUND FACTS

### A.    FACTS ALLEGED IN THE AMENDED COMPLAINT

The following facts alleged in the amended complaint must be accepted as true for purposes of the defendants' motion to dismiss. *In re Rockefeller Center Prop., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002).

The plaintiffs in this case, David Rudovsky and Leonard Sosnov, are distinguished and long-standing members of the Bar of the Commonwealth of Pennsylvania, each residing in the Eastern District of Pennsylvania. Amended Complaint, ¶¶ 1-2. Their careers have each encompassed the practice of law, particularly, criminal law and constitutional law; teaching as faculty at law schools; and authoring legal books and articles. *Id.* Mr. Rudovsky and Mr. Sosnov both enjoy excellent reputations in the legal and academic communities. *Id.*

In 1988, the plaintiffs authored a book entitled "CRIMINAL PROCEDURE Law Commentary and Forms." *Id.*, ¶ 9. West published the book as part of its "Pennsylvania

Practice" Series. *Id.* A second edition was prepared by the plaintiffs and published by West in 2001. *Id.*, ¶ 10. From 1988 to 2007, except for the year of the second edition, the plaintiffs prepared a pocket part for this book which was published by West. *Id.*, ¶¶ 10-11. (The book, including the second edition and pocket parts for use through 2007-2008, is hereafter referred to as "the Treatise").

There are several hundred subscribers to the Treatise,[2] and many more users of the Treatise. *Id.*, ¶ 15. Subscribers include district attorneys' offices, public defenders' offices, courts, law schools, prisons, law libraries and many other multi-user organizations. *Id.*[3] Subscribers have individual written agreements with West under which they receive each year's pocket part unless the contract is cancelled by the subscriber. *Id.*, ¶ 20. The subscribers to and users of the Treatise rely on the pocket part to provide them with up-to-date citations and analysis of appellate cases and rule changes in Pennsylvania. *Id.*, ¶ 21. The Treatise is also available to certain subscribers to Westlaw, who have the Treatise included in their Westlaw subscription, and to members of each subscriber's organization. *Id.*, ¶ 17.

In their preparation of the pocket part for the book each year, the plaintiffs reviewed all of the appellate opinions on criminal law and procedure in the Pennsylvania courts, and all changes to the Pennsylvania Rules of Criminal Procedure, Rules of Appellate Procedure, and Juvenile Court Rules. *Id.*, ¶ 12. The plaintiffs included in each pocket part approximately 100 to 150 new cases decided in the year following the previous pocket part, as well as rule changes and other legal developments. *Id.* The pocket parts contained revisions of text and commentary where warranted by new developments. *Id.* The pocket parts also contained subsequent history

---

[2] In Paragraph 15 of the Amended Complaint, the plaintiffs estimated that there were between 500 and 1000 subscribers to the Treatise. The subscriber list (submitted to the Court under seal) indicates that there were in fact several hundred subscribers, although fewer than 500.

[3] The subscriber list makes it clear that the vast majority of subscribers were just these sorts of large organizations.

of cases previously cited in earlier pocket parts. *Id.* To the best of plaintiffs' knowledge, their manuscripts for the pocket parts were accepted each year without substantive change. *Id.*, ¶ 13.

In 2008, plaintiffs and West were unable to agree on financial terms for Plaintiffs to prepare a pocket part to the Treatise for 2008-2009. *Id.*, ¶ 18.[4] In December, 2008, without any prior notice to Plaintiffs, West published a document entitled "2008-2009 Pocket Part." *Id.*, ¶ 19. West prominently displayed on the front page of the document that it was "by" David Rudovsky and Leonard Sosnov, and then in smaller print "The Publisher's Staff." *Id.* (A copy of the front page of the so-called "2008-2009 Pocket Part" is attached hereto as Exhibit "B").

The "2008-09 Pocket Part" was sent by West to all subscribers to the Treatise under the terms of the subscribers' agreements with West, which required them to accept and pay for the pocket part on an annual basis, subject to termination of the agreement, and was also sent to any new purchasers of the Treatise. *Id.*, ¶ 20.

While the defendants attempt to dismiss the parties' dispute over the so-called "2008-09 Pocket Part" as mere "editorial dissatisfaction" (Def. Mem., p. 2), the facts paint a far more disturbing picture. Contrary to the defendants' representations, Rudovsky and Sosnov had nothing to do with the preparation of the "2008-2009 Pocket Part." *Id.*, ¶ 23. Furthermore, the publication was not a bona fide revision or update; it contained no new cases of any consequence, failed to address negative history in cases, failed to identify relevant rule changes, and generally failed to update or account for changes in law. *Id.*, ¶¶ 25-30. For example, while the prior pocket parts that Rudovsky and Sosnov had prepared typically included citations to between 100 and 150 new cases decided since the prior version was published, the "2008-2009

---

[4] As Mr. Rudovsky testified at the April 14, 2009 hearing on plaintiffs' motion for a preliminary injunction, West previously had paid $5000 to each of the plaintiffs for preparation of an annual pocket part. In 2008, however, West cut its offer in half, saying that it would pay only $2500 to each of the plaintiffs for preparation of the 2008-09 pocket part.

Pocket Part" contained only three (3) new cases that were not cited in the 2007-08 Pocket Part. *Id.*, ¶¶ 12, 25.

In addition, the "2008-2009 Pocket Part" failed to include a number of cases in which the Pennsylvania Supreme Court reversed or vacated lower court judgments. *Id.*, ¶ 26. The "2008-09 Pocket Part" also failed to contain any subsequent history with respect to other actions by the Pennsylvania Supreme Court in the period following preparation of the 2007-2008 pocket part. *Id.*, ¶ 27. In addition, the "2008-2009 Pocket Part" failed to reflect relevant changes to pertinent rule changes. *Id.*, ¶ 28.[5]

As the Court wrote in its April 23, 2009 Memorandum:

> Thus, although Plaintiffs had no role in authoring the pocket part, defendant West made it appear that they had indeed authored the pocket part, with aid from members of the publisher's staff. To make matters worse, the quality of that particular pocket part was not up to standard. Few, if any, relevant court decisions were included in the publication; and the reader was not informed that some cases cited in earlier volumes had since been reversed or modified.

April 23, 2009 Memorandum, p. 2. (Exhibit A hereto).

In sum, the "2008-2009 Pocket Part," in being represented as an update to the Treatise, was a sham, which West falsely attributed to Rudovsky and Sosnov. *Id.* Any reasonably competent legal author would have included reference to, and discussion of, new developments in an annual pocket part to the Treatise, and the legal community would have expected, and did expect, such developments to be addressed in the 2008-09 Pocket Part. *Id.*, ¶ 29. Indeed, it is precisely the point of a pocket part to update the readers of the Treatise on relevant legal developments since the publication of the prior pocket part. *Id.*

---

[5] Significantly, the defendants have never disputed any of these facts. Indeed, the defendants have conceded that it would be "disingenuous" for them to "say that we are proud of the supplement," and that "[i]t didn't measure up to what our standards are." *See* April 14, 2009 transcript, p. 10. (A copy of the transcript of excerpts from the April 14, 2009 hearing is attached as Exhibit C hereto).

West misrepresented the nature, characteristics, and/or qualities of the "2008-09 Pocket Part," and sold the "2008-09 Pocket Part" to many subscribers based on these misrepresentations. *Id.*, ¶ 31. West falsely represented, advertised and marketed the 2008-09 Pocket Part as having been authored by Rudovsky and Sosnov, and as having been endorsed and sponsored by Rudovsky and Sosnov as well recognized and highly regarded experts in Pennsylvania in criminal law and criminal procedure. *Id.*, ¶ 32.

The foregoing misrepresentations and concealments by West were deliberate and intentional, done by West for the purpose of selling the "2008-09 Pocket Part" to subscribers and potential subscribers under false pretenses, including particularly that the publication had been authored and prepared by the plaintiffs and that it incorporated relevant changes and developments in the law since the preparation of the 2007-2008 pocket part. *Id.*, ¶ 39.

In addition, West operates other information platforms (including the Westlaw on-line database) which include the Treatise. *Id.*, ¶ 41. West represented on these information platforms that the Treatise had been updated and revised and was therefore current, and that this updating and revision had been done by Rudovsky and Sosnov. *Id.* For example, each individual section of the Treatise that appears on Westlaw in the "PAPRAC - CPFC" database (the database dedicated to the Treatise), read as follows:

West's(R) Pennsylvania Practice Series TM
Current through the 2008 Update

Criminal Procedure
David Rudovsky, Leonard Sosnov [Footnotes omitted].

*Id.* Thus, the Westlaw version of the Treatise likewise represented to the legal community that plaintiffs were responsible for updating the Treatise to be a current statement of the law. *Id.* Moreover, the Westlaw version of the Treatise did not even contain the authorial reference to

"The Publisher's Staff" that appeared on the 2008-09 Pocket Part. *Id.* As of the filing date of even the Amended Complaint in this case, Westlaw, and, upon information and belief, West's other electronic information platforms, contained virtually no updating after the preparation of the 2007-2008 pocket part in the summer of 2007. *Id.*

> **B.  THE MARCH 2009 LETTER AND THE "REPLACEMENT" 2008-09 POCKET PART**

As the Court is aware from the preliminary injunction hearing, the defendants sent a letter to subscribers to the Treatise in March 2009. (A copy of the March 2009 letter is attached as Exhibit D hereto). The March 2009 letter did not remediate the harm caused to Rudovsky, Sosnov, subscribers and users by West's publication of the sham pocket part and its wrongful attribution to Rudovsky and Sosnov for two basic reasons. First, the letter will not reach many, and probably most, of the people who use the pocket part. Second, the letter was grossly inadequate in notifying anyone of the absence of supplementation or updating of the pocket part.

For each subscriber to the Treatise, the March 2009 letter presumably went to a person in the offices of the subscriber. Many subscribers, however, are multi-user subscribers, such as public defender offices, district attorney offices, courts, law schools, and prisons, where the Treatise is in a library. *See* Declaration of David Rudovsky, attached hereto as Exhibit "E", at ¶ 10. The 2008-09 pocket part was presumably placed in the Treatise of each subscriber, at the urging of West, when it was sent to subscribers in December 2008. Individual district attorneys, defenders, professors, law students, judges, law clerks and inmates who use the Treatise are not likely to have seen the letter. Accordingly, they will not have had notice that the attribution of the sham pocket part to Rudovsky and Sosnov was an outright misrepresentation.

Moreover, West's description of the 2008-09 Pocket Part, in the March 2009 letter, did not provide anyone with notice that the pocket part was a sham. The statement that not "all"

changes in the law have been included was disingenuous, and only served to conceal the absence of any minimal attempt to supplement or update the Treatise. (*See* March 2009 Letter, Ex. "D" at ¶ 3.)

The only other acknowledgement in the March 2009 letter that the "2008-09 Pocket Part" was deficient was the statement that "all citations should be checked for later developments." (*Id.*). This statement did not reflect that between 100 and 150 cases in the year following the preparation of the 2007-08 supplement, which should have been included in the 2008-09 pocket part, were not included, or that statutory and rule changes were not included. Nor did it expressly warn that negative case histories were not included. Subscribers were not warned that they had been sold a worthless product, falsely attributed to Rudovsky and Sosnov, the use of which could cause substantial harm to the user, his client, and/or a court. Moreover, some new cases will not be revealed simply by "Shepardizing" or "Key Citing" earlier citations, since they make entirely new legal pronouncements that do not necessarily reverse or impact on previous cases. Finally, the two sentences in the March 2009 letter, taken together, strongly suggested that the absence of updating on a few citations was the only problem. Accordingly, it is very unlikely that any subscriber would take steps to make sure that users of the Treatise know about the letter or its contents.

Finally, with respect to use of the Treatise on Westlaw, the March 2009 letter said that a notice would be included in the "scope" section of Westlaw's PAPRACE-CPFC database for the Treatise (the "Database"), to the extent that "the database on Westlaw is current through the 2007-2008 edition." The "Scope" section, however, is not viewable by Westlaw users accessing the Database unless they specifically seek out the "Scope" section by clicking on a particular icon in the search field for the Database. Most Westlaw users rarely, if ever, view the "Scope"

information of any database, including the Database.  Moreover, the disclaimer "current through the 2007-2008 edition" did not adequately convey that the last update was prepared in June 2007, and that the usual, and expected, annual update in 2008 was not done.

The Court aptly described some of the deficiencies in the March 2009 letter during the preliminary injunction hearing:

> THE COURT:  Part of the problem, of course, is that what you consider corrective action is extremely ambiguous and impossible to understand, as well as ungrammatical.
>
> This letter says, "Dear Criminal Procedure Law, Commentary and Forms, Pennsylvania Practice Subscriber," which seems like a strange salutation.  Then it says, "In December, 2008, our records indicate," well, for heaven's sake, that's not what you meant to say, is it?  Then it says, "The book and the prior pocket parts was authored by David Rudovsky and Leonard Sosnov.  We wish to bring to your attention the following."
>
> And the fourth paragraph – third paragraph, whatever it is, "After thorough review we've determined that the 2008-2009 pocket part does not reflect all changes in the law that have occurred since the prior year's update."  That's an understatement.  "Due to this, all citations should be checked for later developments."  What the heck does that mean?  Just don't rely on what we said?
>
> And the final paragraph, "We are in the process of preparing a new 2009 pocket part which will be shipped to you free of charge.  If you are not satisfied with the information provided, please contact Customer Service, and reference this letter to receive a credit for the 2008-2009 pocket part."  What does that mean?  It doesn't say anything about getting your money back, does it?

April 14, 2009 transcript, pp. 28-29 (Exhibit C hereto).

Further, as described at the preliminary injunction hearing, the defendants created and mailed to subscribers a "replacement" 2008-09 pocket part after the filing of the amended complaint.   However, for the reasons that plaintiffs outlined at that hearing, the replacement

pocket part also fails to cure the harm caused by the original, sham 2008-09 pocket part. As an initial matter, West has made no showing that the "replacement" pocket part was sent to all subscribers that had previously received the sham pocket part.

In addition, as Mr. Rudovsky testified at the hearing, the "replacement" pocket part contains some of the same errors as the previous, sham pocket part.[6] Although West removed the plaintiffs' names from the cover of the "replacement" pocket part, however, it refused to send a letter to subscribers informing them that the plaintiffs had no part in the preparation of the "replacement" pocket part.

Finally, although the defendants included "shelving instructions" with the "replacement" pocket part, that document does not reflect the fact that Mr. Rudovsky and Mr. Sosnov had no role in creating the "replacement" pocket part. Nor is there any indication in either the cover letter or the "shelving instructions" that the subscriber can get a refund if he or she so wishes.

## III. ARGUMENT

### A. LEGAL STANDARDS APPLICABLE TO DEFENDANTS' MOTION TO DISMISS

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). When considering a motion to dismiss for failure to state a claim upon which relief can be granted, courts must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*,

---

[6] Mr. Rudovsky noted that he had only been able to conduct a very cursory review of the "replacement" pocket part at the time, because he had not received the manuscript until the day before the preliminary injunction hearing.

292 F.3d 361, 374 n. 7 (3d Cir. 2002). The Court is "required to accept all well pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of the non-moving party." *In re Rockefeller Center Prop., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir.2002) (citations omitted). "The inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." *Id.* (citation omitted).

### B. THIS 'LEGAL ACTION' DOES NOT 'ARISE UNDER' ANY CONTRACT, AND THEREFORE DOES NOT COME WITHIN THE VENUE SELECTION CLAUSE IN THE 2000 AGREEMENT

The defendants argue that this case should be transferred to Minnesota pursuant to a venue selection clause in the 2000 Agreement. However, even if one were to assume that the 2000 Agreement applied to the purported 2008-2009 pocket part, the venue selection clause would not support transfer. The defendants fail to take into account the very narrow wording of this clause, and do not cite the relevant authority. The venue clause is limited to "any legal action arising under this Agreement," and ***none*** of the claims made by the plaintiffs is based upon the 2000 Agreement or even sounds in contract.

Most critically, defendants fail to cite the Third Circuit's principal discussion of this issue, a 1997 opinion written by then-Judge Alito in *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070 (3d Cir. 1997), and likewise fail to cite the only case within this Circuit to decide the application of a venue selection clause to non-contractual claims where the clause applies to claims that 'arise under' the contract, *i.e.*, *Wild v. Jungle Media Group*, 2004 WL 834695 (E.D. Pa. 2004) (Yohn, J.).[7] As explained below, *Wyeth*, *Wild* and additional case law

---

[7] Instead, defendants cite to footnote 10 of an earlier decision by Judge Yohn, *Jordan v. SEI Corp.*, 1996 WL 296540 (E.D. Pa. 1996) (*see* Def. Mem. at 9), which makes clear that the parties in that case never briefed the issue of whether plaintiff's tort claims were "contract-related." In any event, *Jordan* has effectively been superseded by

12

from this and other Circuits make clear that the venue selection clause cannot apply to the plaintiffs' claims in this lawsuit.

The 2000 Agreement's venue selection clause is expressly limited to "legal actions arising under the Agreement." Although it ultimately enforced the venue provision at issue due to its broad language – "any dispute arising under or out of or in relation to this Agreement" – (which is more expansive than the language in the 2000 Agreement), the Third Circuit concluded in *Wyeth* that courts in this Circuit should read forum selection clauses with 'arising under' or 'arising out of' provisions more narrowly than those with 'arising in relation to' or 'related to' language. *Id.* at 1074-75 ("the phrase 'arising in relation to' is broader than [the phrase] 'arising under'"). The Second Circuit has recently followed this reasoning. "To 'arise out of' means 'to originate from a specified source,' . . . and generally indicates a causal connection." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 389 (2d Cir. 2007) (citing dictionary and case law). There is no such connection here. The Second Circuit further noted that "[w]e do not understand the words 'arise out of' as encompassing all claims that have some possible relationship with the contract, including claims that only 'relate to,' be 'associated with,' or 'arise in connection with' the contract." *Id.*

Similarly, the Third Circuit's opinion in *Wyeth* makes clear that forum selection clauses which contain language applying to parties' 'disputes' or 'any dispute' must be interpreted more broadly than provisions applying to 'claims.' *Wyeth*, 119 F.3d at 1074. The venue selection clause at issue here does *not* apply to 'disputes' or 'any dispute' between the parties. Instead, it states only that "[a]ny **legal action** arising under this Agreement **will be brought**" in Minnesota.

---

Judge Yohn's subsequent decision in *Wild*, which is directly on point here. *Wild* was itself guided by an intervening decision by the Court of Appeals for the Third Circuit in *Wyeth*.

*See* 2000 Agreement, art. 11.B (emphasis added).[8]  A "legal action" that is "brought" is the same thing as a "claim."  The narrow terms "legal action" and "claim" denote what is asserted by the plaintiff.  Unlike the broader term "dispute," they do not encompass matters raised solely as a defense to the plaintiff's assertions.  The "legal action" in this case – *i.e.*, the claims brought by Rudovsky and Sosnov against the defendants – consists of six Counts, none of which arise under the Agreement(s).

The recent Second Circuit decision in *Phillips* is directly on point.  In that case, the parties entered into a recording contract whereby the plaintiff agreed to create certain songs, and the defendant agreed to produce an album of the songs and to pay the plaintiff royalties from sales of the album.  A forum selection clause in the recording contract stated that "any legal proceedings that may arise out of it are to be brought in England."  *Phillips*, 494 F.3d at 382.  The defendant released the album as planned, but then also released a second album containing additional songs created by the plaintiff.  The plaintiff, claiming that the defendant had no rights to the songs on the second album, asserted causes of action for breach of the recording contract, copyright infringement, unjust enrichment, and unfair competition**.**

There was no dispute that the plaintiff's breach of contract claim was subject to the venue provision.  However, the Second Circuit held that the copyright claims were not subject to the venue selection clause:  "[b]ecause the recording contract is only relevant as a defense in this suit, we cannot say that Phillips' copyright claims originate from, and therefore 'arise out of,' the contract."  *Id*. at 391.  The Court also held that the plaintiff's "state law claims d[id] not originate from the recording contract," and therefore were not subject to the venue provision.  *Id*. at 392.

---

[8] A copy of the 2000 Agreement is attached as Exhibit B to the Declaration of James F. Rittinger, submitted by the defendants in support of their motion.

14

Accordingly, the Second Circuit transferred the contract claim, but denied the motion to transfer as to all of the other claims. *Id*. at 393.

In the present case, none of plaintiffs' claims assert contractual claims under ***any*** agreement, and therefore none of the claims can be subject to the venue clause. *See Cheever v. Academy Chicago Ltd.*, 685 F. Supp. 914, 917 (S.D.N.Y. 1988) (forum selection clause did not apply because plaintiff was not "attempting to assert contractual rights arising from that agreement").

In *Wild v. Jungle Media Group*, 2004 WL 834695 (E.D. Pa. 2004), Judge Yohn observed that "[t]he Third Circuit has not directly addressed the application of a forum selection clause to non-contractual claims where the language of the clause governs claims that 'arise under' the contract and where the plaintiff d[oes] not have contractual claims." *Id.* at * 8. *Wild* is the first, and perhaps the only, case from within this Circuit to decide the applicability of a forum selection clause which contains identical language to the provision at issue here. In *Wild*, the plaintiff brought claims for, *inter alia*, tortious interference with prospective contract, alleging that the defendants falsely claimed to a third party that they had the exclusive right to use the plaintiff's literary work. *Id.* at ** 3-4. The defendants moved to dismiss or to transfer venue due to the parties' forum selection clause, which stated that claims "arising under" the agreement "must be brought" in New York courts. *Id.* at * 7. The Court denied defendants' motions, finding that plaintiff's claim for tortious interference with contract did not "arise under" the contract and that the narrowly worded forum selection clause at issue had "limited force." *Id.* at * 8.

The defendants in *Wild* asserted defenses very similar to those at issue here and, thus, *Wild* is persuasive authority. First, the defendants argued that their conduct was privileged due

to a provision in the underlying contract that gave them the exclusive right to use the work in its original form. Second, the defendants argued that the above provision also prevented the plaintiff from using the work in a different form. *See id.* at ** 3-4. Accordingly, defendants contended that their actions were privileged because of their contract with plaintiff. Judge Yohn held that defendants' reliance on the contract did not bring the tortious interference claim within the venue selection clause.

Purportedly in support of their venue arguments, the defendants cite to *Crescent Int'l, Inc. v. Avatar Cmty., Inc.*, 857 F.2d 943 (3d Cir. 1988) and to *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190 (3d Cir. 1983), *cert. denied*, 464 U.S. 938 (1983). *See* Def. Mem., at 9-10. The Third Circuit more recently has cast doubt on the reasoning of these cases, however, by noting their different venue selection language and disavowing any reliance on those cases when construing forum selection clauses "contain[ing] the phrase 'arising in relation to' or something similar." *See Wyeth*, 119 F.3d at 1075-76 and n.4. Likewise, Judge Yohn distinguished *Crescent* and *Coastal*, noting that those cases "raised contract claims in addition to asserting tort claims," whereas the "essence of plaintiff's claims [in *Wild*] [wa]s tortious." 2004 WL 834695, at * 8. This reasoning applies equally to the instant case.

Accordingly, even assuming that the 2000 Agreement applies to the purported 2008-2009 pocket part, the venue selection clause does not apply to the claims in this case.

### C. REGARDLESS OF WHETHER OR NOT THE 2000 AGREEMENT APPLIES TO THE 2008-2009 POCKET PART, THE DEFENDANTS' MOTION TO DISMISS MUST BE DENIED

The defendants' motion to dismiss is based almost entirely on the 2000 Agreement. The defendants argue that the 2000 Agreement immunizes them from liability, because it gave West

"the contractual right" to defame the plaintiffs by falsely attributing the sham "2008-09 Pocket Part" to the plaintiffs. As the defendants state in their memorandum of law:

> plaintiffs' claim for defamation (Count IV) is devoid of merit because, among other things, it is based upon the allegation that "the 2008-09 Pocket Part constitutes a false statement that the Plaintiffs authored the publication" (Am. Compl. ¶ 87), which, as stated above, West had the contractual right to do.

Def. Mem., p. 2.

The Court aptly summarized the gist of the defendants' argument at the April 14, 2009 hearing on the plaintiffs' motion for a preliminary injunction:

> THE COURT: What does the 2000 agreement say that helps you?
>
> MR. RITTINGER: Well, the 2000 agreement, first of all, it says that we can use their name or likeness.
>
> THE COURT: It gives you license to falsely attribute something to them?
>
> MR RITTINGER: No, it gives us the right to use their name on a supplement, even one that they don't prepare themselves, the actual supplement and I can read the language on that, your Honor.
>
> THE COURT: Well, you mean that it authorizes you to say that they prepared the supplement, when they didn't?

*See* April 14, 2009 transcript, pp. 12-13. (A copy of the transcript of excerpts from the April 14, 2009 hearing is attached as Exhibit C hereto).

As the Court recognized, the language of the 2000 Agreement simply does not support the defendants' arguments. The 2000 Agreement did not authorize West to falsely attribute authorship of the sham pocket part to the plaintiffs, and it surely did not authorize West to use the plaintiffs' names to facilitate the sale of a fraudulent product.[9]

---

[9] In addition, the only evidence (to the extent that the Court chooses to look outside the four corners of the document) directly contradicts the defendants' interpretation. Mr. Rudovsky testified at the April 14 hearing that he

Even if the 2000 Agreement had the extraordinary effect urged by the defendants – and, not surprisingly, it does not – the defendants' argument fails as a matter of law because the 2000 Agreement does not apply to this case. The 2000 Agreement does not apply to the purported 2008-2009 pocket part because, even assuming that it otherwise applied, it was superseded by a June 2007 agreement (the "2007 Agreement") between the plaintiffs and West. (A copy of the 2007 Agreement is attached hereto as Exhibit F).

The 2007 Agreement, paragraph 9H, provides in relevant part as follows:

> This is the entire agreement of the parties. All prior negotiations and representations are merged into this Agreement. This Agreement supersedes all previous agreements concerning the Work.

The first sentence of this integration clause states that the 2007 Agreement is now controlling for all purposes, *i.e.*, that it "is the entire agreement of the parties." The second sentence encompasses ***all*** prior negotiations and representations, regardless of whether those negotiations and representations led to the 2007 Agreement or to the 2000 Agreement.

With respect to the third sentence of the integration clause, "The Work," as defined in the 2007 Agreement, is the "Pennsylvania Practice Criminal Procedure 2007 Supplement." *See* 2007 Agreement, attached as Exhibit F, ¶ 1. According to defendants, the 2000 Agreement applied to all pocket parts, which would include the "2007 Supplement." Therefore, since the 2000 Agreement would otherwise apply to "the Work," it was superseded.

Defendants apparently contend that the 2007 Agreement supersedes the 2000 Agreement only as to "the Work," and nothing else. But the words "concerning the Work" come directly after, and therefore apply to, "previous agreements," so that it is the previous agreements which

---

never believed that the 2000 Agreement authorized West to falsely attribute the 2008-09 pocket part to the plaintiffs. And, as West failed to introduce any testimony whatsoever, there is no evidence supporting West's interpretation.

are superseded if they would otherwise apply to the Work. Had the defendants wished to achieve the result they now argue for, they could have easily so provided. For example, they could have drafted a provision with the following language: "With respect to the Work, this Agreement supersedes all previous agreements." This, however, is not what is provided by the language which Defendants chose.

Moreover, if one were to assume that the language used by the defendants is ambiguous (defendants' best case), any ambiguity should be resolved against defendants because they (or West Group—whoever that is) authored both the 2000 Agreement and the 2007 Agreement. *See*, *e.g.*, *Dardovitch v. Haltzman*, 190 F.3d 125, 141 (3d Cir. 1999) ("It cannot be doubted that 'in choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.'") (quoting Restatement (Second) of Contracts, § 206). In addition, at the motion to dismiss stage, the Court must construe the amended complaint in the light most favorable to the plaintiff, accept all well pleaded allegations in the amended complaint as true, and draw all reasonable inferences in favor of the plaintiffs. *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008); *In re Rockefeller Center Prop., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir.2002). In this context, the 2000 Agreement provides no basis whatsoever for dismissal.

    **D.**    **THE DEFENDANTS' REMAINING ARGUMENTS LACK MERIT**

        **1.**    **The Defendants' Arguments About Counts II Through VI Merely Rehash Their Meritless Arguments About the 2000 Agreement**

Sections I and II of the defendants' brief are based entirely on the 2000 Agreement. For the reasons discussed above, that agreement provides no support for the defendants' arguments, and no basis for dismissing the amended complaint.

19

In Section III of their brief, the defendants argue for dismissal pursuant to Fed. R. Civ. P. 12(b)(6), asserting that the plaintiffs have failed to state a cause of action upon which relief can be granted. However, with one exception (discussed below), the defendants' arguments are merely rehashes of their earlier, meritless arguments about the 2000 Agreement. In essence, the defendants argue – once again – that the 2000 Agreement gave the defendants unfettered discretion to use the plaintiffs' names in whatever manner they deemed fit.

Thus, according to the defendants: (1) Count II of the Amended Complaint fails because "consent to the use of one's name or likeness is a valid defense against false endorsement claims under the Lanham Act" (Def. Mem., p. 11), (2) Count III fails because West "possessed written permission" to use the plaintiffs' names (*id.*, p. 13); (3) Count IV fails because "a plaintiff's consent to a defendant's communication precludes any liability for defamation" (*id.*, p. 16); (4) Count V fails because "the Agreement grants West the right to use Plaintiffs' names . . . and to use and license to use Plaintiffs' names and likenesses with respect to revisions as West sees fit" (*id.*, p. 13); and (5) Count VI fails because, again, "the Agreement grants West the right to use plaintiffs' names . . . and to use and license to use plaintiffs' names and likenesses with respect to revisions and new editions as West sees fit" (*id.*, p. 14).

The defendants' arguments are frivolous. As the Court recognized at the preliminary injunction hearing, the 2000 Agreement did not give the defendants "license to falsely attribute" the sham 2008-09 pocket part to the plaintiffs. *See* April 14, 2009 transcript, p. 12 (Exhibit C hereto). The 2000 Agreement did not authorize the defendants "to say [the plaintiffs] prepared the supplement when they didn't." *Id.*, p. 13. And, the 2000 Agreement also did not give the defendants the right to misappropriate the plaintiffs' names, to defame the plaintiffs, or to commit any of the other wrongs set forth in the amended complaint.

### 2. Plaintiffs Have Pleaded Viable Claims Under the Lanham Act

Section 43(a) of the Lanham Act prohibits, *inter alia,* false endorsement and false advertising by imposing liability upon:

> Any person who, on or in connection with any goods or services, uses in commerce any word, term, name, . . . , or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . .

15 U.S.C. § 1125(a)(1).

Defendants argue that plaintiffs' Lanham Act claims for false endorsement and false advertising should be dismissed. As set forth below, plaintiffs have properly pleaded these claims under the Lanham Act and defendants' motion should be denied.

#### a) False Endorsement

First, the "2008-09 Pocket Part" falsely represented that plaintiffs Rudovsky and Sosnov endorse, sponsor, or are otherwise associated with the sham "2008-09 Pocket Part." Messages falsely implying that a person endorses or sponsors a particular product are actionable under the Lanham Act. *See, e.g., Facenda v. N.F.L. Films, Inc.,* 542 F.3d 1007, 1019-20 (3d Cir. 2008); *see generally* 5 J. Thomas McCarthy, *The Rights of Publicity and Privacy,* § 5:31 (2009)

(hereafter "McCarthy, *Publicity*").[10]  Moreover, a non-celebrity may assert a false endorsement claim, particularly if that non-celebrity is known in the relevant market.  *See* McCarthy, *Publicity,* § 5:33.  *See also, Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 306 (D.N.H. 2008).

To prove a false endorsement claim under Section 43(a)(1)(A) of the Lanham Act, "a plaintiff must show that: (1) its mark is legally protectable; (2) it owns the mark; and (3) the defendant's use of the mark to identify its goods or services is likely to create confusion concerning the plaintiff's sponsorship or approval of those goods or services."  *Facenda,* 542 F.3d at 1014.  Here, plaintiffs' personal names (their mark) are entitled to legal protection because they have acquired secondary meaning by virtue of their association with a high level of scholarship and expertise in the area of Pennsylvania criminal law and practice, and as providers of high quality legal services and legal scholarship in those areas, and because lawyers, judges, and other practitioners involved in the field of Pennsylvania criminal law and practice have come to associate the Treatise with plaintiffs**.**  *See* Am. Complt., ¶ 70; *see also, e.g., Yarmouth-Dion, Inc. v. D'ion Furs, Inc.,* 835 F.2d 990 (2d Cir. 1987); *Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc.,* 267 F. Supp. 963, 968 (W.D. Pa. 1967), *judgment aff'd,* 395 F.2d 457 (3d Cir. 1968), cert. denied, 393 U.S. 934 (1968).[11]  Plaintiffs obviously own their names.

The final factor, whether the "2008-09 Pocket Part" is likely to cause confusion concerning plaintiffs' sponsorship of that product, is a question of fact and inappropriate for

---

[10] False endorsement claims are not precluded by *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 123 S. Ct. 2041 (2003).  *See MDM Group Associates, Inc. v. Resort Quest Int'l, Inc.,* 2007 WL 2909408, No. 06-cv-01518 at * 7  (D. Colo. Oct. 1, 2007) (holding that false sponsorship allegations "are . . . separate from plaintiff's false designation of origin claims and are not governed by *Dastar*").

[11] These facts were further established by the testimony at the preliminary injunction hearing.  Mr. Frenkel testified that he wanted Mr. Rudovsky to write the original Treatise because Mr. Rudovsky was *the* person to use to assure quality and market acceptance.  Likewise, Mr. Yatvin testified that he subscribed to the Treatise largely because of how greatly respected Messrs. Rudovsky and Sosnov are in the field of Pennsylvania criminal law and procedure.

resolution at the motion to dismiss stage. *Facenda,* 542 F.3d at 1024 (holding that likelihood of confusion in false endorsement case is question of fact, and denying summary judgment). Here, plaintiffs have fully pleaded that the "2008-09 Pocket Part" is likely to create confusion. *See* Amended Complaint, ¶ 72-74.

In any event, defendants do not challenge whether the claim was pleaded properly, but instead resort to their refrain that defendants "possessed the right 'to use Authors' names in connection with the Work and upkeep of the work….'" (Def. Memo at 12). For the reasons stated above, this argument must be denied, inasmuch as whatever rights defendants do have with respect to plaintiffs' names, they clearly do not include the right to falsely represent to the public that plaintiffs sponsor a sham pocket part.

### b) *False Advertising*

Finally, defendants have moved to dismiss plaintiffs' claim for false advertising under Section 43(a) of the Lanham Act. The core of plaintiffs' false advertising claim is that defendants misrepresented the nature, characteristics, and/or qualities of the "2008-09 Pocket Part" by falsely representing that it constitutes a supplement, update, revision, improvement and/or amplification of the Treatise and/or the "2007-08 Pocket Part". Am. Compl., ¶¶ 63-64.

Defendants do not challenge whether plaintiffs have properly pleaded a false statement, and argue only that plaintiffs have not alleged that defendants made any specific advertising about the "2008-09 Pocket Part." Def. Memo at 15. However, it is clear that defendants sent literature to subscribers with the "2008-09 Pocket Part" which charged subscribers for the full cost of the pocket part, and, at the very least, contained the implied message that the enclosed publication, which was being offered for sale, was a *bona fide* supplement. *See* Invoice, attached

hereto as Exhibit G. Accordingly, plaintiffs have pleaded a proper Lanham Act claim, and defendants' motion should be denied.

## IV.    CONCLUSION

For all the foregoing reasons, defendants' motion to dismiss the amended complaint should be denied.

Respectfully submitted,


*s/ Noah H. Charlson*
Richard L. Bazelon, Esquire (I.D. No. 02505)
Noah H. Charlson, Esquire (I.D. No. 89210)
Michael F.R. Harris, Esquire (I.D. No. 56948)
BAZELON LESS & FELDMAN, P.C.
1515 Market Street, Suite 700
Philadelphia, PA  19102
(215) 568-1155
Email:  ncharlson@bazless.com

Attorneys for Plaintiffs,
David Rudovsky and Leonard Sosnov

Dated:  May 4, 2009

*CERTIFICATE OF SERVICE*

I hereby certify that on this 4th day of May, 2009, I served a true and correct copy of the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint upon the following counsel for defendants, as follows:

*via the Court's Electronic Case Filing system:*

Matthew J. Borger, Esquire
Klehr, Harrison, Harvey, Branzburg & Ellers LLP
260 South Broad Street
Philadelphia, PA 19102

*via electronic mail:*

James Rittinger, Esquire
Aaron Zeisler, Esquire
Satterlee Stephens Burke & Burke LLP
230 Park Avenue, Suite 1130
New York, NY 10169

 *s/ Noah H. Charlson*
Noah H. Charlson, Esquire