IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

DAVID RUDOVSKY, et al.      :   CIVIL ACTION
                            :   NO. 09-CV-727
                            :
          Plaintiffs        :
                            :
        vs.                 :   Philadelphia, Pennsylvania
                            :        April 14, 2009
WEST PUBLISHING CORPORATION, :
et at.                      :
                            :   TESTIMONY OF WITNESSES AT
          Defendants        :     PRELIMINARY INJUNCTION
                            :            HEARING
- - - - - - - - - - - - - - - -
                            - - -

BEFORE THE HONORABLE JOHN P. FULLAM
UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For the Plaintiffs:     RICHARD L. BAZELON, ESQUIRE
                        BAZELON, LESS & FELDMAN, P.C.
                        1515 Market Street, Suite 700
                        Philadelphia, Pennsylvania  19102

For the Defendants:     JAMES F. RITTINGER, ESQUIRE
                        SATTERLEE STEPHENS BURKE & BURKE
                        230 Park Avenue
                        New York, New York  10169




                        - - -


ESR Operator:           Dennis Taylor

                        - - -


TRANSCRIBED BY:    Drummond Transcription Service
                   Haddon Heights, New Jersey  08035

     Proceedings recorded by electronic sound recording,
     transcript produced by computer-aided transcription
     service.

1    (The proceedings held in open Courtroom 15A from 1:42

2    p.m. until 2:18 p.m. have been previously transcribed and are

3    filed under separate cover.)

4                              * * *

5    (In open court at 2:18 p.m.)

6    MR. BAZELON:  Yes, your Honor.

7    I'd like to call my first witness, Douglas Frenkel.

8    THE COURT:  You're going to have to call him louder,

9    because I don't think he heard you.  Oh, there --

10   MR. BAZELON:  Here he is.

11   THE COURT:  The record will note that the witness just

12   handed counsel his testimony in written form, apparently.

13   (Laughter.)

14   MR. FRENKEL:  Good afternoon, sir.

15   ESR OPERATOR:  Please raise your left hand -- please

16   place your left on the Bible and raise your right hand.

17   DOUGLAS FRENKEL, PLAINTIFF WITNESS, SWORN.

18   ESR OPERATOR:  Please state your name and spell your

19   last name, sir.

20   THE WITNESS:  Douglas Frenkel, F-r-e-n-k-e-l.

21   ESR OPERATOR:  Thank you.

22   MR. BAZELON:  With the Court's permission, I would

23   propose to mark Mr. Frenkel's CV as Plaintiff's Exhibit 1.

24   THE COURT:  Go right ahead.

25   MR. BAZELON:  Can I put a sticker on it or should I

1   leave this --

2               THE COURT:  Any -- any way you want to do it.

3               MR. BAZELON:  All right.  Thank you.

4               MR. RITTINGER:  Your Honor, could we have an offer of

5   proof as to what he's going to testify to, I don't know who he

6   is?

7               THE COURT:  I think it will be faster just to find

8   out.  Maybe, you can whisper what he -- what you're planning to

9   do with him.

10              (Discussion held off the record at 2:19 p.m.)

11              MR. RITTINGER:  Well, your Honor, I -- your Honor, I

12  have no idea what relevance he would have to a preliminary

13  injunction hearing.

14              THE COURT:  I don't know, let's find out.  Go ahead.

15                          DIRECT EXAMINATION

16  BY MR. BAZELON:

17  Q.   Mr. Frenkel, can you identify for us, please, what has been

18  marked as Plaintiff's Exhibit 1?

19              THE COURT:  That's his *curriculum vitae*, go ahead.

20              MR. BAZELON:  All right.

21  Q.   And did you, Mr. Frenkel, have a role in connection with

22  the West Practice Series and the origination of the West

23  Practice Series for Pennsylvania Law?

24  A.   I did.

25  Q.   And can you tell us about when you began to have some

1  involvement with respect to what came to be the West Practice

2  Series?

3  A.   It was -- it would have been in the mid-1980s.

4  Q.   What were you asked to do by West, if anything?

5          MR. RITTINGER:  Objection.

6          THE COURT:  Objection overruled.

7  A.   I was asked by a representative of West whether I could

8  assemble a team of practitioners in Pennsylvania to serve as

9  authors of a new series of form books with commentary that they

10  wanted to come out with in a variety of subject matter areas.

11  Q.   What did you -- and what was your response to West?

12          MR. RITTINGER:  Objection.

13          THE COURT:  I'll bet he accepted.

14          Let's -- he can go through this rapidly but these are

15  not disputed facts, I take it, so let's get moving.

16  A.   My response was after thinking about it a bit, that this is

17  something that I would be happy to try to do on their behalf and

18  I did that.

19  Q.   What -- why did you undertake this assignment?

20  A.   Well, for a few reasons --

21          MR. RITTINGER:  Objection.

22          THE COURT:  Let's find out, it will be faster.  It's a

23  waste of time, but let's waste as little time as possible.

24  A.   I took --

25          THE COURT:  Go ahead.

1    A.    -- I took on the assignment for several reasons.

2          First of all, I was a relatively new faculty member

3    and one of the institutional expectations on me was to

4    contribute to the development and improvement of the law in a

5    variety of ways.  And this was obviously something relevant to

6    -- to my work at the university.

7          Number two, I thought that what they wanted to do was

8    something that was needed.  They -- West -- had expressed a

9    desire to -- to do -- to put something out there on the market

10   that was better than what was out there at the time.

11         And I -- I said that I'd be interested in doing this

12   but only if this could be -- what I thought -- was a quality

13   combination, not only of forms but of text that would represent

14   the best thinking of practitioners in the field, because I -- if

15   I was going to be associated with this and put it on my CV,

16   that's -- that's the kind of project I wanted to be involved in.

17   Q.    Did you express your purpose as you've just described it to

18   West at the time?

19   A.    Directly, yes.

20   Q.    And did there come a time when you approached Professor

21   Rudovsky about the possibility that his -- his becoming an

22   author in the series?

23   A.    Yeah.

24         Once -- once we decided to go ahead with this, David

25   Rudovsky, in fact, was the first practitioner I approached as I

1    recall.

2    Q.    Why did you choose David Rudovsky?

3    A.    Well, criminal procedure was one of the nine or ten subject

4    matters that West wanted to cover in the series.  And I knew

5    David Rudovsky and, frankly, he was -- in my view -- the leading

6    practitioner of the quality that I was looking for statewide.

7           His name was very well known in both criminal defense

8    and prosecution circles.  I thought that he -- his name --

9    attached to a book like this would, frankly, be a good seller

10   because I thought both sides of -- of a criminal case would want

11   to know what David Rudovsky thought.

12          And I also thought -- and knew -- of his writing, that

13   he was a prolific author, he had -- I believe at the time --

14   done a book on prisoners' rights, if I recall correctly.

15          I had read -- I had read stuff that he has written in

16   a more academic context.

17          And, perhaps, most importantly, in combination with

18   all of these things, I knew he would do the job, if he said he

19   was going to do it, he would do it and he would bring the level

20   of quality I was looking for.

21   Q.    And did you ask Professor Rudovsky to take this on?

22   A.    I did.

23   Q.    And I take it, he responded affirmatively?

24   A.    Well, I don't recall specifically --

25          THE COURT:  I'm going to -- I'm going to --

1    A.   -- he obviously -- obviously undertook it and at some

2    point, he affiliated with Professor Sosnov.

3              MR. BAZELON:  I have no further questions, your Honor.

4              THE COURT:  I don't appreciate the waste of time.

5              Anything -- any questions?

6              MR. RITTINGER:  Just a couple, your Honor.

7              THE COURT:  Go ahead.

8                        CROSS-EXAMINATION

9    BY MR. RITTINGER:

10   Q.   First of all, this was in the 1980s, is that correct?

11   A.   That's correct.

12             THE COURT:  That's what he said.

13             MR. RITTINGER:  Right.

14   Q.   Has any -- has anyone complained to you at any time -- have

15   you heard anyone complain -- other than the plaintiffs and their

16   attorney about the quality of the supplement, the 2008/2009

17   supplement?

18             MR. BAZELON:  Objection, your Honor, no foundation.

19             THE COURT:  Well, that's not proper cross-examination,

20   but we'll let it in.  Go ahead.

21   A.   No, no one has.

22             (Pause at 2:25 p.m.)

23             MR. RITTINGER:  No -- no further questions, your

24   Honor.

25             THE COURT:  You may step down.

1          I take it you haven't made a practice of consulting

2    with the practicing Bar as to whether they approve of this or

3    not?

4          THE WITNESS:  Approved of?

5          THE COURT:  The supplements?

6          THE WITNESS:  Ah, well --

7          THE COURT:  Have -- have you discussed with any

8    practicing lawyers in Philadelphia whether the supplements are

9    good or bad?

10         THE WITNESS:  Ah, I can't speak to the supplements,

11   Judge, but the books have been very well received.

12         THE COURT:  Well, I know but not the supplements?

13         THE WITNESS:  I can't -- I can't say I have.

14         THE COURT:  Didn't think so.  Go ahead.

15         You may step down.

16         THE WITNESS:  Thank you.

17         (Witness excused at 2:26 p.m.)

18         MR. BAZELON:  Professor Rudovsky.

19         ESR OPERATOR:  Good afternoon, sir.

20         DAVID RUDOVSKY, PLAINTIFF, SWORN.

21         ESR OPERATOR:  Thank you, sir.

22         Please spell your name -- state your name -- and spell

23   your last name, sir.

24         THE WITNESS:  David Rudovsky, R-u-d-o-v-s-k-y.

25         ESR OPERATOR:  Thank you.

1           MR. BAZELON:  Your Honor, Plaintiff's Exhibit 2 is the

2     CV for Professor Rudovsky.

3           THE COURT:  And we will assume that if he were asked

4     questions, he would repeat what's in it --

5           MR. BAZELON:  Yes.

6           THE COURT:  -- and that it would all be true.  Go

7     ahead.

8           I'm particularly interested in irreparable immediate

9     harm.

10          (Pause at 2:27 p.m.)

11                        DIRECT EXAMINATION

12    BY MR. BAZELON:

13    Q.   Mr. Rudovsky, I'm going to -- Dr. Rudovsky -- I'm going to

14    ask you the -- to turn your attention to the 2008/2009 packet

15    part that was sent out by West in December of 2008.

16          Can you tell the Court when you first saw this

17    document?

18    A.   It was sent to my office some time in December of 2008.

19    Q.   And did you -- how soon after that did you look through the

20    document?

21    A.   Within a couple of days, I looked at it just to review it

22    to see what it was.

23          The background was that we had told West we were not

24    in a position to prepare that pocket part after having done it

25    for some eighteen years.

1      And it was sent to us, anyway and I looked at it

2  within a couple of days of receiving it.

3  Q.   What if anything did you learn about deficiencies in this

4  pocket part?

5  A.   Well, what I did -- and this is what I learned -- I looked

6  at it -- I -- I was just curious to see what kind of job they

7  had done.

8      So, I looked at several sections where I knew there

9  had been a fair amount of activity by the Pennsylvania courts,

10  post-conviction, sentencing, appeals were three I think I looked

11  at, because I was aware of certain cases that had come down

12  which surely should have been included in any new supplement or

13  packet part and when I looked, they weren't there.  So, I found

14  that somewhat curious and unsettling.

15      I then -- what I did was looked at the table of cases

16  in the back just to kind of eyeball it to see if there were any

17  cases from 2008, because normally on the cycle we prepare our

18  pocket parts, you would have 2007 and 2008 cases.

19      I looked at all those cases and I -- I think -- I

20  didn't see a single case cited with a 2008 date, which meant to

21  me they had missed or had decided not to include scores of cases

22  decided by the appellate courts relating to the material in the

23  book.

24      I then went a little bit further and -- and kind of

25  compared the table of cases from the 2007 pocket part, which Mr.

1   Sosnov and I had prepared and compared it to the table of cases

2   for the 2008/2009 pocket part.

3           And on my first review, I think I found one or two

4   additional cases, that is of the hundreds of cases that we had

5   already included, it appeared to me that there were -- on first

6   glance -- one or two additional cases that had been included.

7           It turned out on further review, we were able to

8   determine that all they had included were three new cases, none

9   of them particularly significant, two in a string cite and one

10  with a parenthetical description, it didn't -- it didn't add

11  anything to the -- the pocket part.

12          And then, I and Mr. Sosnov also had occasion to look

13  at cases where we knew that the Pennsylvania Supreme Court had

14  actually reversed lower courts, either, Common Pleas Courts or

15  the Superior Court to determine whether this pocket part would

16  include -- what we call -- that negative case history.  That --

17  that there had actually been reversals by the highest court in

18  Pennsylvania and we looked at a number of cases that we were

19  aware of in which those reversals had occurred and none of them

20  were in the book.

21          And -- and, essentially, what I found was that what

22  had happened -- in our view -- was that the pocket part that was

23  mailed out called the 2008/2009 pocket part, was almost verbatim

24  -- again, with a couple of added cases and a couple of citations

25  to rules -- but virtually verbatim which had been sent out under

1    our names a year and a half previously or a year previously

2    which we had done.

3           It -- it had, basically, they'd put a different cover

4    on it, 2008/2009 instead of 2007/2008 and -- and that's what

5    they did.  Very upsetting.

6    Q.   Professor Rudovsky, when you and Professor Sosnov prepared

7    an annual pocket part -- which I take it you had done for a

8    number of years before 2007/2008, is that correct?

9    A.   Yes, sir.

10   Q.   Approximately, how many new cases each year did you include

11   in the new pocket part?

12   A.   Finally, including -- we -- we included anywhere from a

13   hundred to a hundred and fifty, sometimes, more new cases.

14          We would read every case that was decided by the

15   appellate courts in Pennsylvania.  We read every case in this

16   field, decided by the U.S. Supreme Court and some selected

17   federal cases.

18          We followed rule changes as well, statutory changes as

19   well.  We did that during the year, we accumulated all of that.

20          And then, when we distilled it and added material to

21   the pocket part, our best estimation is that we added up to a

22   hundred and fifty new cases each year.

23          Some were just in a string cite, it gives another

24   authority for an established proposition.  Many were new -- new

25   principles of law or different principles of law, building on

1   what had happened before.  We would explain that in the pocket

2   part.

3           Some were questionable decisions in our mind, we would

4   say that.  Some left issues open, we would say that.

5           In other words, we'd try to bring the pocket part up

6   to date.

7   Q.   Now, Professor Rudovsky, can you identify for the Court,

8   the cases which were cited in the prior year -- 2007/2008 --

9   pocket part, that had been reversed by the Pennsylvania Supreme

10  Court in the succeeding year but were not shown as having been

11  reversed by the Supreme Court in the 2008/2009 pocket part?

12  A.   They -- I can't -- from memory, they are in the amended

13  complaint, I believe, we listed the --

14  Q.   Let me -- can I show you the amended complaint, Paragraph

15  26 and ask you if this refreshes your recollection?

16  A.   Yes.

17          MR. BAZELON:  May I approach, your Honor?

18          THE COURT:  Go right ahead.

19  A.   Yes, to my best recollection, these were the cases that on

20  our initial review, we found were not covered by the -- by the

21  2008/2009 pocket part where the Pennsylvania Supreme Court had

22  actually reversed decisions of the Superior Court or the Common

23  Pleas Court.

24          I should say, this was a sample, this was not an

25  exhaustive study.  Since then, we've found some additional ones,

1    but on -- on our first take on this -- and I think we made it

2    clear to -- to West -- this was a sample of cases in which they

3    did not advise the subscriber that cases they had previously

4    cited -- or we had previously cited -- had been overturned on

5    appeal.

6            THE COURT:  And how many cases were there?

7            THE WITNESS:  There were -- there were six of these

8    that -- I believe -- one, two, three, four -- actually, we -- we

9    had seven, because one was just noting than an allowance of an

10   appeal had been granted, it hadn't yet been ruled on but -- but

11   the Pennsylvania Supreme Court had granted a review.

12           So, there were six reversals and one cited in the

13   complaint where the Pennsylvania Supreme Court granted a review,

14   but it had yet decided the case.

15   Q.   And since that time, have you become aware of at least one

16   additional case that was cited in the 2007/2008 pocket part --

17   A.   Yes.

18   Q.   -- that was reversed in the succeeding year and not cited

19   for having been reversed in the 2008/2009 pocket part?

20   A.   Yes.  And -- yes, we did.

21           There's a case -- I'll give the citation --

22   Commonwealth versus Holmes, the citation is 933 Atlantic 2nd,

23   57, again, this was another case that had been previously cited

24   from the Superior Court.

25           The Supreme Court in 2007, October reversed in large

1   part the Superior Court.  This also was not included.

2          And I might add that in the new pocket part -- which

3   has just been published -- it's not referenced, either.  And so

4   we have it even with the new pocket part, we have a case from

5   the Pennsylvania Supreme Court reversing a Superior Court

6   decision, this new pocket part that was sent out over this

7   weekend makes no reference to it.

8          THE COURT:  And which court do you think was correct?

9          (Laughter.)

10         THE WITNESS:  I -- I refused to answer that question.

11         THE COURT:  Okay.

12         MR. RITTINGER:  Your Honor, I'm sorry, I missed that?

13   I -- I missed your comment, I'm sorry, your Honor.

14         THE COURT:  I just asked him which court was correct?

15         MR. RITTINGER:  Oh.

16         THE COURT:  It was a joke.

17   BY MR. BAZELON:

18   Q.   Professor Rudovsky, in addition to cases that were reversed

19   that had been cited in a prior pocket part, but the reversal had

20   taken place in the next year and were not referenced as such,

21   did you find that there were cases that had been cited in the

22   prior pocket part which had been affirmed by opinion of the

23   Pennsylvania Supreme Court in the succeeding year where -- where

24   that was not noted?

25   A.   Yeah.

1          I did and I just might as well, of the six cases that

2     had been reversed and were not included in the original pocket

3     part sent in December, one of them is a case called <u>Commonwealth</u>

4     <u>versus Leigh</u>, 935 Atlantic 2nd, 865, that too was not included

5     in the new pocket part, even though we had specifically advised

6     West of that fact.  They didn't even correct that in the new

7     pocket part.

8          To answer your question directly, we found two cases

9     in which the Pennsylvania Supreme Court granted a review and

10    affirmed the lower court -- so I'll give you both of those

11    citations -- the reasoning was somewhat different, the

12    Pennsylvania Supreme Court adopted its own reasoning in its

13    affirmance, but neither of those cases were cited in the 2008

14    pocket part and they're not in the new pocket part, either, the

15    pocket part that's just been sent out.

16         And I'll give you the two cases, one is <u>Commonwealth</u>

17    <u>versus States</u>, S-t-a-t-e-s, 938 Atlantic 2nd, 1016 and the other

18    is In the Interest of J period, E period, 937 Atlantic 2nd, 421.

19         As I say, both cases affirming the Superior Court --

20    using somewhat different reasoning but affirming -- but neither

21    Supreme Court case included in the 2008 pocket part that went

22    out or the most recent, the 2009 pocket part.

23         Now, I haven't had time to go through all -- you know

24    -- four hundred pages, but just on a cursory review between last

25    night and tonight, we have found four Supreme Court cases highly

1  pertinent to our work that are not included in what has just

2  been sent out to subscribers.

3          (Pause at 2:39 p.m.)

4  BY MR. BAZELON:

5  Q.   Why is it important, Professor Rudovsky, to cite a Supreme

6  Court of Pennsylvania affirmance, if all it's doing is affirming

7  the opinion below -- or the holding?

8          MR. RITTINGER:  Objection, your Honor.

9          THE COURT:  Objection overruled.

10  A.   I think two primary reasons.

11          Oftentimes, an appellate court even when they affirm

12  will adopt their own reasoning, it wouldn't be the affirmances

13  of the judge, you often have different kinds of reasoning,

14  different kinds of rationales.

15          The second one is more practical, that's the end of

16  the issue as far as Pennsylvania is concerned, the issue was

17  decided by the Superior Court, there's still an argument that

18  might get reversed.  I can't imagine a practitioner wouldn't

19  want to know that the Supreme Court has finally talked

20  authoritatively on a particular issue and that's why it's

21  important.

22          THE COURT:  You would agree that a practitioner might

23  even go so far as to Shepardize?

24          THE WITNESS:  And probably should Shepardize, your

25  Honor, that's correct.

1  BY MR. BAZELON:

2  Q.   Professor Rudovsky, you mentioned in your testimony rules

3  changes, can you tell us what you meant by that?

4  A.   Yes.

5       Well, I mean, the treatise, obviously, is -- concerns

6  Pennsylvania Criminal Procedure, a lot of that is governed by

7  Rules of Court.  Both the Pennsylvania Rules of Criminal

8  Procedure, there are Rules of Juvenile Procedure, there are

9  Rules of Appellate Procedure, sometimes, there are Rules of

10 Evidence that interrelate as well.  All of which we cover.

11 There are Rules of Habeas Corpus, we have a section -- we have a

12 chapter on federal habeas corpus litigation.

13      So, there are rules that govern all those areas and

14 what we've done over the years -- both in the main volume and in

15 the pocket part -- is to alert the reader to changes in those

16 rules.

17 Q.   And I take, Professor Rudovsky, that it's not just a --

18 that not referring to a reversal or a granting of a petition for

19 review, is not simply a matter of the citation, itself, but it

20 also affects the discussion that takes place within the text?

21 A.   Well, that's right.

22      I mean, the -- the Judge did say, you could always

23 Shepardize although I'm not sure why you'd need a treatise, you

24 could always take an original case and go from that.

25      What West wanted from us and what we set out to do

1    starting in 1991 when we first -- or 1990 -- when we first

2    published this book, is to give the practitioner, not just a

3    list of cases in each area but a discussion of those cases, what

4    the cases mean, how the law is developing, what issues are open,

5    what arguments could still be made, notwithstanding certain

6    decisions from both sides, prosecutor or defense.  And, indeed,

7    when you look at our pocket parts, we try to integrate that.

8           So, if a major case came down, we just wouldn't say,

9    the Supreme Court has decided this issue in X, we would then

10   explain what the Supreme Court did including all those other

11   factors that as a lawyer, you'd want to know, Shepardizing it,

12   wouldn't necessarily give you that.

13   Q.   What kind of feedback have you gotten over the years,

14   Professor Rudovsky, in connection with your authorship of this

15   treatise?

16          MR. RITTINGER:  Objection.

17          THE COURT:  Objection overruled.

18   A.   We've gotten comments, questions, feedback from a variety

19   of sources, I think the subscribed list includes defense

20   lawyers, prosecutors, judges, prison-law libraries, university-

21   law libraries and the like.

22          Leonard and I have fielded -- probably over the years

23   -- hundreds of -- of kind of inquiries or comments.  You talked

24   about this case, can you give me some more advice?  You know,

25   something like that, 'cause they'd pick something up in the

1    treatise.

2            I get letters from inmates all the time, who use this

3    as a reference book in *pro se* litigation.

4            I've had comments from prosecutors about a certain

5    issue.

6            So, when lawyers look at a particular issue,

7    sometimes, they comment on it, sometimes, they say, you did a

8    good job, that's a good analysis, other times, they just ask us

9    a question.

10           But there's -- there's kind of a constant --

11           THE COURT:  I think he wants you to brag about how

12   mostly they're favorable comments.

13           (Laughter.)

14           MR. BAZELON:  Thank you, Judge.

15   A.   I would say over the years, that -- that the comments have

16   been favorable, some are just inquiries but I -- I don't -- I

17   can say this thing, I've never gotten a negative comment in the

18   sense that this isn't up to par.

19           And I can also say that in eighteen years of producing

20   the -- our producing -- both the main volume and the pocket

21   part, we have never in eighteen years gotten a negative comment

22   from the West ever.  That is, everything we've sent in to my

23   knowledge, they've published.  They never come back and said,

24   substantively, you missed a case, you -- maybe, you ought to

25   consider this.  They've basically taken what we've sent in and

1    -- and published it.

2              (Pause at 2:44 p.m.)

3    BY MR. BAZELON:

4    Q.   Professor Rudovsky, what is the relief that you are asking

5    the Court to provide?

6    A.   Oh, wait a minute, could you -- I think the Judge has heard

7    that.

8              I -- I think we do want -- and it sounds like West is

9    agreeable on the West Law, that people who access this

10   electronically, ought to know that Ms. Sosnov and I are no

11   longer associated with the book.  We stopped our work as of 2000

12   -- 2007/2008 and any of the updates are being done by someone

13   else.

14             The other thing we're asking for and I think it's --

15   it's also important, is that current subscribers ought to know

16   not only that we are no longer associated with the publication

17   of the book, that it's being produced only by West -- you know

18   -- internally by -- by their own authors.  But they have a right

19   to the extent they've relied in this book because they have

20   confidence in the work that Mr. Sosnov and I have done, that

21   they have a right to return it and -- and not use it any more.

22             I mean, that's -- that I think is what is necessary at

23   this point, at least, that's what we're asking the Court to do.

24             (Pause at 2:46 p.m.)

25   Q.   Professor Rudovsky, do you feel that the sale of the

1   2008/2009 pocket part on or about December of 2008, was done

2   with, either -- well, it was done with an expression by West

3   that it was endorsed by you?

4           MR. RITTINGER:  Objection.

5           THE COURT:  Objection overruled.  I don't know what he

6   means.

7           MR. RITTINGER:  I don't understand it --

8           THE COURT:  I don't, either --

9           MR. RITTINGER:  -- I'm sorry, your Honor, I -- I --

10          THE COURT:  -- that makes two of us, maybe, the answer

11  will clarify it.

12          MR. RITTINGER:  Right.

13  A.   Well, it -- it was clearly an endorsement in that sense, as

14  I understand the question.

15          When you -- if you received that 2008 supplement in

16  December of 2008 -- which as I said, in our view totally

17  incomplete and -- and inadequate -- as you've pointed out, the

18  cover page of that listed Ms. Sosnov and I as the authors in

19  bold print -- large print.

20          And then, at the bottom -- I think -- with the

21  assistance of the publisher's staff.

22          I think any lawyer who received that would assume that

23  Ms. Sosnov and I were the authors of that product.  Somebody on

24  the staff may have added something, but we continue to be --

25  and, remember, people who got that pocket part, presumably, had

1    the book for years, have known we've published the book for

2    years, published the pocket part each year.

3         Clearly what -- in my view -- what West was saying is

4    -- trading on our name -- saying, here's the new pocket part,

5    it's as good as all of the other pocket parts, here's the law

6    that you should know for 2007/2008.

7         MR. RITTINGER:  Your Honor, I'd move to strike the

8    answer as not responsive.

9         THE COURT:  Oh, I think it's responsive.  Objection

10   overruled, it doesn't mean anything.

11        MR. RITTINGER:  Hmm?

12        THE COURT:  It's his view that since it's under -- the

13   reader would understand he was responsible for what's in it,

14   that's what you wanted to get, right?

15        MR. BAZELON:  Yes.

16   BY MR. BAZELON:

17   Q.   And Professor Rudovsky, how did you feel about that, about

18   having your name used that way?

19   A.   I -- I -- I -- it's -- it's the reason I retained you, I --

20   I -- I was -- we -- we were both stunned.  I mean, I -- I can

21   use that word without exaggerating.

22        I can't imagine that a publisher could put out

23   something, charge somebody for it, use our names, when it was, I

24   -- and -- and sham is the only word that comes to mind that

25   actually describes it.

1    There was nothing new other than these three

2    meaningless citations in -- in this pocket part that gave the

3    subscriber anything that was worthwhile.  It was the same as

4    they had gotten the years before.

5    And prominently displayed on that pocket part were our

6    names.

7    And I was immediately concerned -- quite frankly --

8    not that people would have come up to me and complained -- but

9    someone is going to look at that, rely on it as they have over

10    the years, look at the pocket part, there's no change in the

11    law.

12    Sure and they Shepardize and maybe they'll find it,

13    but if they do that, they're going to say, what are these guys

14    doing?  They didn't alert me of a -- of a new Supreme Court

15    case.

16    THE COURT:  Would you agree then that you suffered

17    emotional distress as a result of this whole thing?

18    THE WITNESS:  I -- distress, I -- I would say -- I --

19    I won't categorize it as emotional distress, Judge, at -- at

20    this point.

21    I was -- I -- we -- we were both professionally

22    stunned, quite frankly, that -- that our names were being used

23    on a sham product.

24    And that West which -- counsel is right, they have a

25    very good reputation -- I -- I literally, couldn't believe it.

1   And when I -- when I started to compare those cases, I said, I

2   must be missing something.  I went back and I went back and I

3   went and literally, they put out one year, what they had put out

4   the year before with -- with no changes of any significance.

5   BY MR. BAZELON:

6   Q.   I take it that in addition to the three new cases, did they

7   also include some changes in the Rules of Criminal Procedure?

8   A.   There were -- there were references to new Rules of

9   Criminal Procedure.  They also -- when they send out the pocket

10  part, they send out -- as -- as another part of the package --

11  the Rules of Criminal Procedure, which I assume were updated,

12  that's just a separate package, you pay separately for, another

13  fifty dollars or whatever that -- that goes out with it.

14       I don't recall -- I could be wrong on this -- I don't

15  recall any commentary on the new rules, they may have cited the

16  rules, not even an indication that the rule was changed.

17       They clearly did not make any changes in Juvenile

18  Rules which were significant and Rules of Appellate Procedure

19  which were significant, no changes in those rules even though

20  there had been rule changes.

21       THE COURT:  May I ask a --

22       MR. BAZELON:  That's all I have, your Honor.

23       THE COURT:  -- stupid question No. 17?

24       Does everybody who purchased the original publication,

25  does everybody purchase the annual pocket parts in your

1    understanding?

2         THE WITNESS:  My understanding is when you purchase

3    the book, you agree by -- with West -- that you'll be sent the

4    pocket part automatically as a subscriber.  You can certainly

5    cut off your subscription at any time.

6         But I -- I think the practice is, if you had

7    subscribed, let's say, in 2004, you would have gotten the volume

8    and then, each year, you would get the pocket part and then,

9    you'd be billed for the pocket part.

10        THE COURT:  Okay.  Thank you.

11        THE WITNESS:  That -- that's my understanding of the

12   -- of the way it worked.

13        THE COURT:  It's your turn.

14        MR. BAZELON:  Nothing further.

15        MR. RITTINGER:  Thank you, your Honor.

16        Your Honor, is it all right if I use the podium?

17        THE COURT:  Sure, anywhere you want.

18        MR. RITTINGER:  Thank you.

19        Your Honor, I'd like to mark the customer letter dated

20   2009 as Defendant's Exhibit -- you got my letters, I guess?

21        THE COURT:  Anyway you want to do it.

22        (Pause at 2:52 p.m.)

23        MR. RITTINGER:  Your Honor, do you want a copy for

24   yourself or a copy for --

25        THE COURT:  I don't care, as long as I have access to

 1    one.

 2              DEPUTY CLERK:  What is it?

 3              MR. RITTINGER:  Defendant's Exhibit A?

 4              THE COURT:  It's best to mark your own exhibits.

 5              MR. RITTINGER:  Your Honor, may I show this to the

 6    witness?

 7              THE COURT:  Yes, of course.

 8              MR. BAZELON:  Are you providing counsel a copy?

 9              MR. RITTINGER:  It's the copy of the letter, you'll

10    get --

11              (Discussion held off the record.)

12                          CROSS-EXAMINATION

13    BY MR. RITTINGER:

14    Q.   Now, this customer letter was submitted with your papers on

15    the motion for a preliminary injunction, isn't that correct?

16    A.   I believe that's correct, yes, sir.

17    Q.   And in response to counsel's question as to how you were

18    being irreparably harmed today and what you wanted -- the

19    irreparable harm stopped, you said, that you wanted people to

20    know that you are no longer associated with the work, isn't that

21    correct?

22    A.   That's part of what we wanted, that's correct, that's

23    right.

24    Q.   That's one of the things.

25              And this letter specifically so advised subscribers,

1    isn't that correct?

2    A.   It does indicate -- that's right -- it does state that we

3    did not participate in the 2008/2009 pocket part.

4    Q.   All right.

5         And that you're no longer going to be associated with

6    the work --

7    A.   That's correct.

8    Q.   -- isn't that correct?  All right.

9         So, West already did that, isn't that correct?

10   A.   They did that.

11   Q.   Okay.

12        And you also said the second part of the preliminary

13   injunctive relief that you want is, you want people who paid for

14   what you call, the sham publication to be reimbursed, isn't that

15   correct?

16   A.   That's correct.

17   Q.   All right.

18        And this letter offers to give a refund to any West

19   subscriber who asked for it --

20   A.   Well, I --

21   Q.   -- does it not?

22   A.   -- I don't quite read it that way, quite frankly.

23        I think what this letter says is, we sent out a pocket

24   part to you.  On review it was not all it should have been --

25   I'm paraphrasing here.  We will send out a new pocket part in

1    the future.

2           And then, -- and this was in the earlier argument --

3    if you're not satisfied with the information provided -- which

4    is referring to the new 2009 pocket part -- please contact

5    Customer Service.

6           The problem is when the new pocket part was sent out

7    on Friday -- I haven't seen it, 'cause I haven't got it yet, so

8    I don't know what's included altogether -- but I -- as I

9    understand it, there's no notice, other than to say, take out

10   the old one, put in the new one.  There's nothing there that

11   refers them to either this notice or to their right to

12   reimbursement.

13   Q.   So, it's your position that this letter is not offering to

14   give back money to the subscribers?

15   A.   Not -- in the context in which it was said and --

16   Q.   You want it said a different way, is that correct?

17          MR. BAZELON:  Objection to interrupting the witness,

18   your Honor.

19   A.   That's right.  And we actually made some suggesting to you

20   that -- on the letter -- you rejected them.

21          We -- there were discussions between counsel on what

22   the letter ought to include.  You sent this out.  All I'm saying

23   is in context.  Sending this out in March and then sending out

24   the pocket part -- the new one that you've just sent out in

25   April -- doesn't do what you're suggesting it does that's --

1   Q.   Is it --

2   A.   -- that's my view.

3   Q.   -- is it your understanding that counsel objected to this

4   part of the letter?

5   A.   There were discussions as to what the letter ought to

6   contain, I don't know what -- what parts were -- I -- I do know

7   what we wanted as the letter did not go out.  I don't know which

8   parts were included and which parts --

9   Q.   So, you don't know whether --

10  A.   -- were not.

11  Q.   -- your counsel did or did not object to this part --

12  A.   Don't know.

13  Q.   -- is that correct?

14  A.   (No verbal response.)

15          (Pause at 2:56 p.m.)

16  BY MR. RITTINGER:

17  Q.   Now, other than being informed that you were no longer

18  associated with the work -- which this letter does -- and that

19  you want all subscribers to get a refund, is there any other

20  irreparable harm that you're suffering today that you can advise

21  the Court of?

22  A.   Yes.

23          As I said, the -- the irreparable harm we're suffering

24  today -- in our view, I -- first of all, we talked about the

25  West electronic and how -- you know -- that change hasn't been

1   made yet, that's -- that's ongoing, people who access the

2   electronic version are not informed in an adequate way that

3   we're no longer part of this publication.  So, that's -- that's

4   one.

5   Q.   Well, let -- let me interrupt you there.

6   A.   Yes.

7   Q.   They were involved in the Scope section, isn't that

8   correct?

9   A.   The -- the Scope section, no -- nobody reads, you know,

10  when --

11  Q.   Well --

12  A.   -- if I -- if I -- let me finish.

13          If I, as a lawyer, have a problem in criminal

14  procedure and I think -- well, I've been -- I need an issue, I

15  need a case on post-conviction relief in Pennsylvania.

16          And maybe, the Rudovsky/Sosnov book would be helpful.

17  I'd go to that section of the book, I'd go to 16.3 and I see

18  what cases are there.  I -- I don't go to the Scope section

19  which is just kind of the West description of what you'll find,

20  that's where you put the fact that we're no longer associated.

21          I, as a lawyer -- as a practitioner -- would have no

22  reason to go to the Scope section.  In fact, I didn't even know

23  about a Scope section until I was -- I was informed by counsel.

24          THE COURT:  Okay.  We understand your position.

25          What else have you got?

1            THE WITNESS:  I -- I'm sorry, your Honor?

2            THE COURT:  I think we understand --

3            THE WITNESS:  Okay.

4            THE COURT:  -- your position.

5            I wanted to know what other questions he has?

6    BY MR. RITTINGER:

7    Q.   Now, it is also true, is it not, that the supplement -- the

8    new supplement -- makes it absolutely clear that you and your

9    co-author are no longer involved with the publication?

10   A.   Here's -- here's the problem with -- with what you've sent

11   out.

12            It is true on the cover page, ah, you say that we -- I

13   -- the --

14   Q.   Well, that's my question.

15   A.   No, the --

16            MR. BAZELON:  No, no, that wasn't his question.

17   A.   -- the question, I don't think.

18            MR. BAZELON:  It was not the question.

19            THE COURT:  Go ahead --

20   A.   Well, first of all, again as --

21            MR. RITTINGER:  Your Honor --

22   A.   -- again as --

23            MR. RITTINGER:  -- could I have the question read

24   back?

25            THE COURT:  No, you cannot.  Let's hear the witness.

1   A.    As -- as a user, I would almost never look -- whether it's

2   this pocket part or any other pocket part -- to the cover page

3   of the pocket part.

4            Again, as a user, I would go to 16.3 and see what new

5   cases there are or what new discussion there is.

6            So -- and that's why I think it was essential that

7   something more than just the pocket part be sent out with new

8   shelving instructions, that the subscriber -- that the reader --

9   actually be told that we no longer are part of this.

10           And you can -- if you were relying on the work we have

11  done over the years -- and that's why you have it -- then, you

12  have a right to return it and -- and we'll give you a full

13  credit.

14           So, the answer is, no, I -- I think on the face of

15  this, given the way lawyers use pocket parts, nobody looks at a

16  pocket part and says, you know, examines the names on it.  You

17  go right to the section that deals with the substance and there

18  it is.

19           And so, unless there's some direct notice to the

20  subscriber/lawyer, user at the library -- whoever it might be --

21  I don't agree with your premise, no.

22  Q.    Let me get that straight.

23           Nobody looks at the names on the -- of the authors on

24  the -- on the front page of the supplement?

25  A.    I -- on a pocket part -- I've used pocket parts for, you

1    know, for -- I've been a lawyer for forty years, I look at the

2    book, I see there's a book by who --

3              THE COURT:  The question that he asked is --

4    A.   I -- I --

5              THE COURT:  -- you can either answer yes or no, you

6    don't have to make --

7    A.   In my -- my experience, I --

8              THE COURT:  -- a long --

9    A.   -- I don't.

10   Q.   So, nobody looked at the names on the -- on what you call,

11   the sham supplement as well, isn't that correct?

12   A.   No, because -- you know, the -- you don't -- you look at

13   the names on the book and if it is a sham publication, ah,

14   they'll associate -- if you're referring to the December of

15   2008, they'll associate our names with it, whether it's on the

16   pocket part --

17   Q.   Well --

18   A.   -- or on the binder, it's the same thing.

19   Q.   Okay.

20             Let me -- let me just try to understand your

21   testimony.

22   A.   Yeah.

23   Q.   Nobody would look at the names on the new supplement,

24   that's your testimony, 'cause nobody ever looks at the names on

25   the first page of the supplement.

1          But your testimony is also that people would look at

2     the names on the supplement that it replaced, is that your

3     testimony?

4     A.   They wouldn't have to look at the names, they would know

5     this was a pocket part, they've been subscribers for years, they

6     are getting Rudovsky and Sosnov every year.  They get a letter

7     that says, here's the new Rudovsky and Sosnov pocket part, put

8     it in.  They -- they know it, they don't have to read that first

9     page.

10    Q.   All right.

11         So, then to -- to answer my questions, they would look

12    at the names on the supplement or they wouldn't have to look at

13    them?

14    A.   You might look at it, you might not look at it when you

15    open it up, it's -- you know when you shelve it, if you shelve

16    it personally, you might look at it, in terms of research,

17    you're probably not looking at the first page.

18    Q.   All right.

19         MR. RITTINGER:  Let me have marked, please, as -- or

20    as Defendant's Exhibit 2, it would be a dec --

21         THE COURT:  Except that you started out with the --

22         MR. RITTINGER:  I'm --

23         THE COURT:  -- Defendant's Exhibit A.

24         MR. RITTINGER:  I'm sorry, your Honor?

25         THE COURT:  Your first exhibit was Defendant's Exhibit

1    A.

2              MR. RITTINGER:  Defendant's Exhibit B, your Honor.

3              The declaration of David Rudovsky.

4              (Pause at 3:01 p.m.)

5              MR. RITTINGER:  May I give it to the witness, your

6    Honor, a copy of the --

7              THE COURT:  All right.

8              This is his declaration, what do you want to ask him

9    about it?

10   BY MR. RITTINGER:

11   Q.   Professor, could you turn to Paragraph 7 and the last

12   sentence -- and I'll -- I'll read it for you?

13             The treatise, including all pertinent parts

14        except for the 2007/'8 pocket part were prepared by

15        us pursuant to a July, 1987 agreement with West --

16        with West Publishing Company.

17             It turns out that that's not correct, isn't that

18   correct?

19             MR. BAZELON:  Objection to form, your Honor, but

20   beyond that, objection to the question, A, on the grounds of

21   relevance and, B, I thought your Honor was interested in

22   focusing on the --

23             THE COURT:  I am.

24             MR. BAZELON:  -- irreparable harm.

25             THE COURT:  But let's find out what he wants.

1   A.   There are -- as it turns out -- three written agreements

2   we've had with West over the years.

3        Let me answer the question this way, we -- we had

4   the --

5        MR. RITTINGER:  Well, your Honor -- your Honor --

6        THE COURT:  Let him answer the question.

7   A.   Because as a legal matter, I can't answer your question,

8   which contract controls, you'll have to argue that to the Judge.

9        I can say there was a 1987 agreement.  There was a

10  2000 agreement when we agreed to do the second edition.  And

11  there was a 2007 agreement for the 2007 pocket part.  Those are

12  the only agreements we've had with West.

13       When I first discovered in December when I looked at

14  the new pocket part and was concerned, I looked at my file, I

15  just pull the relevant material.  I immediately found the 1987

16  agreement, it had a blue backer on it that we used to have.

17       And I had on top of it, the most recent agreement,

18  which was the 2007 agreement for the pocket part.  I did not

19  notice at that time the 2000 agreement, it was my mistake.  I

20  should have noticed it in my file at that time, I did not.

21       We, therefore -- I prepared this declaration based on

22  the 1987 and the 2000 agreement -- the 2007 agreement -- I'm

23  sorry, the 2007 agreement -- which said it superseded all

24  previous agreements.  I did that.

25       You then had a filing in which you attached the 2000

1   agreement, it was unsigned by West as I recall.  I then looked

2   in my file to see if I had that 2000 agreement, I had one.  In

3   fact, I had a signed copy by West and I provided it.

4         Which agreement controls -- which provisions of the

5   agreements control -- I can give you my view on it --

6         THE COURT:  I'd rather not hear it.

7   A.   -- if you want to know it, but that's -- that's what I

8   have --

9         MR. RITTINGER:  Well, your Honor, I didn't --

10  A.   -- well -- we have those three agreements.

11  Q.   I didn't ask for your -- for --

12  A.   And that's why I'm not giving it.

13  Q.   All right.

14        Is it fair to say that you had forgotten about the

15  existence of the 2000 agreement at the time that your complaint

16  was filed?

17  A.   I think that's fair to say.

18        At the time we filed the complaint I --

19  Q.   Is it -- is it --

20  A.   -- that's fair to say, I --

21  Q.   -- I'm sorry -- I'm sorry.

22  A.   -- did not recall a written 2000 agreement, that's right.

23  Q.   And is it also fair to say that you had forgotten about the

24  existence of the 2000 agreement at the time you filed your

25  motion for a preliminary injunction?

1   A.   If that was done before I filed the amended declaration,

2   that's right.

3   Q.   Okay.

4        Now, I believe the -- the 1987 agreement is attached

5   as an exhibit, is that correct?

6   A.   Yes, it is.

7   Q.   All right.

8        MR. RITTINGER:  Now, could I have the -- the 2000

9   agreement, please?  Do you want to mark that as C?

10       (Pause at 3:04 p.m.)

11       (Discussion held off the record.)

12       MR. RITTINGER:  Defendant's Exhibit C, an agreement

13  between the plaintiffs and West Group Publisher dated as of

14  September 7th, 2000 are executed by West Group.

15       THE COURT:  I'm sorry.  Where does it say that, I see

16  August 22nd, 2000.

17       MR. RITTINGER:  Your Honor, each signature is dated

18  with a different date, the last date is the -- is the date that

19  I referred to executed by West.

20       (Pause at 3:06 p.m.)

21  BY MR. RITTINGER:

22  Q.   Now, is that a copy of the 2000 agreement?

23  A.   It is.

24  Q.   All right.

25       And is -- according to your understanding today -- is

1    that the agreement pursuant to which the West Pennsylvania

2    Practice was published?

3    A.   The second edition, that's correct.

4    Q.   The second edition?

5    A.   Yes.

6    Q.   And by the way, it says West Group on the spine, correct?

7    A.   It does.

8    Q.   Right.

9         You knew who West Group is, don't you?

10   A.   We started with West Publishing, it was West Group, it's

11   Thompson West.  It's West.

12   Q.   You don't dispute that that was an agreement with the

13   publisher that published the second edition, is that correct?

14   A.   I -- I assume it was, that's right.

15   Q.   Okay.

16   A.   Absolutely.

17   Q.   Now, I want to direct your attention first of all to

18   Paragraph B2 -- 2B -- capital B -- do you see that?

19   A.   Yes.

20   Q.   All right.

21        And I'm going to read that into the record:

22        Authors will provide upkeep to the work on an

23        annual basis or as otherwise agreed by publisher and

24        authors, including but not limited to supplements,

25        revisions or new editions of the work in order to

1        keep it current and marketable.  All references to

2        the work in this agreement also apply to such upkeep

3        as well as to the original work unless otherwise

4        provided.

5              Do you see that?

6    A.   I do.

7    Q.   All right.

8              And you agreed to that provision at the time you

9    entered into the 2000 agreement?

10   A.   We did.

11   Q.   All right.

12             And then --

13             (Pause at 3:08 p.m.)

14   Q.   -- turning your attention to Paragraph 3A2 on the next

15   page.

16   A.   Yes.

17   Q.   Do you see that?

18   A.   I do.

19   Q.   And I'm going to read that into the record, use of authors'

20   names.

21             MR. BAZELON:  Your Honor, excuse me, I -- I want to

22   object.  I think -- it appears that we're going to go to reading

23   in provisions with the question of, did you agree to it?  And I

24   think that's a waste of time.

25             THE COURT:  I do, too, but if he wants to waste time,

1   he may.

2               MR. RITTINGER:  I'm sorry?

3               THE COURT:  I said, you may waste time if you want to.

4   BY MR. RITTINGER:

5   Q.   Use of author's name:

6               Publisher will have the right to use author's

7          names in connection with the work and upkeep of the

8          work.

9               So, at the time you entered into the 2000 agreement --

10              THE COURT:  Read the next sentence -- read the next

11   sentence.

12  Q.   If -- if the work or upkeep is prepared by persons

13         other than the --

14              THE COURT:  By a person.  Read -- read it for heaven's

15   sake.

16  Q.   If the work or upkeep is prepared by a person other

17         than authors, publisher may identify that person on

18         the new material and any related advertising and give

19         him or her authorship credit in addition to or in lieu

20         of credit given to the authors.

21              Do you see that?

22  A.   I do.

23              THE COURT:  That's right there.

24  Q.   Is there a comparable provision to that according to your

25   understanding in the 1987 agreement?

1    A.   Not in those --

2          MR. BAZELON:  Your Honor, I'm going to object, but I'm

3    going to stop objecting, 'cause I understand that you're going

4    to listen to all of it.

5          THE COURT:  Either there is or there isn't, I don't

6    know whether there is or not.

7          MR. BAZELON:  Exactly.  A continuing objection.

8          THE COURT:  It's going to speak for itself.

9    A.   You -- you can compare them, in those words, there's --

10   there's not, but that's the best I can say, right.

11   Q.   Well, is there any comparable provision according to your

12   understanding?

13   A.   There -- I'll have to look at the '87.

14         (Pause at 3:10 p.m.)

15   A.   There is a provision in the '87 agreement, Section -- under

16   what's titled miscellaneous agreements that:

17         The author shall have first option to prepare

18         pocket parts and revise volumes.

19         And then, it goes on:

20         If the authors are deceased or for any reasons,

21         the authors do not exercise such option to prepare

22         pocket parts and related material, then the publisher

23         may arrange for these at its own expense and in that

24         event, the authors would not have any compensation.

25         So, there is a provision that deals with the

1  contingency of us not continuing as authors.  So, there is a --

2  in that sense -- a comparable provision, not with all the terms

3  you just read.

4  Q.  Is there a provision that is similar to the provision of

5  the --

6          (Pause at 3:11 p.m.)

7          THE COURT:  May I make a modest suggestion which is

8  that the agreements are or could be in evidence and they speak

9  for themselves and you make your arguments based on them, not on

10 what this --

11         MR. RITTINGER:  All right.

12         THE COURT:  -- witness says about it.

13         MR. RITTINGER:  I -- I accept that, your Honor.

14 BY MR. RITTINGER:

15 Q.  The 2007 agreement and I'll -- I'll cover this quickly.

16         It's your position that that does not apply, correct?

17 A.  It's not -- ah -- as a legal matter and there could be

18 argument, the 2007 agreement purports to supersede all previous

19 agreements.  It describes the work as being the work -- the --

20 the volume and the pocket parts.

21         And then it has this language in there someplace --

22 which I'll put my finger on it -- where it says, it supersedes

23 all previous agreements.

24         I'm not an expert in this area, I'm not going to make

25 any argument on that.  I'm just saying that there is an argument

1   here that could be made that the 2007 agreement is the one that

2   controls.  But I --

3   Q.   Well --

4   A.   -- you probably don't want my opinion on that.

5   Q.   Let me -- let me -- you are a professor and you're --

6   you're careful in what you've -- what you do when you write

7   books and you --

8        THE COURT:  What's your question -- what's your

9   question?

10  BY MR. RITTINGER:

11  Q.   I'm going to read to you, first of all, Paragraph 1,

12  subject:

13       Publisher is preparing a work for publication

14       entitled, Pennsylvania Practice Criminal Procedure,

15       2007 Supplement, quote, The Work.

16  A.   Hm-hmm.

17  Q.   That's the work that's referred to in this agreement,

18  correct?

19       THE COURT:  Yes, it is.

20  A.   Yes, it is.

21  Q.   It doesn't refer to any other supplements or any other

22  updates, does it anyplace?

23  A.   Not there, but the agreement later says:

24       This supersedes --

25  Q.   Okay.

1    A.    -- all previous agreements --

2    Q.    All right.

3    A.    -- between the parties.

4    Q.    All right.

5          And -- and that's Paragraph H?

6    A.    Ah --

7          THE COURT:   We'll take your word for it.

8    A.    Can you tell me which page you -- you have there?

9          Oh, yeah, yeah, that's right on Page 5 under 9H:

10         This is the entire agreement of the parties, all

11    prior negotiations and representations are merged into

12    this agreement.   This agreement supersedes all

13    previous agreements regarding the work.

14   Q.    Okay.

15         Let me stop you there.

16   A.    Yeah.

17   Q.    Now, where is work defined in this agreement?

18         THE COURT:   Yes, exactly.

19   A.    It's defined in the first paragraph.

20   Q.    Right.

21         It only refers to the 2007 supplement, isn't that

22    correct?

23   A.    That's what it refers to there, there was no previous

24    agreement.   This -- this was -- this was the only agreement we

25    had.

1   Q.   Were there -- were there oral discussions beforehand?

2   A.   I don't recall if there were or there were not at that

3   point.

4   Q.   In your vast experience, have you ever seen an agreement

5   have a similar provision when there was not a written agreement

6   preceding it?

7   A.   I've seen standard language like this, sure.

8   Q.   Right.

9        It can apply to oral discussions and agreements,

10  correct?

11  A.   It could.

12  Q.   Okay.

13       MR. RITTINGER:  Your Honor, could I have a minute or

14  two to look through something?

15       THE COURT:  You may have up to seven.

16       MR. RITTINGER:  I'm sorry?

17       THE COURT:  You may have as many as seven, go ahead.

18       (Pause at 3:14 p.m.)

19       (Discussion held off the record.)

20       MR. RITTINGER:  Your Honor, I only have one copy of

21  this document, but I'd like to mark it as Defendant's Exhibit 4.

22       THE COURT:  Sure, go ahead.

23       I think you're going to mark it as a defense exhibit,

24  possibly.

25       MR. RITTINGER:  D, I'm sorry, D.

1          MR. BAZELON:  May I see it, please?

2          MR. RITTINGER:  Yeah.

3          THE COURT:  What's it going to turn out to have been?

4          MR. BAZELON:  Your Honor, this document is part of the

5     settlement discussions that took place between counsel.

6          Mr. Rittinger wrote me an e-mail and he said, I want

7     it understood that everything that takes place in settlement

8     discussions is privileged and confidential.

9          Now, he is taking out a document that are part of

10    those discussions and having it marked and wanting to use it at

11    this hearing.

12         THE COURT:  No, he marked it himself.

13         What's -- how do you get around that?

14         MR. RITTINGER:  Yes, your Honor.

15         The witness testified that he wasn't satisfied with

16    the last paragraph of the letter that went to the customers,

17    because it didn't explicitly state a refund.

18         And I asked him, if -- if his counsel had objected to

19    that and he said, no.

20         This is a letter that has counsel's markups on it that

21    does not in any way reflect any changes in the -- in the

22    penultimate paragraph -- well, it gets to the -- the paragraph

23    that --

24         THE COURT:  What --

25         MR. RITTINGER:  -- we referred to.

1          THE COURT:  -- what do you do with the objection that

2    it's part of the settlement discussions which are privileged and

3    don't get into evidence?

4          MR. RITTINGER:  Well, your Honor, the door was opened

5    by counsel when -- when he said that he objected to that

6    paragraph.

7          THE COURT:  That's ridiculous.

8          Are you objecting to this --

9          MR. BAZELON:  I certainly am.

10         THE COURT:  -- I don't know what it is, I don't want

11   to know.  The objection is sustained.  Let's get on to something

12   that makes sense.

13         (Long pause at 3:17 p.m.)

14   BY MR. RITTINGER:

15   Q.   Professor, I take it that you have received no complaints

16   or inquiries and no one has called you and said, you're

17   associated with a bad publication or anything along those lines,

18   isn't that correct?

19   A.   I have not.

20   Q.   All right.

21         And as far as you know, neither has your co-author?

22   A.   That's correct.

23   Q.   And it is true, is it not, that good practice when you're

24   using a treatise of any sort and you're citing a case, that you

25   either Shepardize it as his Honor suggested or as we like to at

1  West, suggest that you KeyCite it, that is good practice, is it

2  not?

3  A.   Absolutely.

4  Q.   All right.

5       And you would expect any lawyer who is using -- no

6  matter what the work is, if it was your treatise, your

7  supplement or anyone else's -- that they would -- they would

8  either Shepardize or KeyCite a case?

9  A.   But -- but only after having looked at a pocket part and

10 seeing that it covered a certain period of time, you would

11 certainly -- there's always a lag time -- you would want to

12 Shepardize or KeyCite for that reason.

13      But the whole point of the book from the -- from the

14 beginning from twenty years ago -- was to give readers something

15 more than a list of cases that they can KeyCite.  That's not

16 what we were asked to do, that's not what we did.

17      We -- we did a book -- we did a treatise -- we did an

18 analysis of the case law.  You don't get that by KeyCites.

19 Q.   No, I understand that.

20      But it's true -- is it not -- as a professor, good

21 practice --

22 A.   The -- the answer is, yes, you --

23 Q.   -- everybody knows that --

24 A.   -- Shepardize.

25 Q.   -- every treatise is always going to -- if it's in print --

1    it's always going to be six to nine months behind --

2    A.    On that point --

3    Q.    -- am I correct?

4    A.    -- you're absolutely right.

5    Q.    Right.

6          And as far as when the treatise -- when the -- when

7    the supplement was up on West cite -- on -- on West Law -- no

8    matter what was there, if someone clicked on to that case, they

9    would get an update through KeyCite, isn't that correct?

10   A.    I assume they would, that's right.

11   Q.    Right.

12         And good practice, again, anyone who was using even

13   what you consider to be the sham supplement, if they clicked on

14   to any case that you've complained about, they would have got

15   the current history of that case, isn't that correct?

16   A.    And -- and they could do that without paying the fifty

17   dollars for a product that gave them nothing.

18   Q.    I -- I understand that, but they could do it --

19   A.    They could do it.

20   Q.    -- couldn't they?

21         Well, they --

22   A.    They could also go to another reference book, they could go

23   to another treatise which was updated and --

24   Q.    But --

25   A.    -- and was timely.

1    Q.    -- but even if they did that, they'd still have to go and

2    do a KeyCite --

3    A.    That's right.

4    Q.    -- or a Shepardization --

5    A.    Absolutely.

6    Q.    -- isn't that correct?  All right.

7          And just to -- to go back to your affidavit for a

8    second and the 2007 agreement, the first -- I've already read

9    the first sentence in Paragraph -- well, not the first sentence,

10   I've read a sentence that started with the treatise and the

11   pocket part were prepared by the authors.

12         Let me go to the --

13         (Pause at 3:21 p.m.)

14   Q.    -- let me go to the last sentence:

15         The 2007 pocket part was prepared pursuant to a

16         stand-alone agreement.

17         What did you mean by a stand-alone agreement, that it

18   only related to the 2007 supplement?

19   A.    At that point, having only looked at the 2007 and not the

20   2000, I assumed it referred only to the 2007 supplement, that's

21   correct.

22   Q.    Well, is it your position, the 2007 pocket part was

23   prepared pursuant to the 2000 agreement?

24   A.    No.  It was prepared pursuant to the 2007 agreement.

25   Q.    Okay.

1            And you called it a stand-alone agreement?

2   A.   That's right.

3   Q.   What did you mean by a stand-alone agreement?

4   A.   It governed the preparation that year of that pocket part.

5   Q.   And only that?

6   A.   For that year, we -- I don't know what would happen in the

7   future, but for that year, that's right.

8            MR. RITTINGER:  I have no further questions, your

9   Honor.

10           THE COURT:  Everyone content?

11           MR. BAZELON:  Very brief, your Honor.

12                    REDIRECT EXAMINATION

13  BY MR. BAZELON:

14  Q.   Professor Rudovsky, can I refer you please to West -- I

15  guess -- West Exhibit 1, which is the March, 2009 letter?

16  A.   Exhibit A, yes.

17  Q.   Yes.

18           THE COURT:  Exhibit A.

19  A.   I have it.

20  Q.   And I take it --

21           MR. BAZELON:  I'm sorry, your Honor.

22  Q.   -- I take it that this is a letter that has been identified

23  by West as having been sent to the subscribers for the treatise

24  some time in March of 2009?

25  A.   That's my understanding.

1   Q.   Now, what is your understanding, Professor Rudovsky, as to

2   whether users of the treatise and the pocket part, that is, the

3   people who actually have a book in hand and are using it, see

4   this letter that's written to the subscribers?

5            MR. RITTINGER:  Objection.

6            THE COURT:  I don't see how he would have any

7   knowledge of that.

8            MR. BAZELON:  Let me try and lay a foundation, if I

9   can, your Honor?

10           THE COURT:  All right.

11  BY MR. BAZELON:

12  Q.   You have worked -- on your *curriculum vitae* -- among other

13  places, at the Philadelphia Defender's office?

14  A.   I have.

15  Q.   And are you -- do you have knowledge of how organizations

16  -- let me ask -- and you are also presently associated with the

17  University of Pennsylvania Law School?

18  A.   I am.

19  Q.   Do you have knowledge about how those organizations

20  function with respect to what they include in their bound

21  volumes and pocket parts?

22  A.   I do.

23  Q.   Based on your knowledge, Professor Rudovsky, does this kind

24  of a letter find its way into the bound volume?

25  A.   It -- it would not find its way into a bound volume, for

1  example, the Defender Associations has a couple of copies in the

2  library, this letter would not be there.

3          A law library at the University of Pennsylvania, if

4  you'd put a sticker and said, put the sticker in instead of the

5  supplement, it would go there, but this letter would not.

6          Prison law libraries, the prison administration would

7  get the letter, the inmates who use it, would have no idea that

8  the pocket part they're dealing with has any deficiencies.

9  Q.   So, in your experience then, a user -- as opposed to

10  whoever gets this letter -- is in all probability never going to

11  see this letter?

12  A.   I think that's right, this is not -- this was not intended

13  to be put in the book.  And for -- certainly, for users in

14  libraries, institutional places.

15          And even in multi-person law firms, if three or four

16  people do criminal law in that firm, the secretary/manager gets

17  this, it's -- there's no instructions, put this in, advise

18  people.  It's a bookkeeping notice in a lot of ways.  You'll get

19  something later.  People using it will not -- in my experience

20  -- will not know.

21          (Pause at 3:25 p.m.)

22  BY MR. BAZELON:

23  Q.   Professor Rudovsky, you were asked to read one or two

24  provisions that had to do with the preparation of pocket part

25  going forward, that is, provisions in an agreement.

1       The question I want to ask you is this:

2       What took place that led to you and Professor Sosnov

3  not doing the pocket part beyond the pocket part that was used

4  in 2007/2008?

5       MR. RITTINGER:  Objection.

6       THE COURT:  Objection overruled.

7  A.   In 2007/2008, Mr. Sosnov and I kind of consulted on what we

8  should be doing with the book and we both decided it was time

9  for a new edition.

10      You know, at some point the pocket part becomes the

11  tail that wags the dog, the pocket part becomes too cumbersome,

12  everything is in the pocket part, very little is left from the

13  main text which is why in 2000, we did a new edition after about

14  nine years.

15      We thought it was appropriate to do a new edition.  We

16  talked to our editor at that time, she said she would check.

17  She got back to us and said -- and we said, you know, that's

18  obviously a more expensive proposition to rewrite the whole book

19  is more expensive.  We were then getting paid -- I believe --

20  five thousand dollars each for the pocket part.

21      She came back and said, West didn't want to do that,

22  but would you prepare another pocket part as we'd been doing.

23  We said, we'd consider it.

24      At that point or some subsequent conversation, she

25  said, we can only pay you twenty-five hundred each instead of

1   five thousand each, twenty-five hundred each.  And our response

2   after we consulted was, we're almost -- we're already doing this

3   for -- for very little.  We spend hundreds of hours every year

4   on this book at twenty-five hundred, it just wasn't worth it to

5   us at that point.  And we said that we were going to decline to

6   -- to participate that year.

7           MR. BAZELON:  I have nothing further, your Honor.

8                     RECROSS-EXAMINATION

9   BY MR. RITTINGER:

10  Q.   Do you know how much the pocket part generated?

11  A.   I have no idea, we were not on royalty, so we never saw any

12  income from pocket parts, we were just on -- you know -- a

13  salaried basis for doing it.

14          MR. RITTINGER:  Now, if I could mark as Defendant's

15  Exhibit E, a document entitled, Shelving Instructions.

16  Q.   Now, while the customer letter will not go in every

17  individual work, it's your understanding that these instructions

18  say, that the new supplement should go in every single work,

19  correct?

20  A.   That's correct.

21  Q.   And we've already established that you have no complaint

22  about what is on the front cover of the new supplement that went

23  out Friday night, isn't that correct?

24  A.   We're not complaining about that cover standing alone,

25  that's right.

1   Q.   Thank you.  All right.

2        And at one time, you wanted -- you -- your demand was

3   that West go out and sticker all of the works, isn't that

4   correct?

5   A.   Before you published this -- this new one, we -- we had --

6   you know -- what I described as the sham product -- we asked you

7   to send a sticker out to inform readers -- not only people, who

8   were buying it -- but readers, people who used it, that this

9   pocket part was, in effect, not worth anything and don't --

10  don't use it.

11  Q.   But now that pocket part is being discarded and this has

12  replaced it and, therefore, you are no longer asking for a

13  sticker, isn't that --

14       MR. BAZELON:  Your Honor --

15  Q.   -- correct?

16       MR. BAZELON:  -- I object only because there's no

17  evidence of this, other than what Mr. Rittinger has said.  If he

18  -- if he intends to present evidence that this is what has taken

19  place --

20       THE COURT:  He's a very truthful person, I'm sure.

21       MR. BAZELON:  It's just, your Honor, I'd prefer to

22  have it in the form of a witness and evidence rather than --

23       THE COURT:  Right.

24       MR. BAZELON:  -- counsel's assertion.

25       THE COURT:  I understand.  Go ahead.

1        What are you doing?

2        MR. RITTINGER:  Well, I think there's a question

3   pending.

4   A.    If -- if this instruction goes out and people get the new

5   pocket part, I assume what they'll do is put it in the back of

6   their book or someone will and they'll throw out what I've

7   described as sham pocket part.  That's what will happen.

8        They won't know by virtue of this, that -- by virtue

9   of this -- this notice here, which says nothing about us

10  participating or not participating, that -- you know -- they're

11  getting something that -- that we're not involved with.

12       Now, you're right, the cover page of the pocket part

13  says that, that's the debate you're having as to what additional

14  relief is -- is necessary.

15       But as a factual matter, someone will put that in

16  their book, that's correct.

17  Q.    Have you heard from any prisoners that complained about

18  this?

19  A.    I have not heard from any prisoners, who have complained

20  about it, no.

21  Q.    Any users?

22  A.    I -- I've already said, I've gotten no complaints.  I

23  wouldn't expect --

24  Q.    Have you --

25  A.    -- I also would --

1  Q.   All right.

2  A.   -- add, I wouldn't expect if -- if somebody --

3  Q.   No, I --

4  A.   -- used it for --

5       THE WITNESS:  If I can explain, your Honor?

6       THE COURT:  He hasn't gotten any complaints and he

7  wants to explain why.  Go ahead.

8  A.   People use this on discrete research problems.  I have a

9  problem with post-conviction, I want to see if there's case law

10  on it, I want to see what the rule says, I'd go to that section.

11       My understanding -- and certainly it's true with what

12  I've done -- if somebody went to that section, did it and -- and

13  as you suggested Shepardizes as they should -- and found that we

14  did not include -- or you did not include -- a case that was

15  highly relevant, I wouldn't expect them to call me and complain.

16       I would expect them to think, Rudovsky and Sosnov

17  aren't up to snuff.  I wouldn't expect them to call me.  I

18  wouldn't expect a prisoner surely to say, how come you didn't

19  have Commonwealth versus Graves with the updated cite, I -- I

20  just wouldn't expect them to do that.

21  Q.   Okay.

22       Now, in your direct testimony you talked about over

23  the years, you got a lot of positive comments or you got

24  questions and things of that nature, correct?

25  A.   That's correct.

1  Q.  Have you had any of those since December of 2000 up until

2  Friday?

3  A.  I don't recall any, people may have called about it -- no,

4  I would have remembered because by the end of December, we knew

5  what was going on.  And I can't --

6  Q.  So, it's fair --

7  A.  -- I can't recall any -- any comments or anything since --

8          THE COURT:  Either way?

9  A.  -- the end of December.

10          THE WITNESS:  Either way, yes.

11  BY MR. RITTINGER:

12  Q.  So, it's fair to say since the publication of the 2008/2009

13  supplement that's now been withdrawn, you have had no comments

14  one way or the other with respect to this work?

15  A.  That's correct.

16          MR. RITTINGER:  I have no further questions, your

17  Honor.

18          THE COURT:  Everyone content?

19          MR. BAZELON:  No, your Honor.

20          THE COURT:  You may step down.  Thank you, sir.

21          THE WITNESS:  Thank you, your Honor.

22          (Witness excused at 3:31 p.m.)

23          THE COURT:  Do you have anything further?

24          MR. BAZELON:  Yes, your Honor, I have two more

25  witnesses that will be brief.

1           THE COURT:  Good.

2           MR. BAZELON:  Does your Honor want to keep going?

3           THE COURT:  Yes.

4           MR. BAZELON:  I'm calling Alan Yatvin.

5           ESR OPERATOR:  Good afternoon, sir.

6           ALAN YATVIN, PLAINTIFF WITNESS, SWORN.

7           ESR OPERATOR:  Please state your name and spell your

8   last name for the record.

9           THE WITNESS:  Alan, Yatvin, Y-a-t-v-i-n.

10          ESR OPERATOR:  Thank you, sir.

11          THE COURT:  How do you spell Alan?

12          THE WITNESS:  A-l-a-n, your Honor.

13          THE COURT:  Thank you.

14          MR. RITTINGER:  Your Honor, could I have him list for

15  us as to why he's got him on?

16          THE COURT:  Sure.  Do you want to whisper?

17          MR. BAZELON:  Okay, yes.

18          MR. RITTINGER:  Or he could tell me out loud.

19          (Discussion held off the record at 3:33 p.m.)

20          MR. BAZELON:  Your Honor, I'm marking a *curriculum*

21  *vitae* for Mr. Yatvin as Plaintiff's Exhibit 3.  I previously

22  gave this to Mr. Rittinger.

23          THE COURT:  That's nice.

24                          DIRECT EXAMINATION

25  BY MR. BAZELON:

1    Q.    Mr. Yatvin, can you first identify yourself for the record?

2    A.    I'm -- my name is Alan Yatvin, I'm an attorney practicing

3    in Philadelphia.

4    Q.    And is P-3, your *curriculum vitae*?

5    A.    Yeah, it's actually my December version which I tried to

6    quickly update yesterday afternoon, so I'm -- I can't guarantee

7    that everything between December and today is current.

8    Q.    And if I were to ask you about your history and the matters

9    that are covered by this *curriculum vitae*, would you testify --

10        THE COURT:  Yes, he would --

11   Q.    -- as set forth herein?

12        THE COURT:  -- let's not waste time.

13   A.    Yes, I would.

14   Q.    Did there come a time -- I take it part of your practice,

15   Mr. Yat -- Yatvin -- is in the area of criminal law?

16   A.    Yes.

17        My practice consists of predominately police

18   misconduct, civil rights.  Almost an equal amount of criminal

19   defense, principally, appellate.

20        And my partner, sort of the other way around, he does

21   mostly criminal defense trial and works with me on the civil

22   rights cases.

23   Q.    Did there come a time when you became a subscriber to --

24   what I'll call -- the treatise that's the matter of discussion

25   here today?

1    A.    Yeah.

2          I looked on the shelf and the one I have is the 2001,

3    but I'm pretty sure I subscribed right after it came out in

4    1990.  I'd gone into private practice from the Defender

5    Association in '88.  I knew the book was in progress.  I -- I

6    have a vague recollection of even sending over a form or two to

7    -- to Mr. Rudovsky when they were in the process of putting it

8    together.  So, I'm pretty sure, I subscribed right away.

9    Q.    When you subscribed on or about in 1988, did you know

10   Professor Rudovsky and Professor Sosnov?

11   A.    Yes.

12         I -- when I graduated from law school in 1983, I went

13   to work at the Defender Association of Philadelphia, I was there

14   for not quite five years.

15         At that time, Professor Rudovsky was on a three-year

16   sabbatical from his firm, acting as the First Assistant Defender

17   of the Defender Association and so, I got to know him very well

18   through that.

19         And Len Sosnov was a Senior Appellate Attorney and I

20   think that his particular job description was law reform at the

21   time.  But Len was one of the go-to guys on appellate issues or

22   -- or law-development issues.

23         So, I -- I knew both of them very well professionally.

24   Q.    Why did you decide to become a subscriber for the treaties?

25         MR. RITTINGER:  Your Honor, objection.

1    THE COURT:  Objection overruled, if he wants it in.

2    A.   As a practitioner, there are certain books that are useful

3    for their forms, for their updates on the law and for giving you

4    a quick summary of things you know.

5         And this book was a corollary for Pennsylvania

6    Criminal Practice to Wright Miller for federal/civil or Goodrich

7    Amram for Pennsylvania civil or Arbiter for Philadelphia civil

8    practice.  It provided text, commentary --

9    THE COURT:  So, it seemed like a good idea at the

10   time.  Go ahead.

11   BY MR. BAZELON:

12   Q.   What if anything did the identity of the authors have to do

13   with your decision?

14   A.   Libraries -- especially back then -- are very expensive, so

15   you're selective and you're trying to pick things that are going

16   to be useful to you.

17        And in determining whether something is useful, you

18   have to either know of it and know its reputation or know the

19   people involved.  In this case, it was a new book, but the two

20   authors were very highly respected.

21        Dave Rudovsky is the got-to guy on criminal procedure

22   in Pennsylvania, particularly, Fourth Amendment stuff.

23        And Len is widely known for his appellate work and,

24   particularly, PCRA post-conviction stuff.

25   Q.   Now, I want to direct your attention to December of 2008.

1          At that time, did you receive a pocket part and an

2    invoice for what was called the 2008/2009 pocket part for this

3    treatise?

4    A.    I'm -- I'm sure I received both.

5          We're a two-person practice, we have two lawyers, we

6    have two --

7          THE COURT:  It's all right, you've answered the

8    question.  Wait for another one.

9    Q.    And in connection with the invoice, I want to show you a

10   document which I've marked as P-4 and ask you if you can

11   identify this for us?

12         THE COURT:  And he wants you to tell us, yes, this is

13   the invoice you got.

14   A.    Yes, this is the invoice I got.

15   Q.    And when you received this invoice, did you receive it at

16   the same time or if not, how close in time to you actually

17   receiving the 2008/2009 pocket part?

18   A.    We subscribe to a number of West publications.

19         And the way it works is, the pocket part come in with

20   a shipping manifest of some kind, usually, taped to the cover of

21   the box or the envelope or inside.

22         Someone on my staff unpacks it, they -- they replace

23   the old pocket part with the new pocket part.  And at some later

24   point, we receive invoices.  It's usually not together.

25         THE COURT:  Well, just as a matter of curiosity, the

1    bottom portion you're supposed to re -- return with payment, how

2    come it's still here?

3                THE WITNESS:  Well, Judge --

4                (Laughter.)

5                THE WITNESS:  -- end of the year, a lot of bills.

6                West -- West is very good about sending followup

7    notices where they list all your outstanding invoices.

8                THE COURT:  Okay.

9                THE WITNESS:  And I tend to pay them in clumps.

10               I'm -- I'm the bookkeeper/chief cook and bottle washer

11   and it just happens that way, sometimes.

12   BY MR. BAZELON:

13   Q.   Has the invoice been paid?

14   A.   Yes.

15   Q.   And this invoice is dated -- is it not -- December 26th,

16   2008?

17   A.   That's what date it says, yes.

18               MR. BAZELON:  I want to mark as Exhibit P-5 and I do

19   not have an extra copy of this, this is the cover page for the

20   2008/2009 pocket part.

21   Q.   I want to show this document along with the 2008/2009

22   pocket part and ask you whether P-5 is the cover page for that

23   document, that is for the pocket part you received in December

24   of 2008?

25   A.   That is the pocket part.

1          Do I know exactly when I got it -- but it's the one

2     that's in my book that I looked at yesterday, that's the one

3     that's there -- when I got it, December, November, January, I

4     don't know.  I know it was there when I spoke to David Rudovsky

5     some time in February -- January or February.

6     Q.   And the cover page is the -- is the cover page of that

7     pocket part?

8     A.   It seems to be the same one, yeah.

9          MR. RITTINGER:  I'm sorry, I couldn't hear your

10    answer.

11         THE WITNESS:  I said, it seems to be the same one and

12    then, I said, yeah.

13         (Pause at 3:43 p.m.)

14         THE WITNESS:  You know, I'm not sure if it was

15    simultaneous, but I think I also got a CD with all of this with

16    the forms, if I remember correctly.  I'm not sure what the

17    timing is, but I know that -- that periodically forms come out

18    on a CD.

19    BY MR. BAZELON:

20    Q.   Mr. Yatvin, as a attorney practicing in criminal law and

21    civil rights, what do you expect to be contained in the pocket

22    part to this treatise?

23         MR. RITTINGER:  Objection.

24         THE COURT:  The objection is overruled.  But it's

25    unnecessary.  You expect all the up-to-date information, right?

1          THE WITNESS:  I -- I expect the cases to be up to

2     date, the text to be up to date and the forms to be updated

3     consistent with the case law and -- and the text.

4          MR. BAZELON:  Nothing further, your Honor.

5          THE COURT:  Any questions?

6          MR. RITTINGER:  Yes, your Honor.

7                         CROSS-EXAMINATION

8     BY MR. RITTINGER:

9     Q.   I -- I missed it.

10         Do you specifically recall receiving the invoice

11    that's been marked into evidence?

12    A.   No, when -- when I was asked if I had an invoice, I have a

13    box where I keep pending bills or recently-paid bills and it's

14    all clipped together and I pulled out the West packet and I

15    don't know if it was in the paid or the to be paid, but it was

16    in there.  I have no specific recollection.

17         I get more West mail than any other category because

18    everything you've ever subscribed to, they send you trying to

19    get you to go back to subscribing it.

20    Q.   All right.

21         Well, let -- let me ask you this question:

22         First of all, when is the first time that you learned

23    that there was a dispute between West and the plaintiffs?

24    A.   I -- well, the first time I learned that there was a

25    problem with the pocket -- with the pocket part --

1   Q.   Well, that's what I -- yeah.

2   A.   You know, I want to say it was February, but it may have

3   been January.

4   Q.   All right.

5        Do you recall, did you receive a copy of Defendant's

6   Exhibit A?

7   A.   You know, I -- I was asked about it.  I -- I don't recall

8   seeing it.  I'm not saying it didn't come in, like, I say, I get

9   a lot of stuff from West, but I don't recognize it.

10  Q.   Well, is it fair to say that -- that any letter that --

11  according to -- at least, in your practice, any letter that

12  comes in from West, you really don't pay that much attention to?

13  A.   No, it -- it all comes -- it all ends up on my desk.

14       And some of it goes into the shredder and some of it

15  goes into the bill file and any -- I get pocket parts which go

16  in the book.

17       I also sometimes get stickers.  They send you out,

18  like, these adhesive things that you -- you're putting over

19  certain sections of the books or the pocket parts.

20       And I look at it all, but I don't have a specific

21  recollection of that letter.  I don't know if I got it or not --

22  I'm not saying, I didn't get it, but I don't remember seeing it.

23  Q.   Let me ask you this question:

24       In your practice, you said that you expect print

25  products to be up to date.

1        You are aware that there's always going to be a lag

2   between the time that you receive the print product and the time

3   that the print product was actually prepared, correct?

4   A.   Of course.

5   Q.   All right.

6   A.   Of course.

7   Q.   And you also know there's going to be a lag a lot of times

8   between the time that you actually got the current supplement

9   and the time that you actually look at it, correct?

10  A.   Of course.

11  Q.   All right.

12       And is it your practice similar to the -- you were in

13  court during the Professor's testimony, correct?

14  A.   Yes, I was.

15  Q.   All right.

16       And it is your practice always to Shepardize or

17  KeyCite cases that you find in a treatise?

18  A.   You know, if I'm writing a brief or a memorandum for the

19  Court, I'm going to Shepardize, I'm a Lexis subscriber, I'm

20  going to Shepardize it.

21       But if I'm checking something that doesn't rise to

22  that level, I may not Shepardize it, I may rely on what's in the

23  book in the pocket part.

24  Q.   But you're -- you do understand that anything you're

25  submitting to a court or anything that you're relying on to go

1    to a court, good practice mandates that it be Shepardized or

2    KeyCited, is that correct?

3    A.    Sure.  I can give you an example, if you'd like.

4    Q.    No, that's okay.

5          Have you checked today to see if the new supplement

6    has arrived?

7    A.    I left my office around noon.

8          THE COURT:  It's either yes or no.

9    A.    The mail had not come when I last spoke to my office.

10         THE COURT:  I think the answer is, no.

11         MR. RITTINGER:  Thank you, your Honor.

12         No further questions.

13         THE COURT:  You may step down.  Thank you, sir.

14         Oh, wait a minute, okay.

15         MR. BAZELON:  Your Honor, can you give me one second?

16         (Discussion held off the record.)

17         MR. BAZELON:  No further questions, your Honor.

18         THE COURT:  You may step down.  Thank you, sir.

19         THE WITNESS:  Thank you, your Honor.

20         MR. BAZELON:  Thank you.

21         (Witness excused at 3:48 p.m.)

22         MR. YATVIN:  Your Honor, may I be excused?

23         THE COURT:  Sure.

24         MR. YATVIN:  Thank you.

25         (Discussion held off the record.)

1          MR. BAZELON:  Yes, thank you.

2          Your Honor, I'm calling as my next -- and I believe

3    last witness -- Noah Charlson.

4          ESR OPERATOR:  Good afternoon, sir.

5          Please place your left hand on the Bible and raise

6    your right hand.

7          NOAH CHARLSON, PLAINTIFF WITNESS, AFFIRMED.

8          ESR OPERATOR:  Please state your name and spell your

9    last name for the record, please.

10          THE WITNESS:  Noah Charlson, C-h-a-r-l-s-o-n.

11          ESR OPERATOR:  Thank you, sir.

12          MR. RITTINGER:  Your Honor -- your Honor, I believe

13    this witness is an attorney in Mr. Bazelon's firm and I think

14    his name --

15          THE COURT:  Well, that's not a criminal offense, go

16    ahead.

17          (Laughter.)

18          MR. RITTINGER:  Well --

19          MR. BAZELON:  I hope not, Judge.  Thank you.

20                       DIRECT EXAMINATION

21    BY MR. BAZELON:

22    Q.   Mr. Charlson, are you an attorney at Bazelon, Less and

23    Feldman?

24    A.   I am.

25    Q.   Are you, in fact, a shareholder at Bazelon, Less and

1   Feldman?

2   A.   I am.

3   Q.   Mr. Charlson, do you have occasion frequently in your legal

4   practice to use West Law?

5   A.   I do.

6   Q.   How many years have you been practicing?

7   A.   Thirteen, I believe.

8   Q.   And have you specifically used West Law to access what I'll

9   call the Rudovsky/Sosnov treatise?

10  A.   I have.

11  Q.   I want to mark as P-6, a document that I'm going to ask you

12  please identify.

13          (Pause at 3:50 p.m.)

14  Q.   Would you tell the Court what Exhibit P-6 is, please?

15  A.   These are several pages that I printed out this morning

16  from West Law for the purpose of demonstrating what a user who

17  accesses the Pennsylvania Criminal Procedure database would see

18  and what they would need to do in order to access the Scope

19  Section that there's been testimony about this -- this

20  afternoon.

21  Q.   Mr. Charlson, would you describe the process that an

22  attorney goes through if he or she wants to access the Scope

23  page for the treatise on West Law and when you do so,

24  incorporating the images on Exhibit P-6?

25  A.   Certainly.

1          Page 1 of Exhibit 6 is the -- the main screen --

2          MR. RITTINGER:  Your Honor, could we get a date as to

3    when this was done?

4          MR. BAZELON:  He said this morning.

5          THE COURT:  This morning, I think.

6          MR. RITTINGER:  This morning?

7          MR. BAZELON:  This -- well --

8          THE WITNESS:  Yes, approximately, four hours ago,

9    actually.  Probably, around 11:55 this morning.

10   A.   The first --

11   Q.   Just -- just so we're -- we're clear on this.

12          You're talk -- that is when you prepared these

13   exhibits and did the search that is reflected on these exhibits?

14   A.   Well, it's not a search but that's when I printed -- this

15   document was printed out, yes.

16   Q.   Okay.

17          Had you on other occasions done the same search?

18   A.   I -- I have --

19   Q.   Or the other -- what --

20   A.   -- I have accessed the Pennsylvania Criminal Procedure

21   database on West Law frequently in the last several months.

22          THE COURT:  Well, you had started to tell us what Page

23   1 is.

24          THE WITNESS:  Yes, Page 1, your Honor, is the main

25   screen that comes up as soon as I log into West Law.

1       Page 2 is the same screen, except that on the left-

2   hand side, most of the way down, I have typed in the database

3   identifier for the Pennsylvania Criminal Procedure database on

4   West Law, that's where it says, PAPRAC-CPFC, that is the West

5   Law code to get into the database for the Rudovsky and Sosnov

6   treatise.

7       The third page show the search box, once I get into

8   the Rudovsky/Sosnov database on West law.

9       And if I was going to be searching within that

10  database, I would enter the search terms in the box that appears

11  there on Page 3.

12      You'll also see at the top in the center, a -- next to

13  the words, West Pennsylvania Practice Series Criminal Procedure,

14  PAPRAC-CPFC, a circle with a small letter i in the middle of it.

15      If you happen to click on that icon, you would be

16  taken to what is known as the Scope Section of the database,

17  which appears on Pages 4 and 5.

18      And that -- I wouldn't say that's necessarily, the

19  only way to get into the Scope Section, it's certainly the only

20  way that I am aware of to get into the Scope Section.

21      And -- well, I think that answers the question.

22  That's what this -- that's what this exhibit is.

23      (Pause at 3:55 p.m.)

24      MR. BAZELON:  No further questions, your Honor.

25      THE COURT:  Any questions?

1          MR. RITTINGER:  Yes -- yes, your Honor.

2                    CROSS-EXAMINATION

3     BY MR. RITTINGER:

4     Q.   I'm just curious, you say you accessed West Law and you got

5     to this this morning?

6     A.   I did.

7     Q.   All right.

8          And this -- this according to your understanding is

9     currently on West Law?

10    A.   According to my understanding, it is, because -- actually,

11    I should say that the Scope -- let me correct something I said.

12         The Scope Section -- Pages 4, 5 and 6 -- is not a

13    direct screen shot, because I could not print the entire -- I

14    could not print the entire Scope as a screen shot, I had to copy

15    it into -- from the Internet Explorer program into a Word

16    program and print it as a Word document.

17         So, I can't say that this was printed directly as a

18    screen shot, but this was printed this morning at four o'clock.

19    Q.   Well, I mean, do you know whether that -- the -- the Scope

20    Section or the -- the last couple of pages and particularly,

21    that part under Content Highlights is what was available on West

22    Law today?

23    A.   Yes, this was -- I did this today.

24    Q.   All right.

25         MR. RITTINGER:  Let -- let me have marked as

1   Defendant's Exhibit -- A, B, C, D, E, F.

2          Your Honor, I -- I -- again -- I don't have an extra

3   copy of this.

4   BY MR. RITTINGER:

5   Q.   And I guess, first of all, what is the --

6          MR. BAZELON:  May I see it, please?

7          MR. RITTINGER:  Yeah.

8   Q.   What is it on --

9          MR. RITTINGER:  Has this been marked as an exhibit?

10         THE WITNESS:  6.

11         MR. BAZELON:  Yes.

12         THE WITNESS:  P-6.

13  Q.   -- 6 that shows that the Scope page is current as of

14  today's date?

15  A.   (No verbal response.)

16  Q.   Is there anything that you can point to?

17  A.   Ah, my testimony.

18  Q.   No, I know but I'm talking about on the document, itself?

19  A.   I don't -- well, under coverage it says:

20         The database is current through the 2009 edition which

21  the Scope Section didn't say, at least, any time before Friday,

22  April 10th, according to you.

23         So, I -- 'cause I have been routinely monitoring the

24  Scope Section of the West database and it has not until -- until

25  yesterday -- to the best of my knowledge -- had never said,

1  current through the 2009 edition.

2          Previously, it had said something to the effect that

3  the database is current either through the 2008 edition or,

4  perhaps, through the 2007/2008 pocket part.

5  Q.  All right.

6          And the first time that you have accessed it since

7  that was on there, was -- was today?

8  A.  Ah, probably, yesterday, but I printed this today.

9  Q.  Well --

10  A.  I accessed it yesterday, but I printed it --

11  Q.  -- could this be -- could this be have -- could this be

12  current then even according to your testimony only as of

13  yesterday?

14  A.  I don't understand your question.

15  Q.  Well, did you access it again today before you printed it?

16  A.  I couldn't have printed it without accessing it.

17  Q.  All right.

18          Let me show you --

19          MR. RITTINGER:  Your Honor, may -- may I approach the

20  witness and read the document?

21          THE COURT:  Of course.

22          (Pause at 3:58 p.m.)

23          MR. RITTINGER:  Your Honor --

24          THE COURT:  Go ahead --

25          MR. RITTINGER:  -- is it all right, if I --

1           THE COURT:  -- I said, yes.

2   BY MR. RITTINGER:

3   Q.   Can you -- based upon your knowledge of West -- of how West

4   Law operates -- can you identify what the first page of this is?

5   A.   This appears to be a search screen for the Pennsylvania

6   Practice Series database, but I notice -- now, whether this is a

7   Westlaw.com or West Law's proprietary software, I don't know --

8   I know sometimes, the search screens look different.

9           However, it seems to be a different database -- a

10  slightly different database -- than the one that I accessed

11  because PAPRAC is a database for -- from my understanding -- you

12  should know, 'cause you're counsel for West -- but it would seem

13  to be to be all of Pennsylvania Practice Series, including a --

14  a number -- whatever those ten different volumes are.  I

15  accessed, specifically, the Criminal Practice forms and

16  commentaries which is what the CPFC is as far as I know.

17  Q.   All right.

18          And turning to the next page, can you -- do you

19  recognize what that is?

20  A.   The second page of Exhibit --

21  Q.   F.

22  A.   -- F looks familiar to me as a Scope Section for the

23  Pennsylvania Practice Series database, which I have accessed

24  previously, although not today.

25  Q.   All right.

1           And could you read what it says under Content

2    Highlights?

3    A.   West's Pennsylvania Practice Series written by local

4         experts as a practical and formative survey of PA.

5         Practice.

6    Q.   All right.

7           And then, under Content Highlights, it's a note?

8    A.   Note regarding Criminal Procedures Second edition.

9         Although the title page of the supplement references

10        David Rudovsky -- excuse me -- David Rudovsky and

11        Leonard Sosnov, neither author participated in the

12        2008-2009.

13   Q.   All right.

14          And that seems to be different from the one that you

15   have?

16   A.   Ah, slightly different.

17          The one that -- Plaintiff's Exhibit 6 -- which is the

18   Criminal Procedure database says something slightly different

19   than that.

20   Q.   Okay.

21          MR. RITTINGER:  I have no further questions, your

22   Honor.

23                    <u>REDIRECT EXAMINATION</u>

24   BY MR. BAZELON:

25   Q.   Mr. Charlson, in your work with West Law doing legal

1   research, how frequently do you access the Scope Section of a

2   treatise?

3   A.   Ah, the -- the Scope Section is something in my

4   experience --

5              MR. RITTINGER:  Your Honor, I -- I --

6              THE COURT:  He may answer the question.  Go ahead.

7   A.   It is -- it is not a routine part of computerized legal

8   research at all.

9              In my experience and the experience of others, you

10  know, with whom I have spoken, it's generally used only if one

11  is uncertain what's included in a particular database.

12             For example, how -- how far back the cases may go in a

13  particular case-related database or if it's a database

14  containing many different -- different types of source material,

15  one might want to know what's included.

16             But if one is accessing a specific database for a

17  particular treatise, I certainly would have no reason to check

18  the Scope Section.  And it -- it's certainly not something that

19  a user, who is doing routine research would access in my

20  experience.

21             MR. BAZELON:  No further questions.

22                         RECROSS-EXAMINATION

23  BY MR. RITTINGER:

24  Q.   You're an attorney on the papers for the plaintiff in this

25  case, correct?

1    A.    That is correct.

2    Q.    You prepared the papers and the legal arguments, isn't that

3    correct?

4    A.    That's correct as well.

5    Q.    And did the research, correct?

6    A.    Ah, did some of it, yes.

7              MR. RITTINGER:  I have no further questions.

8              THE COURT:  You may step down.  Thank you, sir.

9              (Witness excused at 4:03 p.m.)

10                              *  *  *

11             (The remainder of the proceedings from 4:03 p.m.

12    until 4:27 p.m. have been previously transcribed and filed

13    under separate cover.)

14                              *  *  *

15

16

17

18

19

20

21

22

                              I N D E X

WITNESS               DIRECT    CROSS     REDIRECT   RECROSS

DOUGLAS FRENKEL

| Witness | | | | |
|---|---|---|---|---|
| By Mr. Bazelon | 3 | | | |
| By Mr. Rittinger | | 7 | - | - |
| **DAVID RUDOVSKY** | | | | |
| By Mr. Bazelon | 9 | | | |
| By Mr. Rittinger | | 27 | | |
| By Mr. Bazelon | | | 53 | |
| By Mr. Rittinger | | | | 57 |
| **ALAN YATVIN** | | | | |
| By Mr. Bazelon | 63 | | | |
| By Mr. Rittinger | | 69 | - | - |
| **NOAH CHARLSON** | | | | |
| By Mr. Bazelon | 73 | | | |
| By Mr. Rittinger | | 77 | | |
| By Mr. Bazelon | | | 82 | |
| By Mr. Rittinger | | | | 83 |

\* \* \*

| PLAINTIFF EXHIBITS | | IDENTIFIED | EVIDENCE |
|---|---|---|---|
| P-1 | *Curriculum Vitae* of D. Frenkel | 3 | - |
| P-2 | *Curriculum Vitae* of D. Rudovsky | 9 | - |
| P-3 | *Curriculum Vitae* of A. Yatvin | 63 | - |
| P-4 | Invoice | 66 | - |
| P-5 | Cover Page for 2008/2000 Pocket Part | 67 | - |
| P-6 | West Law Pages | 74 | - |

| DEFENSE EXHIBITS | | IDENTIFIED | EVIDENCE |
|---|---|---|---|
| D-A | Customer Letter | 27 | - |
| D-B | Declaration of D. Rudovsky | 36 | - |
| D-C | 2000 Agreement | 39 | - |
| D-D | E-Mail/Document | 48 | - |
| D-E | Shelving Instructions | 57 | - |
| D-F | Document | 78 | - |

\* \* \*

<u>C E R T I F I C A T E</u>

    I do hereby certify that the foregoing is a correct transcript of the electronic-sound recording of the proceedings in the above-entitled matter.


_____          Date: <u>May 2, 2009</u>
Gail Drummond
28 8th Avenue
Haddon Heights, New Jersey  08035
(856) 546-6270