UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


DAVID RUDOVSKY and            )   09-CV-0727
LEONARD SOSNOV,               )
                              )
                              )
        Plaintiffs,           )
                              )
    vs.                       )
                              )
                              )
WEST PUBLISHING               )
CORPORATION, WEST SERVICES,   )
INC., and THOMPSON LEGAL      )
AND REGULATORY, INC., t/a     )
THOMPSON WEST,                )   Philadelphia, PA
                              )   December 16, 2010
        Defendants.           )   9:58 a.m.


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JOHN P. FULLAM
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs:        RICHARD L. BAZELON, ESQUIRE
                           MATTHEW R. SKOLNIK, ESQUIRE
                           NOAH H. CHARLSON, ESQUIRE
                           BAZELON, LESS & FELDMAN, P.C.
                           1515 Market Street
                           Suite 700
                           Philadelphia, PA   19102


For the Defendants:        AARON M. ZEISLER, ESQUIRE
                           JAMES F. RITTINGER, ESQUIRE
                           SATTERLEE STEPHENS BURKE &
                           BURKE, LLP
                           230 Park Avenue
                           New York, NY   10169

2

Audio Operator:        Dennis Taylor


Transcribed by:        DIANA DOMAN TRANSCRIBING
                       P.O. Box 129
                       Gibbsboro, New Jersey  08026-0129
                       Office:  (856) 435-7172
                       Fax:     (856) 435-7124
                       E-mail:  dianadoman@comcast.net



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

3

I N D E X

CLOSING ARGUMENT:                    PAGE NUMBER
  By Mr. Bazelon                        40, 88
  By Mr. Rittinger                        66


JURY INSTRUCTIONS:                   PAGE NUMBER
  By Judge Fullam                   104, 119, 130


VERDICT:                             PAGE NUMBER
  By The Court                           133

POLLING JURY:                        PAGE NUMBER
  By the Courtroom Clerk                 134

Colloquy                                                       4

1              COURTROOM CLERK:  Court is now in session.

2              THE COURT:  Good morning.

3              UNIDENTIFIED COUNSEL:  Good morning, Your Honor.

4              THE COURT:  May I see that, please?  What's the

5       situation?

6              MR. RITTINGER:  Well, the situation, I think, is,

7       Your Honor, that we --

8              THE COURT:  Pardon?

9              MR. BAZELON:  The -- the parties have closed, Your

10      Honor, and --

11             THE COURT:  I -- I thought defense said they had some

12      more evidence.

13             MR. BAZELON:  No, Your Honor, not that I'm aware of.

14             THE COURT:  Oh, okay.  Well, then let us up and

15      doing.  I've proposed to use the verdict form which I showed

16      you yesterday.  I'm not going to use the defendant's on which

17      it's simply a detailed questionnaire, which stresses the

18      defendant's position too -- too much.  I have instructions here

19      that I've proposed to use if you want to read them.  I don't

20      know, how -- how many copies do we have?

21             COURTROOM CLERK:  I don't think we have any copies.

22             THE COURT:  Pardon?

23             COURTROOM CLERK:  We don't have any copies, Judge.

24             THE COURT:  You can look them over, see what you

25      think.

1              MR. RITTINGER:  Your Honor, may we -- may was be

2     heard on a special verdict form?  (No audible response)  As I

3     understand Your Honor's, it doesn't make any distinction

4     between the finding of per se libel or actual malice.  And I

5     think the law is pretty clear, starting with <u>New York Times v.</u>

6     <u>Solesman</u> (phonetic), that there should be special verdicts and

7     -- given to juries in libel cases.

8              THE COURT:  What's your position, Mr. Bazelon?

9              MR. BAZELON:  Our -- our position, Your Honor, is

10    that that would be covered in the charge.

11             THE COURT:  At least that's what I plan to do.

12             MR. RITTINGER:  But I'm talking about a special

13    verdicts, Your Honor.  The problem is at the -- at the -- when

14    the -- when the jury comes in, if all they have is a

15    compensatory damage award, you don't know what they did it on.

16    Here, you -- here, it's even more compounded because they have

17    to make a finding of libel per se based upon the instruction

18    having to do with the user concluding.  And we also have Third

19    Circuit law on that as well, Your Honor.

20             THE COURT:  Well, the problem with your form is the

21    questions don't make much sense.  "Did the users of the 2008

22    pocket part conclude that it was inaccurate and out of date?"

23    Does that mean that everybody that subscribed had to conclude

24    that it was?  It seems to me that it's --

25             MR. RITTINGER:  Well, Your Honor --

Colloquy                                    6

1          THE COURT:  -- it's libel as if only if one or two.

2          MR. RITTINGER:  Your Honor, it can be modified, but

3     that's taken from your order.

4          THE COURT:  Pardon?

5          MR. RITTINGER:  I -- I believe that is taken from

6     your order.  Your order uses intended users or intended

7     audience.

8          THE COURT:  What order?  I didn't -- I've never had

9     an order as to what --

10         MR. RITTINGER:  No, your -- you -- your order of

11    December 10th, when you determined that on our motion to re-

12    argue -- we made a motion to re-argue, saying that the Court

13    was supposed to, as a matter of law, determine whether a

14    statement is libel as a per se or not.  There is no dispute in

15    this case that if -- if it's not libel per se, the case is

16    over, because there's no special damages.

17         Your Honor has granted the motion to re-argue and --

18    but then issued an order that said that you were going to give

19    to the jury the question of whether the -- I think the words

20    were intended audience concluded that the supplement was

21    inaccurate or out of date, then you would determine that it was

22    libel per se.  So we're just -- we're -- we're using what we

23    understand -- and by the way, that instruction is in -- in the

24    instructions submitted by the plaintiffs as well.

25         MR. BAZELON:  It certainly is not.  There's --

1              MR. RITTINGER:  Well, but --

2              MR. BAZELON:  There's a major difference between -- I

3      respectfully submit, Judge, between what Mr. Rittinger has just

4      told you and what your order of December the -- I think it's

5      December 8th said.  Your order said, "It is for the jury to

6      determine whether the intended audience of the pocket part

7      would conclude," and -- and then it goes on, "would conclude

8      that the plaintiffs authored an inaccurate and out-of-date

9      supplement to the treatise.

10             What -- what that means, at least to me, and I don't

11     want to be presumptuous, but I would expect to Your Honor, was

12     that the jury looks at the facts as to what was published and

13     uses it -- its judgment to determine what a reader would

14     conclude, not -- it's much different than what Mr. Rittinger is

15     saying.  He's asking that there's a factual finding as to what

16     readers actually did conclude as compared to what they would

17     naturally, in the normal course, conclude based on the

18     publication.  That is a major difference.  But in any event,

19     Judge, that is covered in the instructions.  And presumably,

20     hopefully, the instructions will be so worded.  Your Honor --

21             MR. RITTINGER:  Your Honor, here's -- here's the

22     problem.

23             THE COURT:  Pardon?

24             MR. RITTINGER:  I said here is the problem that we --

25     that we face in terms of what we submit to -- I'm sorry.

Colloquy                                                    8

1    Here's -- here's the problem in terms of what we -- we -- we

2    face with respect to what goes to the jury.  Normally, libel

3    per se is going to be decided by the Court, and you're not

4    going to have something like that.  But this is clear -- this

5    is not -- I mean, I know of no other case where you have

6    something like this that -- where -- where the -- where the --

7    it cannot be determined on its face that it's libel per se.

8    Therefore, it -- and if the jury -- there's got to be some

9    proof that somebody read it.

10          If this was -- if this -- if we had put in the back

11   of the supplement the plaintiffs are unskillful and do not

12   write -- they write outdated and inaccurate supplements, we

13   wouldn't have this problem.  But as Your Honor pointed out in

14   connection with the motions for the directed verdict, they

15   haven't even proved that somebody read it, let alone that

16   somebody read it and used a part that was inaccurate and out of

17   date, let alone somebody read it, used the part that was

18   inaccurate and out of date, and concluded that it was false --

19   or that it was inaccurate and out of date.  And if the jury

20   finds that that didn't -- that didn't happen, this case is over

21   and we don't have to go on any further.

22          THE COURT:  No, I -- I disagree.

23          MR. BAZELON:  Yes, that I -- I didn't waste Your

24   Honor's time.  Those arguments have been made time and time

25   again and rejected.

Colloquy                                          9

1              THE COURT:  I propose to let you -- can we make a

2      copy of this?

3              COURTROOM CLERK:  Yes, Your Honor.

4              THE COURT:  We'll have copies of the proposed

5      instructions made for you and you can --

6              MR. BAZELON:  Your Honor -- I'm sorry.

7              THE COURT:  -- read them and see whether you have

8      objection to them or not.

9              MR. RITTINGER:  Well, Your Honor, what about the --

10     what about a specific instruction with respect to actual

11     malice?

12             THE COURT:  Wait till you see the instructions.

13             MR. RITTINGER:  And -- and a special verdict with

14     respect to actual malice.

15             THE COURT:  What about it?

16             MR. RITTINGER:  Well, I think we're entitled to it as

17     a matter of law, Your Honor.

18             THE COURT:  We'll hear from you after you've reviewed

19     the proposed charge and see if you still have the argument.

20                             (Recess)

21             COURTROOM CLERK:  All rise.

22             THE COURT:  Okay.  How many screams -- be seated,

23     please.  How many screams of anguish do we have after you've

24     reviewed the proposed instructions?

25             MR. BAZELON:  Your Honor, we just have very few

1    suggestions that we would offer to Your Honor.

2              THE COURT:  Let's hear them.

3              MR. BAZELON:  The -- you have a bracket on page 1.

4              THE COURT:  About 209, you mean?

5              MR. BAZELON:  Yeah.  Yes.  Yes, Your Honor.

6    Plaintiffs will --

7              THE COURT:  I propose to leave that out.  You're --

8    you're not seeking damages for the 2009 supplement, are you?

9              MR. BAZELON:  Well, we are, Your Honor.  We are in

10   the sense that if it's -- it didn't remedy.  But we can go

11   either way on how that's worded there.

12             THE COURT:  Well, what do you want me to do?

13             MR. BAZELON:  Our preference would be 2008 and 2009.

14             THE COURT:  Any problem with that?

15             MR. RITTINGER:  Well, yes, Your Honor.  We don't

16   think 2009 should be in.  But if his preference is to go either

17   way, let's just do 2008, and then we're -- we don't have to --

18   at least we -- we got that out of the way.

19             THE COURT:  Okay.  Let's just stick with 2008.  And

20   you can argue that the effect of 2008 continued into 2009

21   because of various things but -- okay?

22             MR. BAZELON:  Yes.  We -- we -- it's -- that's

23   satisfactory.  Your Honor, this is very small.  You have some

24   mays here -- jury may find, where -- on page -- on the top of

25   page 4, for example, where the -- the May language follows

1    based on a premise that the jury has made certain findings.  We

2    believe that the more appropriate word there would be shall.

3              THE COURT:  Top of page 4.

4              MR. BAZELON:  Page 4, the top.

5              THE COURT:  In other words --

6              MR. BAZELON:  Then --

7              THE COURT:  Or then you must -- or should -- should

8    would probably be a good word there.

9              MR. RITTINGER:  Well, Your Honor, that -- no, they

10   can conclude that it was inaccurate and out of date and still

11   not believe it libeled them.

12             MR. BAZELON:  No, I -- I believe that that's not

13   correct.  If they conclude that, then it's libel -- then it's

14   defamation per se.

15             MR. RITTINGER:  But -- but you still have to prove

16   damages.  Or you could presume damages, but they still have to

17   presume.  I think may is the right word, Your Honor.

18             THE COURT:  I think it's close enough.

19             MR. BAZELON:  All right.  Thank you.

20             MR. RITTINGER:  Your Honor, I don't know if it makes

21   sense to stay on this one before we go to something else or --

22             THE COURT:  No.  You'll get your turn later.  Let him

23   -- let him finish.

24             MR. BAZELON:  Your Honor, on page 7, in the second

25   paragraph, the proposed instruction says, "In other words, the

1    plaintiff must demonstrate that the -- that the defendant, in

2    fact, entertained serious doubts as to the truth of his

3    publication or acted with a high degree of awareness of

4    probable false -- falsity."  We believe that the charge should

5    also say that the standard is satisfied if the plaintiff proves

6    that there was purposeful avoidance of knowledge of falsity on

7    behalf of the defendants.

8            And purposeful avoidance is a standard which is set

9    forth in the cases, and in particularly it's our instruction 12

10   where we say you may -- we're suggesting that there be an

11   instruction or it be included in that paragraph, you may find

12   that the defendants acted with actual malice if you determined

13   that defendants purposefully avoided the truth.  And we cite

14   the Harte-Hanks case.  In addition, there's the case of

15   Mzamane, M-Z-A-M-A-N-E, versus Winfrey, which was decided --

16           THE COURT:  What -- what's your evidence?

17           MR. BAZELON:  -- in this court -- it's 693 f. supp.

18   442 -- f. supp. 2d., sorry.  And the Court said, "There are at

19   least two methods available to aid plaintiff in showing

20   reckless disregard for purposes of actual malice.  The second

21   approach through which a plaintiff can establish reckless

22   disregard is by demonstrating that the publisher purposefully

23   avoided contradictory information due to the publisher's doubts

24   as to the truth of his own statements.  The theory is akin to

25   the proverbial, quote, burying one's own head in the sand,

Colloquy                                         13

1     closed quote, to avoid obtaining conflicting information."  So

2     we're -- we're suggesting that --

3                    THE COURT:  What were you reading from?

4                    MR. BAZELON:  I'm -- I'm sorry?

5                    THE COURT:  What were you reading from?

6                    MR. BAZELON:  I was reading from the case of Mzamane

7     versus Winfrey at 693 f. supp. 2d. 442.

8                    THE COURT:  That's a mere District Judge.

9                    MR. BAZELON:  That's a mere District Judge at page

10    506.

11                   THE COURT:  Which court?

12                   MR. BAZELON:  It's the Eastern District, Your Honor.

13    Are you asking me the Judge?

14                   THE COURT:  Yes.

15                   MR. BAZELON:  Robreno.

16                   THE COURT:  Okay.  Maybe -- maybe you agree?

17                   MR. RITTINGER:  No, I don't agree, Your Honor.  I

18    think that -- that actually trumps Supreme Court language about

19    serious doubts, high -- yeah, I mean, that makes it sound --

20    the Supreme Court in numerous cases has set forth standards

21    that require --

22                   THE COURT:  Okay.  Let's shorten the argument.  You

23    don't agree with that.  What -- what else do you got?

24                   MR. BAZELON:  I would just also point out, Your

25    Honor, Judge Robreno was in -- in -- was relying on the Supreme

Colloquy                                                14

1    Court opinion in the <u>Harte-Hanks</u> case.

2              THE COURT:  Oh, but what do they know.  Okay.

3              MR. BAZELON:  And Your Honor, on page 9, under

4    damages, Your Honor says at the -- in the first sentence, "I

5    explained you may find that the defendants defamed the

6    plaintiffs if the intended audience of the pocket part would

7    conclude that the plaintiffs authored inaccurate and out-of-

8    date supplement to the treatise."  We would suggest to Your

9    Honor to put in the word reasonably -- if the plaintiffs

10   reasonably conclude.

11             THE COURT:  All right.

12             MR. BAZELON:  I'm sorry, the intended audience would

13   reasonably conclude.

14             THE COURT:  Right.  Any objection to reasonably?

15             MR. BAZELON:  I mean, I -- any -- any reasonably

16   conclude actually.

17             MR. RITTINGER:  But Your Honor, that makes it

18   speculative.  I think it -- I think it should be the way it's

19   written.  Reasonably isn't in your order.

20             THE COURT:  Anything further?

21             MR. BAZELON:  Your Honor, yes, there is.  We would --

22   we would ask Your Honor to give our proposed charges 19 and 20.

23   19 is punitive damages against the principle, 20 is corporate

24   liability for punitive damages based on acts of an employee.

25   Both of those are major issues in the case.  Our proposed

Colloquy                                        15

1     charges, I think, are really fairly boilerplate on those

2     issues.

3                THE COURT:  Okay.  I don't hear any screams of

4     anguish.

5                MR. RITTINGER:  Judge, I'm sorry, I can't -- I -- I

6     didn't hear you from --

7                UNIDENTIFIED COUNSEL:  He said do you object to 19

8     and 20?

9                MR. RITTINGER:  Yes, Your Honor.

10               UNIDENTIFIED COUNSEL:  You -- you object, he said to

11    you.

12               MR. RITTINGER:  Yeah, I -- I object, Your Honor, to

13    19 and 20.  I don't think they're necessary.  And I think they

14    over-highlight punitive damages.

15               MR. BAZELON:  It's -- a major part of the defendant's

16    contention in this case is that what employees did can't

17    establish liability on the corporation.  We believe that that

18    is not the law and that the jury should be, you know, properly

19    instructed -- instructed on that subject.

20               MR. RITTINGER:  First of all, I don't think that's a

21    major position.  Our position --

22               THE COURT:  Pardon?  What's -- what's your problem

23    with that?

24               MR. RITTINGER:  I -- Your Honor, I think they

25    overemphasize the fact of punitive damages.  The issue here is

Colloquy                                                16

1    whether or not there's -- the -- the West employees acted with

2    knowledge of falsity or reckless disregard for the truth.

3    There's no question about that.  They can be held -- these --

4    all this does is highlight punitive damages, which, of course,

5    we -- we don't think should be in the case anyway.  So --

6            THE COURT:  Well, you don't contend that they have to

7    show that the board of directors of the West Publishing Company

8    passed a resolution to which the all subscribed, do you?

9            MR. RITTINGER:  No.

10           THE COURT:  It's a corporation which is libel for the

11   action of its employees, right?

12           MR. RITTINGER:  Yeah, but -- yes, it is.

13           THE COURT:  Good.  Okay.  Then I don't see why you

14   would object to the jury being told that.  But let's hear what

15   your -- anything else that you have?

16           MR. BAZELON:  No, Your Honor.  Thank you.

17           THE COURT:  Let's hear your problems with the

18   proposed charged.

19           MR. RITTINGER:  Your Honor, let's -- if we could,

20   let's -- we could go back to --

21           THE COURT:  I want to know what you think should be

22   done.

23           MR. RITTINGER:  Right.  Your Honor, I'd like us to go

24   to page 3.

25           THE COURT:  I'm on page 3.

1          MR. RITTINGER:  Right.  Again, to make it consistent

2     with the -- with the -- with the intended audience instruction

3     later on that we -- we talked about, I think have should come

4     out, and it should be would conclude.

5          MR. BAZELON:  I'm sorry, what --

6          THE COURT:  Page 3 doesn't have anything like that.

7          MR. RITTINGER:  No, the -- the bottom -- the bottom

8     of the page, Your Honor, the last paragraph.

9          THE COURT:  Of page 3?  You got the wrong number, I

10    think.  Maybe I'm looking at the wrong thing.  Okay.  Yes.

11    You're right.  Let's go back now.  Now what's your problem?

12         MR. RITTINGER:  I think it should say would conclude,

13    not would have concluded, to be consistent with Your Honor's

14    order.

15         THE COURT:  Okay.  Yes.

16         MR. RITTINGER:  And Your Honor, to the next page, the

17    last para -- the last sentence, I mean, I guess we could do it

18    one of two ways.  We would either say it's not necessary and it

19    should come out, or it -- but it should be slightly amended to

20    read, in other words, if you find that the communication was

21    false -- in other words, strike was not substantially true --

22    and that it was understood.  I think that makes it consistent

23    with the -- with the sentence before.

24         THE COURT:  Right.

25         MR. BAZELON:  Your Honor, we -- we strongly disagree

1    with that.

2              THE COURT:  What?

3              MR. BAZELON:  And that's the issue we discussed

4    before, Judge.  And that is that what West is attempting to do

5    is to frame this that the jury needs to find that there was an

6    actual determination made by the audience.  And that's the

7    language that Mr. Rittinger is now proposing.  And that's --

8    that's not what Your Honor is doing in the rest of this charge.

9    It's not what Your Honor said in his order.

10             THE COURT:  Right.

11             MR. RITTINGER:  Well, Your Honor, if you look at --

12   if you -- if you look at the instruction on -- that is given,

13   which really takes the language -- it's really just using the

14   statute, which appears on page 1 and 2.  It says, "The falsity

15   of the publication."  And that's -- that's what the statute

16   requires, to -- the statute doesn't require it was not

17   substantially true.  It requires falsity.  That's what a libel

18   is.  And I -- there's no citation for this.  I don't know where

19   it came from.  I don't know if it came from -- I -- but if it

20   -- if it says false and it says was understood, then it's

21   consistent with the statute.

22             THE COURT:  How about we split the difference, that

23   it was false and would reasonably have been understood by those

24   other than the plaintiffs as defamatory?  (No audible response)

25   Okay.  What else do you got?

1          MR. RITTINGER:  Well, Your Honor --

2          MR. BAZELON:  Your Honor, so what -- what's the

3     resolution that you were suggesting, Your Honor?  Sorry, I

4     don't mean to interrupt.

5          THE COURT:  I'm agreeing with him that instead of

6     saying it was not substantially true, it would -- that it was

7     false.  And instead of it might reasonably have been

8     understood, that it would reasonably have been understood.

9          MR. RITTINGER:  Yes, Your Honor.

10         THE COURT:  Okay?

11         MR. BAZELON:  Yes, Your Honor.  You -- you should

12    bear in mind that I don't normally prepare a written charge or

13    read it to the jury.  I like to listen to the arguments of

14    counsel and then refute all their arguments that are improper.

15         MR. RITTINGER:  Somehow I -- somehow I think I get

16    that, Your Honor.

17         MR. BAZELON:  I guess that keeps the argument short,

18    Judge.

19         THE COURT:  Right.

20         MR. RITTINGER:  Your Honor, I -- I think we really

21    need clarification to talk about the last couple, because I'm

22    not sure what Your Honor's ruling is.  It's -- and maybe if I

23    could just -- it's our position that in order to recover either

24    punitive damages, or put it the other way, I don't think

25    there's any dispute about punitive damages.  I think the

1    plaintiff concedes that we have to recover -- they have to

2    prove actual malice.

3              THE COURT:  Yes.  What page are you on?  What --

4              MR. RITTINGER:  Well, I'm starting on the actual

5    malice definition.

6              THE COURT:  Okay.  Let's go.

7              MR. RITTINGER:  Which is page 7.

8              THE COURT:  That's on page 7.

9              MR. RITTINGER:  Right.  And Your Honor, as you read

10   on, the definition itself -- obviously, we have a few minor

11   suggestions, but it doesn't make clear that you need to -- and

12   it doesn't have to make it clear here, but at some point it's

13   got to be made clear that in order to recover presumed damages,

14   the plaintiff has to -- has to establish actual malice as well.

15   And these don't do that.  And they can -- it can be done in a

16   couple of ways, Your Honor.  If you find in favor of the

17   plaintiffs against the defendants, you must also determine for

18   the purposes of presumed and/or punitive damages -- and I'm

19   reading into it -- whether defendants acted intentionally.

20             THE COURT:  I thought we covered presumed damages

21   when discussing damages.  Let me take a look.

22             MR. RITTINGER:  Your Honor, I'm sorry, I cannot hear

23   you.  I'm -- I'm having trouble hearing.  Is it all right if I

24   get a little closer?

25             THE COURT:  That makes two of us.  (Pause)  On page

1    9, the jury is told that if there was a defamation as set for

2    there, or if they were placed in a false light, they're

3    entitled to be fairly and adequately compensated for the harm

4    they suffered.  And you may presume that they suffered this

5    harm because of the nature of the defamation.

6              MR. RITTINGER:  Yes, Your Honor, I don't have any

7    problem with the first part of that, but and you may presume,

8    there's no indication in the damage section that they have to

9    prove actual malice in order to get the presumed damages.  I

10   mean, really, what we -- we have three types of damages that

11   they might be entitled to.  If they -- if the jury finds that,

12   you know, the intended audience part, then its libel is per se

13   and they're entitled to general damages.  But that doesn't

14   entitle them to presumed damages or punitive damages.

15             And I'm -- and I don't -- I don't know if there's a

16   dispute about that, Your Honor, but we've cited a Third Circuit

17   case, and there's plenty of other cases that we could cite.

18   And this particular case, this is <u>Beverly Enterprises versus</u>

19   <u>Trump</u>.  I don't know if that's Donald.  But in any event, in

20   the absence of actual malice, even if the plaintiff need only

21   prove general damages to reputation as in defamation -- as in a

22   defamation per se case, he or she cannot rely on a presumption

23   of damages.  He or she may offer actual specific evidence of --

24   he or she must offer actual specific evidence of such.  So it's

25   -- it's clear that the actual malice standard has to be applied

Colloquy                                22

1       for presumed damages.

2               THE COURT:  And what do you think they recover if

3       they show that they were defamed?

4               MR. RITTINGER:  Without -- without find -- without

5       the finding of actual malice?

6               THE COURT:  Yes.

7               MR. RITTINGER:  Well, in this case, Your Honor, the

8       only thing I think that they can recover for is humiliation,

9       because they haven't -- they have not proven anything else.

10      They said they were humiliated.  In fact, I think that was the

11      linchpin, Your Honor, as I understand Your Honor's decision, so

12      they would get humiliation.  But they don't presumed damages.

13              THE COURT:  Okay.  Let's find out what plaintiff says

14      about presumed damages.

15              MR. BAZELON:  We -- we agree that presumed damages

16      require that the jury find that there was malice.

17              THE COURT:  Right.

18              MR. BAZELON:  And that -- but that -- that, Judge --

19      and I think that I agree with Mr. RITTINGER about this -- that

20      does not apply to emotional injury.

21              THE COURT:  To a what?

22              MR. BAZELON:  To -- to the emotional damages.  It

23      applies to their reputational damages.  And it -- it -- so

24      perhaps the charge, when it references -- and I thought that it

25      did, Your Honor -- that in order to award damages for

1    reputational injury, it should also say this is not required to

2    award damages for emotional injury.

3              THE COURT:  Does not require what?

4              MR. BAZELON:  It does not -- in other words, if Your

5    Honor is charged -- and I'm sorry -- if Your Honor -- if Your

6    Honor places in the charge that in order for the jury to

7    presume damages for the purpose of giving compensation for loss

8    of reputation, the jury must also find that the defendants

9    acted with malice.  We do not object to that.  We -- but we do

10   respectfully suggest that the Court should also say a finding

11   of malice is not required to compensate the plaintiffs for

12   emotional injury.

13             THE COURT:  Uh-huh.

14             MR. RITTINGER:  Well, I think -- I think it does say

15   that.  I mean, I think -- I think this may be -- we -- we can

16   -- if we have a few minutes, I think we can edit this together.

17             THE COURT:  It sounds -- it sounds to me that you're

18   agreeing for the first time.

19             MR. BAZELON:  I think we do.

20             MR. RITTINGER:  Well, I'm agreeing to this extent, I

21   think.  You're saying general damages.  You're -- in other

22   words, if -- if they say no actual malice, then you're entitled

23   to humiliation.  I don't know what -- I guess if that's

24   emotional, fine.  One -- one witness testified that he was

25   humiliated, and I guess he's entitled to be compensated without

1      actual malice for that humiliation.

2                  MR. BAZELON:  Well, I -- I don't agree that that's

3      all that the testimony is.

4                  MR. RITTINGER:  Well, all right, maybe we could --

5                  MR. BAZELON:  But I think we agree on the

6      principle --

7                  MR. RITTINGER:  You want to try to work that -- we

8      can probably try to work this.  Your Honor, I think if -- I

9      think that we -- we submitted a -- our -- a -- instructions

10     where we had a separate instruction for presumed damages.  So

11     in other words, the first would be general damages.  Then, if

12     you found actual malice, then you would -- then -- then you can

13     go to presumed damages.  And then if you found actual malice,

14     you can go to punitive damages.  (Pause)

15                 UNIDENTIFIED COUNSEL:  It's very short.  It's very

16     short.  Maybe we could read it to him.  It's -- it's on page 11

17     of our submission.

18                 THE COURT:  I have it, yes.

19                 UNIDENTIFIED COUNSEL:  It's very short.  (Pause)

20                 MR. BAZELON:  Well, this -- this is a -- and again

21     with -- Judge, this is extremely poorly worded.  The first

22     sentence is totally objectionable.

23                 THE COURT:  I have written alongside of it,

24     "confusing."

25                 MR. BAZELON:  Yeah, that's the least.  Yes, Your

1    Honor, we agree with that.  (Pause)

2                    THE COURT:  You want me to confuse the jury?

3                    MR. RITTINGER:  Your Honor, maybe you could just --

4    under Pennsylvania -- if you start with the second sentence,

5    "Presumed damages are those that are expected to -- unless you

6    find that West acted with Malice" -- I mean, it can be re-

7    written.  I'm not going to defend --

8                    THE COURT:  Yes.

9                    MR. RITTINGER:  I don't know whether it's confusing

10   or not.  Maybe it is.  But that's the concept that has to come

11   in, Your Honor.

12                   UNIDENTIFIED COUNSEL:  We can re-word it.

13                   UNIDENTIFIED COUNSEL:  Strike the first sentence.

14                   THE COURT:  What is the difference between presumed

15   damages and general damages?

16                   MR. RITTINGER:  Well, presumed damages, he's -- he

17   could say to the jury what he's been saying all along.  You can

18   presume that you lost income.  You can presume that they lost

19   -- even without evidence of it.  But without that, he can't do

20   that.  And the jury can't -- can't make any presumptions.  They

21   can only -- they can only determine damages based upon evidence

22   actually presented.  And there's no evidence of any economic

23   loss or --

24                   THE COURT:  Right.  Right.  Right.  And --

25                   MR. RITTINGER:  -- a loss of reputation in -- in

1    this, unless there's actual malice.  And Your Honor, that's why

2    -- well, I mean, that's for another day, I guess.  But I mean,

3    there -- we tried to get in some evidence about their -- well,

4    never mind.  But that's the difference, Your Honor.  And it --

5    it's clearly -- it's clearly distinguishable in the law.  I --

6    I don't think there's a dispute about that.

7              THE COURT:  I don't either.  I propose to take a stab

8    at clarifying the language in your presumed damages section.

9              MR. BAZELON:  And Your Honor, we would respectfully

10   ask that you consider, when you do that, making it clear that

11   that does not apply to emotional injury.

12             THE COURT:  Right.

13             MR. BAZELON:  Thank you.

14             MR. RITTINGER:  Well, Your Honor, then -- (Pause)

15   Your Honor, as a result of the -- we skipped ahead to damages,

16   so I'd just like to go back to the actual malice point again.

17             THE COURT:  Yes.  Sure.

18             MR. RITTINGER:  I don't know where Your Honor came

19   out, but I think we can -- we can --

20             THE COURT:  What page are you looking at now?

21             MR. RITTINGER:  Now I'm back on page 7.  I think we

22   can properly introduce why actual malice is coming -- the

23   definition is coming into the case, if -- if -- if we add at

24   the end of the -- well, in the middle of the third -- let --

25   let me do it this way.  The first -- the first sentence reads,

Colloquy                                             27

1    "If you find in favor of the plaintiffs and against the

2    defendants, you must also determine for purposes of" -- and I

3    would add presumed and/or punitive damages.  And then why --

4    that -- that explains why that is coming in.

5                THE COURT:  All right.

6                MR. BAZELON:  Your Honor, I -- I would prefer it to

7    say a slight variation of that, for purposes of reputational

8    and punitive damages.  I think that makes it clearer to the

9    jury.

10               MR. RITTINGER:  I -- I think it does the exact

11   opposite.  We're talking about presumed damages.

12               MR. BAZELON:  Which only applies to reputational.  So

13   if you put reputational, you're telling the jury exactly what

14   it applies to, and you're not leaving them confused about

15   whether it applies to something else.

16               THE COURT:  Well, he contends that presumed damages

17   include loss of income.

18               MR. RITTINGER:  Well, it includes everything.  It

19   also includes, by the way, humiliation, too.  They can't

20   presume that they were humiliated.  They have to prove that

21   they were humiliated.

22               THE COURT:  Well, even if there was malice, they'd

23   still have to prove that, wouldn't they, for loss of income?

24               MR. BAZELON:  We're not claiming loss of income.

25               MR. RITTINGER:  Well, there is no claim of loss of

1      income.  But that's not -- I --

2            MR. BAZELON:  There is no claim for loss of income.

3            MR. RITTINGER:  I truthfully don't understand what

4      he's saying.  He's saying he wants to say reputational.  What

5      we're -- we have three kinds of damages in this case right now,

6      it's very clear:  General, presumed and punitive.  Actual

7      malice is required for presumed and punitive.  That's all I'm

8      saying, say presumed and punitive.

9            MR. BAZELON:  But presumed only applies to

10     reputation, Judge.  So why not make that clear to the jury?

11           THE COURT:  Because it isn't clear to me.

12           MR. BAZELON:  Okay.  Well, then -- is there any --

13     what is not -- what is Your Honor's reluctance about that?

14           THE COURT:  Well, I'm --

15           MR. BAZELON:  Not that I have a right to question

16     Your Honor.

17           THE COURT:  -- he says that presumed damages include

18     loss of income.  He said that --

19           MR. BAZELON:  But that's not our claim --

20           THE COURT:  -- a minute ago.

21           MR. BAZELON:  Right, but that's not our claim in this

22     case.  Nobody is claiming loss of income.  That's a red

23     herring.

24           THE COURT:  Well, it's a pale pink herring at this

25     stage because -- what do you think presumed damages relate to?

Colloquy                                                    29

1              MR. RITTINGER:  I think presumed damages relates to

2     anything that the jury is allowed to presume.  They cannot

3     presume -- well, no, I mean, Judge, these are the damages that

4     you're entitled to in a libel case.  You're entitled to damages

5     for loss of reputation.  Unless we can do it in three things,

6     all right, they can't presume damages.  If -- if they find

7     actual malice, they can presume a loss of reputation.

8     Otherwise, there's no loss of reputation in this case.

9              MR. BAZELON:  Exactly.

10             MR. RITTINGER:  Okay.  They can presume -- I -- if

11    you're telling me you're not even asking for presumed damages

12    as to loss of income, that's fine.  Then we'll take that out of

13    the case.

14             MR. BAZELON:  We never made a claim for loss of

15    income.

16             MR. RITTINGER:  In terms of presumed.

17             MR. BAZELON:  I don't know what you're talking about.

18             MR. RITTINGER:  In terms of presumed.  In terms of

19    presumed.

20             MR. BAZELON:  No, we -- we --

21             MR. RITTINGER:  All right.  Well, then we'll amend --

22    let's amend -- we -- we have a stipulation where you -- where

23    you reserved the right to argue to the jury that presumed

24    damages included lost income.  If you're saying you're not

25    going to do that, then that's fine.  That takes it out.

1           MR. BAZELON:  Let -- let me consult with my -- with

2    my client.

3           THE COURT:  Make sure that you read your

4    stipulations.

5           MR. BAZELON:  All right.  Yeah.  (Pause)  Your Honor,

6    I stand corrected.  We'll -- we'll accept Mr. Rittinger's

7    language.

8           THE COURT:  Wow.

9           MR. RITTINGER:  They -- he almost -- they gave away

10   presumed income there, Judge.  He was -- all right.  So -- so

11   we have that.  And Your Honor, in light of the testimony and

12   the type of case this is, I think we are entitled to a specific

13   instruction along the lines that we discussed yesterday, that

14   editorial conduct highly unreasonable -- highly unreasonable

15   con -- conduct constituting an extreme departure from the

16   standards of -- of normal reporting, which is a Supreme Court

17   language that we've put in our jury charge --

18          THE COURT:  Well, this isn't --

19          MR. RITTINGER:  -- I think should go in there.

20          THE COURT:  This is not a newspaper, for heaven's

21   sake.

22          MR. RITTINGER:  Well, no, but it's -- it's analogous.

23   It's an editorial function.  It's a First Amendment function.

24          MR. BAZELON:  That -- that holding only expressly

25   only applied to public officials.  Mr. Rittinger has made it

1    very clear he does not consider the plaintiffs to be public

2    officials.

3                    MR. RITTINGER:  No --

4                    MR. BAZELON:  That is a complete misstatement of the

5    Supreme Court's opinion.

6                    MR. RITTINGER:  I -- I don't believe that to be the

7    case.  We're now -- we're now taking what the Supreme Court has

8    defined --

9                    THE COURT:  Which -- which instruction of yours do

10   you -- is this based on?  What's --

11                   MR. RITTINGER:  Well --

12                   UNIDENTIFIED COUNSEL:  It's -- it's our instruction

13   -- it is number -- I think page 9?  Is it 9?

14                   UNIDENTIFIED COUNSEL:  It is -- it is page -- page 7.

15   It's the bottom of our actual malice proposed instruction.

16                   MR. RITTINGER:  Oh, right, yeah.

17                   UNIDENTIFIED COUNSEL:  Bottom of page 7.

18                   THE COURT:  Well, that defines -- that has to do with

19   malice, right?

20                   MR. RITTINGER:  Yes, Your Honor.

21                   MR. BAZELON:  Your Honor, we believe that that's a

22   misstatement of the law.  They rely on Harte-Hanks.  That's not

23   a Harte-Hanks held.  It only applies to public officials.

24   Plaintiffs are not public officials.

25                   THE COURT:  But I don't see -- what -- what do you

1    want me to read out of that?  (Pause)  Oh, we're not going to

2    talk about the standards of investigating and reporting.  That

3    doesn't have to do with this case.  The definition of actual

4    malice is still all right, isn't it?  (No audible response)

5    Did -- I think we incorporated the first two paragraphs and

6    left out the stuff about --

7              MR. RITTINGER:  I actually -- you're right, Your

8    Honor, but they had that in, too.  And it was no -- there was

9    no dispute about the -- I think -- I think you used their

10   instruction, but it -- which is why I -- I think ours didn't

11   get picked up.  But we don't -- I mean, that was -- that's a

12   correct statement of the law.  But in this case which involves

13   -- the plaintiffs' case is that they're entitled to prove

14   actual malice as a result of our poor writing and editing of

15   that supplement.  I -- it's -- it is not enough just to say

16   that we were reckless.

17             MR. BAZELON:  The standard of recklessness is in the

18   instruction, Judge.

19             THE COURT:  Yes.

20             MR. BAZELON:  And that's what presumably will guide

21   the jury.  But this -- this standard is -- is just plain wrong

22   that this -- that you're now arguing for in the third

23   paragraph.

24             THE COURT:  I don't -- I think we're splitting hairs.

25   I don't think it makes much difference.  But I'm not going to

1    read this business about the standards of investigation and

2    reporting, which I don't think applies here at all.  Okay.

3    Have I confused you enough now?

4                MR. RITTINGER:  Your Honor, if I just could go on for

5    a moment, I think we're getting there.  I don't -- I don't know

6    where you came out on the -- you had -- you had asked for a --

7                MR. BAZELON:  Purposeful avoidance.

8                MR. RITTINGER:  -- yeah, purposeful avoidance.  We

9    object to purposeful avoidance, Your Honor.  That is clearly

10   not the standard.  That trumps all of the language the Supreme

11   Court --

12               THE COURT:  Is there any evidence of purposeful

13   avoidance here?

14               MR. BAZELON:  There certainly is, Your Honor.  I

15   mean, it's clear that -- that West had before it all the

16   evidence they could possibly have with re -- that they were --

17   that the night -- that the 2008 pocket part was a sham; that

18   they had wrongfully attributed it to Professors Rudovsky and

19   Sosnov.  And if they are going to argue to the jury that that

20   doesn't -- that West didn't have knowledge, then they were

21   clearly burying their head in the sand, because all they had to

22   do was look at it.  That's purposeful avoidance.

23               MR. RITTINGER:  Act -- actually, it's not purposeful

24   avoidance, Your Honor.

25               THE COURT:  That's not purposeful avoidance.  That is

1          gross negligence, maybe, but not --

2                    MR. RITTINGER:  Exactly, Your Honor.

3                    THE COURT:  -- purposeful avoidance.

4                    MR. BAZELON:  Well, Your Honor, if all the signs are

5          there and you turn your head the other way, I suggest that the

6          jury would find purposeful avoidance.

7                    THE COURT:  Except that judging by the deposed

8          witnesses, their heads were always turned inside out

9          practically.

10                   MR. BAZELON:  Well, that's -- that's -- yes, exactly.

11         And that's what -- I'd like to make that argument to the jury.

12                   THE COURT:  Well, you can make that argument to the

13         jury, but I don't think we're going to get this kind of

14         instruction.  Okay.  You know, now that the jury is about to

15         breathe down your necks --

16                   MR. RITTINGER:  Yes, Your Honor.

17                   THE COURT:  -- it's -- it's still not too late to

18         settle the case.

19                   MR. RITTINGER:  It's never too late to settle the

20         case, Your Honor.  But this case is about money.  And --

21                   THE COURT:  Well --

22                   MR. RITTINGER:  -- they could have a book.  They

23         could have a book for the rest of their lives.  The baby

24         could --

25                   THE COURT:  You haven't -- you haven't offered them

Colloquy                                        35

1      any, have you, to speak of?

2                 MR. RITTINGER:  Pardon me?

3                 THE COURT:  You haven't offered them any to speak of,

4      money?

5                 MR. RITTINGER:  Oh, no, Your Honor, I -- I beg to

6      differ.  But I -- I can't in the -- in the --

7                 THE COURT:  Well, you've -- my recollections of what

8      I know about it so far is that you were turned off by the

9      exaggerated injury of his demands and refused to make any

10     offers.

11                MR. RITTINGER:  Well, that's not true, Your Honor.

12     Although at the sidebar conference, Mr. Bazelon denied a

13     discussion that I believe took place.  So we can't get into

14     that.  He denies it.  I say it took place.  But Your Honor did

15     say something in that conference that I have tried to go back

16     to him and say, did you hear what the Judge said about the

17     amount that you're asking for?  And if you come in around that

18     area, maybe this case could settle.  And I haven't gotten that.

19     So --

20                THE COURT:  Ah-ha.  So it's your fault.

21                MR. RITTINGER:  Your Honor, if -- if I could --

22                MR. BAZELON:  We have a different view of the

23     settlement negotiations.  And respectfully, I don't think this

24     is the time or the place --

25                THE COURT:  I'm -- I'm much less concerned with the

Colloquy                                    36

1    negotiations than I am with whether you're going to have --

2    with what your final positions are with respect to a

3    settlement.

4              MR. BAZELON:  Your Honor -- well --

5              THE COURT:  You want to write out on a yellow sheet

6    slip of paper what amount would make you happy?  And you're

7    going to write out on a slip of paper what amount you're

8    prepared to pay, if you have to.  And we'll see how far apart

9    you are.

10             MR. RITTINGER:  Sure.

11             MR. BAZELON:  Yeah.  (Pause)

12             THE COURT:  And while you're at it, I will write out

13   on the sheet of yellow paper what I think the case would go

14   for.  (Pause)  Pardon?

15             DEPUTY CLERK:  Do you want to go off the record for

16   this?

17             THE COURT:  I can't hear you.

18             DEPUTY CLERK:  Do you want to go off the record for

19   this discussion?

20             THE COURT:  Yes.  Sure.

21             DEPUTY CLERK:  Going off the record.

22                      (Off the record discussion)

23                      (Audio begins here)

24             MR. RITTINGER:  -- which instruction.  I think it

25   works better if you use either ours or theirs.  The -- the

1   problem with the punitive damage, it doesn't -- it doesn't --

2   it doesn't have enough in it, Your Honor, I guess is what it

3   would be.  It doesn't say specifically that you have to find

4   actual malice.  And we think that should be in there.  In other

5   words, it says malicious willful.  But I think the actual

6   malice buzzword should be there, because there's going to be a

7   definition about actual malice.

8           MR. BAZELON:  I think there's -- there's more than

9   enough already in the charge about malice.  This is clear, and

10  it gets to the -- to the operative terminology.

11          THE COURT:  And we're all saying the same thing.

12  It's a question of different words.

13          MR. RITTINGER:  Well, I mean, we're going to use

14  actual malice to define it.  We're going to use actual malice

15  and presumed.  I don't know why we wouldn't use actual malice

16  in the punitive damage as well.  It is -- it has to be proven

17  by clear and convincing evidence.  It has to -- you know.

18          THE COURT:  It will be in there.  Yes, don't -- don't

19  worry about it.  I'll use the words actual malice.

20          MR. RITTINGER:  Okay.  And Your Honor, I think the

21  last thing that we have is that we object to the last

22  instruction about no negative in -- inference from consultation

23  with counsel.  That's not necessary.  One of our arguments here

24  is that we were acting reasonably and we were -- we were -- I

25  don't know what the right -- is either torpedoed or we were --

1     and that's why this case went the way it went, because we

2     couldn't deal directly with our own authors with a -- with a

3     problem.  I'm going to make that kind of an argument.  And I

4     think that I'm entitled to it.  And I don't think a specific

5     instruction --

6              THE COURT:  Nobody says you can't make the argument,

7     but I'm going to tell the jury that they shouldn't draw any

8     adverse inferences.  Your problem is you sneered at the -- at

9     the witnesses all the time because they went to the -- to a

10    lawyer.  And I think the jury is entitled to know that they had

11    a right to go to a lawyer.

12             MR. RITTINGER:  Well, I've never seen this

13    instruction anyplace, Your Honor.  There's no citation for it.

14             THE COURT:  This is -- this instruction will be

15    given.  Anything else?

16             MR. BAZELON:  Nothing further -- further for the

17    plaintiffs, Your Honor.

18             THE COURT:  Now are you ready to make your closing

19    arguments and convince --

20             MR. BAZELON:  We are ready, Your Honor.

21             THE COURT:  How long are you going to take?

22             MR. BAZELON:  Your Honor, I -- I think that my

23    closing argument will probably be at most 30 minutes, probably

24    a little less.  And I'd like to reserve a short --

25             THE COURT:  The jury's lunch is coming at --

1          MR. BAZELON:  And I'd like to reserve a --

2          THE COURT:  -- at 12:45, did you say?

3          DEPUTY CLERK:  12:45.

4          THE COURT:  Okay.  We'll go ahead with the closing

5     arguments then.

6          MR. BAZELON:  And I'd like -- I'm sorry.  And I'd

7     like to reserve a short rebuttal.

8          THE COURT:  A brief rebuttal.

9          MR. BAZELON:  A brief rebuttal.

10         THE COURT:  Would be the same height.  Okay.

11         MR. RITTINGER:  I -- I think I can do it in a half

12    hour, Your Honor.  I'd like to --

13         THE COURT:  No, no --

14         MR. RITTINGER:  I'd like to have a little leeway

15    there, but --

16         THE COURT:  -- we're not setting any time limits.

17    You can take as long as you need.  Bring in the jury.  (Pause)

18                         (Jury in)

19         COURTROOM CLERK:  All rise.

20         THE COURT:  Good morning, everybody.  Sorry we held

21    you up so long, but we had a lot of matters to go over.  Be

22    seated, please.  You've now heard all of the evidence in the

23    case, and it's time to hear the arguments of counsel.  Under

24    our rules, plaintiff goes first.  And then after the defendant

25    makes their argument, the plaintiff may have an opportunity for

1    a brief rebuttal.  This is not to show favoritism to the

2    plaintiffs.  It's just because they have the burden of proof,

3    and they have a little bit more argument to make.  Proceed.

4                MR. BAZELON:  Good morning.  Mr. Charlson is

5    disappointed that he's not here this morning.  He's unable to

6    be here.  And I am here somewhat embarrassed because when you

7    were being interviewed as perspective jurors, I told you that I

8    was fairly certain that this trial would not take more than

9    three days, and here I am addressing you on the fourth day.  So

10   I am -- I'm -- apologize for that.

11               I think that you probably feel that in the last three

12   days you have gone to law school.  And -- but now, in addition

13   to your having been law students for three days, you are

14   actually a part of the law, a part of the Judicial process that

15   you have been since you've become jurors.  But now at the very

16   crucial stage of being the determiners of the case and the

17   determiners of all the facts that are in this case.  The facts,

18   you will be told by the Judge, are solely for you to determine.

19               My clients, Professor Rudovsky and Professor

20   Rittinger (sic), are, and the evidence have shown, very

21   distinguished practitioners.  Indeed, West, in its opening to

22   you, acknowledged that they were excellent attorneys.  And I

23   think the evidence has shown that they are very distinguished

24   in their profession as teachers, as professors, as advocates

25   for public causes.  And West, in fact, was part of the

1    selection process in approving them on that basis.

2         Now, you have heard in this case a -- a lot about

3    pocket parts, and particularly the pocket parts to the

4    treatises Professors Rudovsky and Sosnov prepared.  And it is

5    almost an understatement to say that they considered this

6    something extremely important to them, that identified them as

7    professionals, that they cared deeply about, and that they

8    spent enormous time and enormous care throughout the year in

9    working on pocket parts.  They already had an enormous

10   investment in the book, having written it, doing the private

11   pocket parts, to maintain the quality, to maintain their

12   reputations.

13        In 2008, you have learned there was a parting of the

14   ways between the professors and West, which led to, in December

15   of 2008, West Publishing a pocket part without any involvement

16   on the part of Professors Rudovsky and Sosnov.  And I think

17   that the evidence is conclusive that this was not really a

18   pocket part, or it shouldn't have been called a pocket part.

19   It certainly was not an update.  It -- there's really no

20   dispute about its total and complete inadequacy.  Only three

21   new cases, they had no particular significance.  In the past

22   there had been between 150 and 200 cases.  There was no

23   discussion.  There was no analysis.

24        All of these things have been carefully done by the

25   professors in prior years.  There were cases that had been

1    cited in the prior pocket parts or in the treatises that, in

2    fact, had been reversed, that could never be cited

3    professionally or responsibly by anybody.  The subsequent

4    history wasn't even contained in the pocket part that West put

5    out.  It was terribly misleading.  And worst of all, as you

6    know, all of this was attributed to Professor Rudovsky and

7    Professor Sosnov.  And you  have seen the title page to that

8    pocket part.

9           And this was done both with respect to the printed

10   material that was sent out to the subscribers and available for

11   use in libraries by users, and it was done on the internet.

12   That is what we call Westlaw.  The harm for this -- the harm

13   that resulted is a harm to subscribers and users.  It was, as

14   to them, a total ripoff.  They paid for, they were sent and

15   billed for a -- an alleged update, which, in fact, was not an

16   update.  It contained no information.  And much worse, it was

17   deceptive because it contained misinformation.  If you don't

18   update information which is no longer accurate, you are giving

19   the readers the wrong information.

20          And these readers used the information for

21   themselves.  They use it to advise clients.  They use it in

22   briefs that they submit to courts and that, therefore, Judges

23   use and rely on.  All of these people are harmed.  But first,

24   or at least prominently and probably the most harmed are the

25   professors themselves who -- to whom this deception is

1    attributed, and who readers reading the pocket part would have

2    -- would -- would assume would be -- in fact, they were told

3    that Professors Rudovsky and Sosnov had -- were responsible for

4    this sham product.

5            Now, this product was widely used.  You've heard that

6    it was -- the subscribers included people who had libraries.

7    Some of them, the subscribers were libraries themselves,

8    university libraries, libraries of district attorneys,

9    libraries of US Attorney's Offices, Defender Offices, libraries

10   of law firms.  So each book, each subscriber represents

11   multiple users with respect to who is actually reading and

12   using the pocket part.  Obviously, many, many people -- and I

13   would respectfully suggest, you know, many, many thousands of

14   people used this pocket part.  In addition, it was used by

15   people who accessed the treatises through the internet.  And we

16   know there is actual proof of that.  And that was described in

17   the testimony in this case.

18           There was also, if you recall, testimony about what

19   we call cite checking, which is the process that when you have

20   a -- a cite that says, for example, Commonwealth versus Smith,

21   and it says -- it gives a Court and a date and a volume and a

22   page number, that users who want to use it should -- they don't

23   always do it, but they should cite check it.  And if they cite

24   check it, they will learn that the information that was in the

25   pocket part was wrong; that it didn't contain the subsequent

1    history in these cases.  And they would know that -- or they

2    would believe wrongfully that this is the fault of Professors

3    Rudovsky and Sosnov, because they were supposed to prepare it.

4    Here's the citation, we checked it, it's wrong.

5           So Professors Rudovsky and Sosnov have told you that

6    they were shocked, they were humiliated, they were -- reacted

7    extremely strongly emotionally to find out that a product that

8    they had worked so hard on, that they cared so much about was a

9    sham.  And it was being attributed to them.  It was misleading

10   the legal profession, which they cared about, which they were

11   esteemed members of.  And the notion that they would be deemed

12   to be the perpetrators of this was -- was horrifying.  And I

13   respectfully submit that you can understand that, if you put

14   everything you have into something and it's defiled in that

15   way, that it's a terrible situation.  And the extreme emotional

16   reaction that follows from that is something that, I think,

17   anybody would experience in that situation.  And they did.

18          Just as I've told you that you as the jurors are the

19   sole determiners of fact, you will get your law in this case

20   from Judge Fullam; not from me, not from West attorneys.  So

21   with that in mind, that you should take the law from Judge

22   Fullam, I believe that the standard that you will learn should

23   be applied in this case is that in this situation, if this

24   pocket part was not accurate, that it was inaccurate and that

25   it was not an update, that you can presume reputational damage.

1          Now, what does that mean?  That means that you can

2     determine what the natural impact would be of this kind of a

3     false statement being read and being available to and being

4     used by many, many, many, many users.  And you can assess value

5     to Professor Rudovsky and Sosnov's reputation, and how this

6     information being attributed to them would affect their

7     reputation.

8          And the law takes into account what is naturally

9     known, which is that if somebody is dissatisfied with a written

10     product, they don't normally pick up the phone, or another way,

11     say to the author, I read your product and I think less of you.

12     And the law recognizes that.  And the law recognizes that for

13     other reasons, as a matter of policy, that presumed damages are

14     important, and that it is for a jury to make a determination as

15     to what those damages should be, taking into account the

16     seriousness of the false representation, the reputation of the

17     people who have been defamed, and to, in consideration of that,

18     award damages for injuries to reputation.

19          And the language, I think, that you will be asked to

20     use is whether the intended audience of the pocket part would

21     conclude that the plaintiffs authorized an inaccurate and out-

22     of-date supplement to the treatises.  The plaintiffs

23     respectfully submit that there can be no question that the

24     answer to that question is that the 2008 supplement was

25     inaccurate and it -- and out of date, that it was not an

1    update, and that the information contained therein was

2    inaccurate.  It was inaccurate both specifically and because,

3    by its very nature, a pocket part is a competent updating of

4    information of which there was, essentially, none.

5              Now, West knew what was in its own pocket part.  They

6    published the pocket part.  You will learn that a corporation

7    acts through its employees.  And this is as though John Jones

8    wrote something and said, gee, I really wasn't aware of what I

9    wrote.  West was the publisher.  West was responsible for the

10   contents of its treat -- of this treatises as it came out.  And

11   it is charged with the knowledge of what it published.

12             This case is not about Sarah Redzic, the West

13   employee who was the first video that you heard and -- and saw.

14   She is not blameworthy.  What is very blameworthy is that West,

15   very consciously, put her in the position that she was in, and

16   that she was asked to do a job that she was not trained to do

17   or qualified to do, nor given the resources, the time, or the

18   ability to do the work.  That's not her fault.  But it clearly

19   is West' fault.  And it was not an accident.  West, obviously,

20   for the same reasons it didn't want to pay a reasonable amount

21   to Professors Rudovsky and Sosnov, it didn't want its own staff

22   taking the time.

23             And you have seen -- you've heard the evidence in the

24   case, that West bases the time that it will spend if it chooses

25   to do an update itself on what it regards as the profitability

1    of the product.  Not on the needs of the product, not on doing

2    a competent job, but how much time should we be spending, given

3    the revenue that we're receiving.

4              Sarah Redzic did a few hours of work.  She apparently

5    changed some formats, some instructions.  She found three

6    random cases, threw them in, changed a few rules, and that was

7    it.  Nobody looked at it.  Out came the publication.  West has

8    communicated to you in its cross-examination of witnesses in

9    the presentation of its case that somehow Professors Rudovsky

10   and Sosnov agreed that a pocket part, which was a sham, could

11   be issued in their name, attributed to them, because they

12   signed contracts with West.  Nothing could be further from the

13   truth.

14             The idea that such a claim could be made is -- it's

15   only relevance to this case is how it reflects on West, that

16   they could even suggest that any contract could give them the

17   right to defame authors, to mislead and deceive the public.

18   There is nothing in the agreements that provides for that.

19   Indeed, there is -- there is specific agreements that West

20   maintains the right to assure that the product is an

21   acceptable, good product.  And obviously, that was the

22   standard, at the very least, that everybody expected and had a

23   right to expect.

24             Plaintiffs, Professors Rudovsky and Sosnov, do not

25   contend that West didn't -- did not have a right to use their

1    name.  That is, to put it affirmatively, West had a right to

2    use their names in the way that was intended when an author

3    writes a book and publishes it through a publisher.  The

4    product they do is associated with them.  And even with respect

5    to pocket parts, you heard Professor Rudovsky say that, yes, if

6    we were not going to be used for a pocket part, and the pocket

7    part had been done competently, we would not have a complaint.

8    And you heard Paul George, the librarian at Penn, explain that

9    when a treatises that is published by a respected author done,

10   in other words, by -- other than staff of a legal publishing

11   company, and those authors are no longer available, the

12   standard accepted practice is that other qualified,

13   knowledgeable people substitute and do the pocket part.  And

14   presumably that would be shown on the pocket part, in addition

15   to the initial authors, in this case, Rudovsky and Sosnov being

16   shown.

17          And you may recall, there was testimony about Prosser

18   on torts and Williston on contracts.  Those distinguished

19   professors have passed on.  Other people have done updates.

20   And -- and yes, if they're done appropriately, there's no

21   objection by the authors.  That, unfortunately, is about as far

22   as possible from what happened in this case.

23          West's other argument in this case has been that

24   nobody complained.  Now, Professors Rudovsky and Sosnov have

25   been very candid with you.  They have said that nobody has come

1   to them to complain.  They have acknowledged that.  They have

2   said they cannot prove that they lost income or revenue as a

3   result of what took place.  And they have explained that they

4   strongly feel that they have been damaged reputationally; that

5   it's not the natural course for people who are unhappy about

6   what is in a professional publication to call the author; and

7   that they are extremely distressed; and that their reputations

8   have been damaged.  And on the matter of reputational damages,

9   it is the instruction that you will hear from Judge Fullam that

10   in this kind of a situation, the law presumes that there has

11   been damage.

12          Now, the law also requires, though, in order for you

13   to award damages for presumed loss of reputation, that the

14   plaintiffs must also show you that the defendant, in this case

15   West, acted with malice.  And I will -- I will come to that.

16   Let me also say that that does not apply to emotional injury,

17   where there is no requirement of malice.  So what I have

18   explained to you up till now in my closing about defamation, in

19   and of itself, if you find in favor of the plaintiffs,

20   requires, we submit, if you find that there was emotional harm,

21   award a damage for emotional injury.

22          As to reputational damages, there is an additional

23   element that you must be satisfied that the defendants acted

24   with malice. I will come back to malice, but in a nutshell,

25   malice means knowledge of truth of falsity, or reckless

1    disregard of whether a statement is true or false.  And we

2    believe that both standards are satisfied in this case.

3           Now, what was West's reaction to the serious breach

4    of ethics that it had committed in putting out the 2007-2008

5    pocket part, which we've often referred to as the 2008 pocket

6    part -- actually, I'm sorry, the 2008-2009 pocket part, which

7    we have often referred to as the 2008 pocket part.  West did

8    extremely little to address the problem.  It sent out a letter

9    in March of 2009, which only went to the subscribers.  There

10   was no request that this be made part of the volume so that

11   users would know that this was the case.  And a subscriber is

12   -- is generally somebody -- the mail comes in, and you know

13   from your own experience, if you're in a office, the secretary

14   opens the mail, it goes to bookkeeping, whatever.  But there

15   was no attempt to reach users and give them this information.

16          Furthermore, the letter said that we, West, failed to

17   note all of the new developments in the law.  Well, they failed

18   to note any.  They didn't miss -- it's not that they missed

19   some.  It's just a presumption if you say we didn't get

20   everything.  They basically got zero in terms of new

21   developments in the law.  So it was a complete misstatement

22   concerning their own product.

23          Then they rushed to put out a new supplement.  We

24   submit, and there is evidence, that the reason they rushed was

25   because there was a court hearing.  And they put this out at

1     the time of the court hearing, so they could say there was

2     another product.  They say, no, that wasn't the reason.  But

3     they don't deny that it was a rush.  And it was another

4     incompetent product.

5             You have heard the evidence about the 2009 pocket

6     part.  There were at least 39 Supreme Court cases -- Supreme

7     Court of Pennsylvania cases that would have come before the

8     publication, and should have been part of that pocket part.

9     They were not included.  27 -- 26 of those cases were in 2007.

10    There was no new analysis.  There was even a failure to correct

11    previous faults in the 2008 supplement, which Professors

12    Rudovsky and Sosnov had specifically brought to the attention

13    of West soon after the publication of the 2008 pocket part.  So

14    they didn't even correct what they were told was wrong.

15            There was nothing done -- there was -- the -- the

16    pocket part that came out in the 2009 supplement did convey,

17    express, state that the pocket part -- Rudovsky and Sosnov were

18    responsible for that pocket part, and that it had been prepared

19    by the West staff.  And the problem with that is that if that

20    is the only thing that is done, it does not account for the way

21    that most readers and users of a treatise use a treatise.  That

22    is, if you are using the treatise and you're in section, say,

23    3.5 on capital punishment, and you say, ah-ha, this is what the

24    treatise says, I'm going to check to see if there are any new

25    developments, you go back to the pocket part, and generally,

1    you don't stop and say who did the pocket part.  You go to

2    section 3.5 and you read what's there.

3             And indeed, you heard Paul George testify that he

4    doesn't even instruct his students to check the pocket part

5    title because you presume that it's either the initial author

6    or a respected other legal authority on the topic.  And now --

7    and now -- well, let me just -- what -- what would have been

8    needed to cure, in some reasonable fashion, what had taken

9    place in the 2008 supplement would have been a sticker on the

10   book, so that it would call to a person's attention that

11   Rudovsky and Sosnov were not doing the pocket parts and had not

12   done the prior for the current pocket part.  Or even, you know,

13   if -- if a competent pocket part had been done, that would have

14   meant that even if somebody -- the usual reader does not stop

15   at the title page, at least what he's going to find will be

16   responsible and competent.  Neither was the case here.

17            Now, it is also clear that even to this day, West is

18   not interested in curing the problem.  We know now that they

19   are currently advertising what you now see on the screen.  And

20   again, the only names you see are David Rudovsky and Leonard

21   Sosnov.  The -- there is an indication that there's going to be

22   an update in January of 2011.  The current sale -- the book as

23   being advertised for sale includes a pocket part, which they

24   didn't do.  The pocket part being advertised as a 2011 pocket

25   part they will not be doing.  There is not disclosure anywhere

1    that anyone -- that the West staff, as opposed to Professors

2    Rudovsky and Sosnov, have done anything.

3            And then, as to what a pocket part should include and

4    a treatise should include, you have what West itself says,

5    quote, complete, expertly drafted and practice tested model

6    forms and documents for use in original criminal proceedings

7    from initial start through verdict and post-trial matters.  It

8    includes expert commentary and guidance.  It provides analysis

9    of Pennsylvania State Law, including Constitutional principles,

10   criminal statutes, rules and Court decisions, plus complete

11   citations for additional research -- complete citations.  It

12   contains advice about alternative dispute resolution practice

13   tips and client -- and a client interview checklist for a

14   thorough information gathering.

15           Also, it governors juvenile proceedings, extradition,

16   contempt, probation, parole and other post-trial matters.  It

17   includes tables of statutes and rules.  Those are West's own

18   description of what a pocket part should contain.  And

19   ascribing that -- that anybody who -- who would read this would

20   believe that that is what Professors Rudovsky and Sosnov are

21   doing.

22           What is particularly pernicious, I would suggest,

23   about this advertisement is that West says, well, when somebody

24   gets the pocket part, if they read the title page, they will

25   then learn it's not Professors Rudovsky and Sosnov.  The only

1      problem with that is that by the time they get the pocket part,

2      they will have already paid their $206.  It will be too late,

3      even if they do take note at the time that they receive the

4      treatise, that the pocket part was not prepared by Professors

5      Rudovsky and Sosnov for them to do anything.  They will have

6      paid their money.  And once again, it is West linking this

7      treatise to Professors Rudovsky and Sosnov.

8              Plaintiffs are asking you to award them damages in

9      this case.  Reputation, we submit, is the polestar, the

10     foundation of their profession, of their professional lives.

11     You have heard their testimony about their shock and

12     humiliation.  West has said that they offered Professors

13     Rudovsky and Sosnov the opportunity to have their name taken

14     off the treatise.  You can't take a name off a treatise which

15     is already in somebody's library.

16             There was never any suggestion about how West would

17     accomplish this.  But taking the name off the treatise, if it

18     could be done, is not the solution to the problem.  It is

19     actually using a second deception to cover the first deception.

20     What needs to be done is to have the underlying matter cured.

21     And you do that by either having a competent pocket part, or by

22     having a very clear disclosure which gets to readers, none of

23     which has been done.

24             There is -- it would serve -- it would just be a

25     further deception to suggest that a treatise was prepared by

1    the West staff, the underlying treaties, when it wasn't.  The

2    point is, what needs to be said is that the pocket parts, since

3    2007, have been prepared by the West staff and not by

4    Professors Rudovsky and Sosnov in a way that the users

5    understand.

6              There is, in this case, also, in addition to

7    defamation, a claim for what we call invasion of privacy, false

8    light.  And that is a claim that Judge Fullam will instruct you

9    about, which concerns placing a person in a false light by

10   statements or publications which you make about the person, in

11   a way that the person would reasonably find to be offensive,

12   done with knowledge, done by the -- the person who makes the

13   communication, with knowledge of falsity or reckless disregard,

14   whether the statements are true or false, and done publicly, in

15   a way that publicizes those statements.  And the damages that

16   can be awarded -- and again, your instruction will come from

17   Judge Fullam -- are mental distress and other injuries suffered

18   by placing the plaintiff in this false light.

19             Plaintiffs are asking, also, that punitive damages be

20   awarded against West.  And again, this brings up the standard

21   of malice, which, if you recall, is a standard that you will

22   need to consider twice in this case.  You'll need to consider

23   whether the defendants have acted with malice in order to --

24   for -- for you to presume damages.  And those are damages in

25   connection with loss of reputation.  And it's the same standard

1    that you will be told you need to apply in order to award

2    punitive damages against West.

3              We submit to you that you could not have a clearer

4    case for punitive damages.  The Judge, I believe, will instruct

5    you -- Judge Fullam -- that in considering punitive damages,

6    you should consider the character of the act that was done by

7    the defendants, the nature and extent of the harm to plaintiffs

8    intended or caused to them, the plaintiffs' trouble and expense

9    to punish the defendant and deter them and others from like

10   conduct in the future, and the defendant's wealth insofar as it

11   is relevant in fixing an amount that will punish them and deter

12   them and others from like conduct in the future.  It is not

13   necessary, even to award compensatory damages, to award

14   punitive damages.  Although we believe that the case for

15   compensatory damages as to both emotional injury and

16   reputational damages is very clear.

17             So what does malice mean?  Well, first of all, you

18   act with malice if you know what you do in the way of

19   publication is false.  And as I've said to you before, if you

20   publish something, the publisher is -- knows that it's false.

21   It is the publisher's work.  Publishers, like any company or

22   corporation, act through their employees.  And they know the

23   product that they are putting out.

24             Willful ignorance is not an excuse, and does not mean

25   that a defendant has -- can rely and argue that he didn't know

1    and have knowledge because he or she was willfully ignorant.

2    Now, in this case --

3            MR. RITTINGER:  Your Honor, objection.

4            THE COURT:  Objection overruled.

5            MR. BAZELON:  -- in this case there are some other

6    factors to be considered.  The evidence in this case showed

7    that what happened to the plaintiffs was the result of West'

8    desire to ring out a few extra dollars.  It is really -- you

9    know, a corporation of this size and magnitude, the largest

10   legal publisher in the country, to save a few dollars, puts out

11   a sham publication.  And the evidence that they would pay

12   Rudovsky -- Professors Rudovsky and Sosnov any reasonable

13   amount, that their own published criteria play a major

14   consideration as to profitability in terms of what effort they

15   make with respect to a pocket part.  They were -- West was

16   driven by the desire that they -- they hurried the pocket part

17   at the end of 2008, in order to make revenue projections for

18   the year 2008.

19           You may recall that the staff believe that the

20   publication was going to be discontinued.  But when they found

21   out it hadn't, they were told that these are the revenue

22   projections for 2008.  You have to get the pocket part in the

23   mail so that you can bill the subscriber in 2008, to bring in

24   the revenue for 2008.  Rush, rush, rush, on top of, don't pay

25   attention if it's not a profit maker.

1          This, you can consider on the issue of punitive

2     damage.  You can consider further the fact that there was no

3     real effort to correct the wrong; that the incompetence of the

4     pocket part in an extreme way continued.  The attribution to

5     Professors Rudovsky and Sosnov continues to the very day, as

6     you can see by what's in front of you right now.  So the --

7     West has shown extremely little interest in attempting to

8     remedy the situation which it, itself, created.

9          Then you have the information about how in the nitty-

10    gritty way this pocket part came about.  And those were on the

11    videos that you saw.  You know, a person, a very nice lady, no

12    qualifications, no supervision, no review, it was -- the result

13    was predetermined by the process that West used consistent with

14    its own policies.  At the very least, we submit, West didn't

15    care whether the pocket part was an update.  They just wanted

16    to get something, anything out.  And they didn't care if they

17    falsely attributed Professors Rudovsky and Sosnov.  The harm

18    that followed was inevitable, both to the subscribers, to the

19    readers, and to Professors Rudovsky and Sosnov.

20         You may consider the wealth of the defendants in

21    awarding punitive damages.  The reason for this is that one of

22    the purposes of punitive damages is to prevent a defendant from

23    repeating the acts in which he or it has engaged.  And wealth

24    is considered by the law to be a relevant consideration.  West,

25    in this case, you have learned, has assets of approximately

1    Twenty-two-and-a-half billion dollars.  It earned, in the last

2    published year, a billion six-hundred and sixty-eight million

3    dollars in revenue.  So it's a -- not only is this a huge net

4    worth.  It is a very profitable company.

5         Now, I'm not suggesting to you that you award damages

6    of anything like that kind of magnitude.  But I do think it is

7    relevant for you to consider if you find that the defendants

8    have acted in a very irresponsible way, that what would be

9    meaningful in terms of bringing it to their attention in a way

10   that would be incentive for them to correct these policies and

11   practices, what, in other words, would cause them to pay

12   attention.

13        And that leads to the matter of what I will call

14   deterrence, function of punitive damages to deter the wrongdoer

15   from continuing to engage in the act.  I want to replay to you

16   for about one minute the end of the testimony of Ms. Kruk in

17   her video in this case.

18        (Video testimony of Ms. Kruk played at this time)

19        MR. BAZELON:  Now, you will see that this deposition

20   was taken on March 3, 2010.  So that was the statement of the

21   responsible person at West about 15 or 16 months after the

22   publication of the 2008 pocket part.  I would submit to you

23   that there couldn't be any clearer evidence that West has not

24   gotten the message that it did anything wrong.  It is still

25   following the same policies, still has the same practices,

1        thinks that that's the way to do business.

2                Now, you heard Jean Maess testify.  And she says that

3        Ms. Kruk, who directly reported to her, was wrong.  Now, how

4        could it be that 15 or 16 months after the publication of the

5        pocket part that Ms. Kruk didn't know that what she testified

6        to was wrong?  You, it seems to me, must conclude that either

7        Ms. Maess's testimony is not reliable and credible, or that she

8        and others at West made absolutely zero effort to communicate

9        what they claim is a change in policy to the people who were

10       charged with implementing it.  Which means that it's worthless.

11       In either of that, it is clear that West does not understand

12       that it has done anything wrong and that it needs to be

13       deterred from continuing in this kind of conduct.

14               And of course, the fact that the conduct is still

15       continuing to this day speaks volumes about the need for

16       deterrence.  It's also interesting in this regard that Ms.

17       Maess, in her testimony, said nothing about the current

18       advertisement.  She didn't tell you that a competent party was

19       going to prepare it, that it would be prepared by somebody

20       qualified, nothing.  So there is absolutely zero reason to

21       think that West is doing anything different, and apart from the

22       fact that it is misrepresenting who is responsible for the

23       pocket parts.

24               Ms. Maess says -- Ms. Maess says that there has been

25       great exaggeration and overstatement.  That is hardly -- given

1    the sham nature of the 2008 pocket part, it's hardly an

2    indication that West has learned anything.  And she bases her

3    determination -- her statement largely on the fact that she

4    says that West received no complaints.  But as we learned that

5    West -- and this, I think, again, speaks volume for the need

6    for deterrence -- incredibly, West has no written policies for

7    processing and handling complaints about its treatises or

8    books.  Mr. Wierzbicki, who, again, directly reports to Ms.

9    Maess, gave an affidavit in this case in which he said --

10            MR. RITTINGER:  Objection, Your Honor.  The affidavit

11   wasn't introduced into evidence.

12            MR. BAZELON:  The interrogatory answer was read, and

13   it was stated that he -- that he took the affidavit.

14            THE COURT:  All right.  Okay.  Objection overruled.

15            MR. BAZELON:  What he said under oath was, quote,

16   West has no written policies and procedures for handling,

17   processing and/or addressing user complaints specific to books

18   and pocket parts.  They don't care about complaints.  And yet

19   they say, "We didn't get any complaints," and that's the reason

20   that Professors Rudovsky and Sosnov are greatly exaggerating.

21   West, indeed, goes so far as to apparently blame other people

22   for the 2008 pocket part.  Ms. Maess testified that, initially

23   in her cross-examination, "No, there was no obligation on the

24   part of Professors Rudovsky and Sosnov to do a continued pocket

25   part."  Then at the end she says, "I guess there was."  So I

1    guess that they are apparently trying to suggest that this was

2    Professors Rudovsky and Sosnov's fault.

3         West even blames me.  West says that, you know, if Rudov

4    -- Professors Rudovsky and Sosnov hadn't contact Rick Bazelon,

5    we wouldn't be here today.  You will here an instruction, I

6    believe, from Judge Fullam in this case that you should not,

7    cannot draw any adverse inference from a person consulting with

8    an attorney.  Indeed, it is amazing that a company like West,

9    that deals with attorneys, could even suggest such a thing.

10        And we -- you know that there have been no changes in

11   West's policies.  You heard testimony from Ms. Maess that one

12   policy had been changed.  On cross-examination, it turned out

13   -- although there are many, many written policies at West, no

14   change in any written policy.  And as we know, whatever changes

15   there were, nobody who implements them knows about them.

16        I want to say a word in closing about reputation.

17   The Pennsylvania Constitution -- the revision in the

18   Constitution of the State of Pennsylvania, Article I, Section I

19   -- I even checked the pocket part -- says, "All men are born

20   equally free and independent, and have certain inherent and

21   indefeasible rights, among which are those of enjoying and

22   defending life and liberty, of inquiring, possessing and

23   protecting property and reputation, and pursuing their own

24   happiness."

25        Shakespeare and Othello, "Good name in man and woman

1    dear my lord, is the immediate jewel of their souls, who steals

2    my purse steals trash, does nothing, 'twas mine, it is his, and

3    it's been slaves of thousands.  But he that filters from me my

4    good name, robs me of that which not enriches him and makes me

5    poor indeed."

6              We are asking you to award compensatory damages to

7    Professor Rudovsky and Professor Sosnov for the injury to their

8    reputation and for emotional injury to them.  We are asking you

9    to award punitive damages towards West for its outrageous

10   conduct.  In that connection, you must decide what is necessary

11   to compensate plaintiffs for their loss of reputation and

12   emotional injury.  And in punitive damages, to make West

13   realize that its actions and policies are not accepted.

14             You have been a very attentive, patient jury.  And on

15   behalf of the plaintiffs, I thank you.  And on behalf of

16   everybody, I'm sure the defendants as well, we thank you for

17   your service in this case.

18             THE COURT:  May I see counsel at sidebar, please, on

19   timing.

20                         (Sidebar begins)

21             THE COURT:  We obviously can't finish your closing

22   and his rebuttal before the jury goes out to lunch.

23             MR. RITTINGER:  What time -- do we have a time

24   already?

25             THE COURT:  12:45 their lunch gets delivered to them.

Colloquy                                                    64

1              MR. RITTINGER:  I could --

2              THE COURT:  And I don't want to have you make your

3     closing now and have his rebuttal be the only thing they hear

4     after lunch.  So I would suggest we recess now and come back a

5     little early if possible.  Is that feasible?

6              MR. RITTINGER:  Anything is feasible, Judge.

7              MR. BAZELON:  Sure.

8              THE COURT:  Okay.

9              MR. BAZELON:  That's fine, Your Honor.

10                        (Sidebar ends)

11             THE COURT:  Members of the jury, we're trying to fit

12    the schedule in with your lunch delivery.  And I think the

13    convenient thing would -- for every -- all concerned now would

14    be to recess at this point for lunch and come back a little

15    earlier after lunch.  So we'll recess from now till 1:30.  I

16    understand your lunch is going to be delivered shortly, I'm

17    told.  Is that true?

18             COURTROOM CLERK:  That's my understanding, Judge.

19             THE COURT:  Pardon?

20             COURTROOM CLERK:  My understanding is folks will be

21    called.

22             THE COURT:  Okay.  That's what we hear anyway.

23    Recess till --

24             MR. BAZELON:  Your Honor, there's a juror who asked

25    if you could make it 1:00.

Colloquy                                    65

1           THE COURT:  Who wants to make it 1:00?

2           MR. BAZELON:  A juror was -- I just -- I didn't think

3      you heard, that's the only --

4           THE COURT:  Oh, you need to come back early?

5           JUROR:  I think we would be more than happy to come

6      back earlier.

7           THE COURT:  Oh, okay.

8           JUROR:  To be -- to be honest, Your Honor, I think we

9      -- we would prefer to hear things now and deliberate over

10     lunch.

11          JUROR:  I agree.

12          JUROR:  They're all cold sandwiches anyway, so

13     there's nothing we're worried about.  But that's not to be

14     disrespectful.

15          THE COURT:  Okay.

16          JUROR:  That's up to you.

17          THE COURT:  Come back at ten after 1:00.

18          JUROR:  No, I think they wanted --

19          MR. RITTINGER:  Oh, Your Honor, I think they're

20     saying they want to go now.  And that's perfectly okay with me.

21          THE COURT:  Well, that's what we're doing, isn't it?

22          JUROR:  No, we --

23          MR. BAZELON:  No, they want to hear argument now.

24          JUROR:  The jury would like to finish the arguments

25     and then have lunch.

1        THE COURT:  Oh, really, no matter how long it takes?

2        MR. RITTINGER:  Well, I'm going to be under a lot of

3    time pressures, but I'll work with you.  Okay.

4        THE COURT:  A unanimous decision.  Okay.

5        MR. RITTINGER:  Your Honor, if it please the Court, I

6    will try to do my opening statement now, and have no one die of

7    hunger.  I -- I want to start --

8        THE COURT:  This is -- this is your closing statement

9    not your opening statement.

10       MR. RITTINGER:  It is closing.  You're absolutely

11   right.  First mistake right off the bat.  The second thing I

12   want to say is, Shakespear said kill all the lawyers, too.

13   That's another Shakespear quote.  But --

14       THE COURT:  Okay.  If that's satisfactory with the

15   jury, it's satisfactory with me.  Go ahead.

16       MR. RITTINGER:  Thank you, Your Honor.

17       I'm going to -- first of all, I have to thank you.  I

18   -- I agree with Mr. Bazelon, at least in -- in the context.

19   Thank you for your time and attention.  And I know you've got

20   other things to do, and I'm sorry we're here a day late.  So

21   let's try to move through this as quickly as we can.  Having

22   said that, I do have an obligation to try to go through to you

23   -- I said in the beginning of my opening statement that I

24   wanted to give you somewhat of a map as to how things, I

25   thought, would develop and what the proof would show.

1           The purpose of this is to take you through what I

2      think the proof did show.  Again, as I've said to you before,

3      what I say, and certainly what Mr. Bazelon said, is not -- is

4      not the facts that you have to determine.  And what Mr. Bazelon

5      said about the law -- and I'm going to tell you what I think

6      what the law is, too, and what Judge Fullam is going to

7      instruct you on is certainly not the law.  It's going to come

8      from Judge Fullam at the end of our charge, probably after

9      you've had lunch.  But -- so -- and Judge Fullam said that the

10     -- the reason that plaintiff gets to go first and I get to go

11     last and then again plaintiff gets to go first and I get to go,

12     but then he still gets his rebuttal.

13          In some ways, it's intuitively not fair.  But there's

14     a reason for that, as Judge Fullam said.  And that's because

15     the plaintiff has the burden of proof in this case.  And burden

16     of proof may or may not be important, but I think it's -- Judge

17     Fullam will give you some description of what the -- the burden

18     of proof is.  There's two forms of burden of proof that you're

19     going to be instructed on in this case, I believe.  The first

20     is that the plaintiff has the burden of proof by a

21     preponderance of the evidence.

22          Now, a preponderance of the evidence -- again, Judge

23     Fullam will tell you what it is, but the best way of describing

24     it is, if you take the scales of justice and the plaintiff

25     moves that scale of justice that much, he has met his burden of

1    proof.  That's -- that is one form of burden of proof.  And

2    Judge Fullam will tell you what parts of the case are subject

3    to that burden of proof.  But there's another type of burden of

4    proof in a case, and that's called clear and convincing

5    evidence.  And clear and convincing evidence is a much harder

6    burden that the plaintiff has to meet.

7            If you take the scales of justice, I guess they don't

8    have to go like this, but they certainly have to be down here.

9    It's weighty.  It's got to be clear, convincing.  And that --

10   and the plaintiff has the burden with respect to that.  And

11   when you -- one of the things that this case is -- one of the

12   things is that this case -- what this case is about is money.

13   And actual malice re -- for -- for plaintiff to require

14   presumed damages -- remember, he doesn't have any real --  he

15   can't come in and show you any damages at all.

16           So how does he want to prove it?  By, I want you to

17   presume -- give me some money -- presume.  Well, for him to

18   even -- for you even to be allowed to do that, he's got to

19   prove by clear and convincing evidence that we acted with

20   actual malice.  And punitive damages, he wants to punish West

21   -- yeah, he wants to punish West.  The plaintiffs want money.

22   But in order for the plaintiff to get that money, again, he's

23   got to prove that we acted with actual malice with clear and

24   convincing evidence.

25           Ladies and gentlemen, I -- I respectfully submit that

1    the evidence does not come anywhere near meeting that.  In

2    fact, it goes the other way.  But it doesn't have to.  It has

3    to go this way for the plaintiffs to recover.

4           Now, there's three main issues in this case that I

5    wanted to talk about, and I want to talk about that you're

6    going to be faced with.  Now, the -- and let -- let me say,

7    again, Mr. Bazelon, sometimes he described the law, I think,

8    accurately, the way Judge Fullam described it.  Other times, I

9    don't think he did.  And sometimes I think he left things out

10   that will be -- that will be in -- in His Honor's instructions.

11   Again, this is what I think.  Again, it will be what Judge

12   Fullam says.

13          But in order for the plaintiffs to recover anything

14   in this case, even on their so-called humiliation damages, they

15   have to prove that -- they have to show with -- by meeting

16   their burden of proof that users of the supplement would

17   conclude that it was inaccurate and out of date.  It's not that

18   they can just prove that it was inaccurate and out of date.

19   Ladies and gentlemen, if that's all they had to prove, we

20   wouldn't be here.  But that's not what libel is about.  Because

21   we wouldn't have removed and replaced that supplement if it was

22   not for the fact that it was deficient, inaccurate, out of

23   date, exaggerated, perhaps.  But they have to prove that the

24   people who read it -- and there's -- what he left out of that

25   -- of that description is that he also -- they also will have

1    to prove the understanding by the recipient -- not the

2    understanding by the two plaintiffs, by the people who read the

3    supplement of its defamatory meaning.

4            In other words, someone had to read something in that

5    supplement and conclude it was false and inaccurate and it

6    damaged their reputation.  Ladies and gentlemen of the jury,

7    I'll talk about this a little bit more in detail, there's no

8    evidence in this case that anybody even read it.  There's no

9    evidence in this case that anybody read any of the inaccuracies

10   in it.  Not one bit.  And there surely is no evidence in this

11   case that anybody would have read it and so concluded as I've

12   just stated it.  And if that's the conclusion you reach,

13   happily, for us, this case is over.  That ends it.  I believe

14   you'll be -- I think you'll be appropriately instructed in that

15   regard.

16           Now, if you don't -- if you do find -- and I don't

17   think you can based on the evidence -- that recipient would

18   have and did conclude, then you're going to move to actual

19   malice.  Because -- because then, if he can prove actual malice

20   and he's proved the first part of it, what we talked about,

21   then he's entitled to his presumed damages.  Now, that's when

22   we get to the clear and convincing evidence.  And that's where

23   Mr. Bazelon said, well, actual malice -- and the Judge will

24   define this in his instructions.  Listen to him, not me.  But

25   this is what I think he's going to say.  He's going to say that

1    West had to have knowledge of falsity.  And he's going to also

2    say they -- or -- or reckless disregard for the truth.

3           Now, the plaintiff would like to have you just take

4    that reckless disregard for the truth and just think about

5    that.  But reckless disregard for the truth is going to further

6    defined in that instruction.  And it's going to be defined as a

7    high awareness of probable falsity.  In order to find actual

8    malice, you're going to have to believe that the people on this

9    screen knew that they were putting out something inaccurate and

10   false.

11          Now, think for a second -- think for a second.  Why

12   would West -- why would Sarah Redzic -- why would Teri Kruk

13   -- why would Catherine Smith -- we'll talk about Ms. Maess

14   later -- why in the world would they -- oh, they screwed up.

15   There's no question about that.  We've never said they haven't.

16   They put out something that didn't meet our standards.  But do

17   you think they put it out intentionally with a high degree of

18   awareness that -- that it was -- that it was false and

19   inaccurate or anything close to that?  And that's the evidence

20   that they absolutely and utterly failed to show.

21          The last part that's going to be part of this -- of

22   part of this, the elements, is damages.  If you find a) that

23   the recipient -- there was some recipients out there that read

24   something that caused them to think it was inaccurate and false

25   and thought less of the plaintiff, one.  And then you find

Rittinger - Closing Argument                          72

1   actual malice, then you can go to presumed damages and then

2   punitive damages.  And I will talk to you a little bit about

3   that later on as well, when -- when I get -- when I get through

4   this.  I know that makes it sound like it's going to be longer,

5   but I'm going to try to move along a little faster.

6        But before I talk about each one of those elements --

7   and I guess we can -- we can -- we can call it the recipient

8   understanding, reading this thing and understanding that it was

9   false and inaccurate, actual malice and damages.  There's a

10  couple of other -- there's a couple of things I would like to

11  -- just to go over more generally.  We did show, ladies and

12  gentlemen -- and there's no -- actually, there's no -- there's

13  no dispute about a lot of things in -- in this case, when you

14  think about it.  Professor Rudovsky, a 28-year relationship

15  with West, still going on; Professor Sosnov, an 18-year

16  relationship.

17       Yes, we do contend that it would have been more -- we

18  don't contend that people can't go to lawyers.  And we don't

19  think, again, that you have to -- that you necessarily have to

20  draw a negative inference that they went to lawyers instead of

21  coming to us.  But if they really wanted to cure something,

22  maybe -- maybe at least a phone call that the lawyer's letter

23  is coming, something.  But that's not -- that -- I -- I don't

24  -- I say this because it is true that people can go to lawyers.

25  You have a right to go to lawyers.  In this situation, with

1    that many years -- that many years experience, maybe something

2    more than what happened in this case and we wouldn't be here.

3    Unless, of course, the case was just about having -- getting

4    money; getting you to pay money for presumed damages and

5    punitive damages.  Then maybe it's the right way to try to go.

6          Now, Professor Rudovsky, he talked about -- in his

7    closing, he talked about the ethics of West and that West is

8    unethical.  I -- I don't know.  I didn't see anything unethical

9    about it.  Maybe -- negligent maybe.  Maybe they could have

10   done a better job.  Ms. Jean Maess, did she come across to you

11   as being unethical?  But there's another thing.  Would you

12   continue to do business and publish with an unethical publisher

13   if you really believed that they were unethical?  I don't think

14   so.  Professor Rudovsky, he's getting his 15 percent on his

15   book from this unethical publisher.  That's what I say about

16   their business about un -- being unethical.

17         Let me talk a little bit about the contract.  Mr. --

18   Mr. Bazelon, he likes to set up straw men.  We do not argue

19   that we had the contractual right to publish a -- a supplement

20   that is a sham.  I'm going to use his words.  We've never said

21   that.  What we have said is -- and there were reasons for

22   saying this that have now been resolved in this lawsuit, that

23   we had the right to use their names.  And we did have the right

24   to use their names on the supplement.

25         I'm not going to spend much time on the new

1    advertisement.  Let me -- let me get to that in a second.  I

2    won't even ask to put it up.  What that new advertisement talks

3    about is this book that they wrote.  They don't have any idea

4    what's in the 2011 supplement, yet they want to come in and

5    somehow inflame you that we're still continuing to sell the

6    book.  It's our book.  We own it.  They don't own it.  We're

7    entitled to sell it.  It's got their names on it.  If you want

8    to take the names off any new printings, we'll take their names

9    off.  But we -- but they haven't told us that.  They want it

10   both ways.  They want their names on it, and yet they want to

11   be able to complain about something that hasn't even happened

12   yet.  That's what we're dealing with in this case.

13           Now, one further point with the contract, and I won't

14   spend a lot of time on it.  The contract, as I said, is our

15   book.  These are the provisions I read to you before.  There's

16   also -- and -- and the -- the significant -- I'm sorry, I meant

17   to bring out one other point on -- on this part.  I have no

18   diea why Mr. Charlson asked Ms. Maess about the -- whether or

19   not it was our -- it was West's position that they had an

20   obligation to write the new supplement.  What Ms. Maess said

21   was -- first of all, she was a little bit befuddled.  What's

22   the question?  We never -- we never said that they had to write

23   the -- the supplement.  We never tried to hold them to doing

24   the supplement.

25           What she said was, oh, if you read the agreement, it

1    says that they have a duty to update.  Authors will provide

2    upkeep to the work on an annual basis, or as otherwise agreed

3    by the publisher and authors.  West didn't say to them, we have

4    the right to cut your -- your payments from 5,000 to 2,500.

5    But we did say, we're only making $17,000 on this thing.  We

6    can't -- we can't get -- if we give you 10,000, we got $7,000

7    left to print, send it out, mail it.  I mean, I'm not -- I'm

8    not saying 5,000 made sense, but 10,000 certainly didn't make

9    sense.  But the plaintiffs made their own decision not to go

10    forward.

11        And the reason I bring that up now is because of some

12    testimony by Mr. Sosnov.  Mr. Sosnov referred to the book as

13    being his baby.  Well, first of all, that's wrong.  It's not

14    his baby.  It's our baby.  We own the book.  But if it really

15    was his baby, would you let it go for $2,500?  Remember what

16    Mr. Sosnov said.  It was a great benefit to him for all the

17    years.  Then they didn't want to do it anymore for $2,500, so

18    they let it go.

19        Now, what they want to do is, they want to second

20    guess every single decision we make.  How we advertise our

21    book, what we do with our -- with the next supplement.  They

22    want to criticize every single thing.  They don't have that

23    right.  It's not their book anymore.  We don't have the right

24    to put something out that damages their reputation, but we

25    certainly have the right to use this book in the way that we

1    deem appropriate, and not to be second guessed by those

2    professors or their lawyer.  That is not in the contract.  In

3    fact, the contract says the exact opposite.

4         Well, let me try to, more quickly, go through again

5    the three issues.  Let's take a look -- the first issue that

6    you will be asked -- and in the instruction, I believe, that

7    will be read to you by the Court, you will be asked, as -- as

8    -- to find as follows:  You must determine what the

9    communication means.  If you find that the intended audience of

10   the 2008 pocket part would conclude that the plaintiffs

11   authored an inaccurate and out-of-date supplement, then you may

12   -- then you may find in favor of the plaintiff.

13        In other words, if you find that the communication

14   was not false, and that it would be under -- and it would be

15   understood by those other than the plaintiffs -- by those other

16   than the plaintiffs -- very important.  It's easy for the

17   plaintiffs to come in and say whatever they want.  And they --

18   and they certainly have.  They couldn't stop talking to you

19   about how bad it was.  But they didn't bring one other person

20   in to say how bad it was.  And I'll have a word to say about

21   that in a minute, too.

22        Anyway, finishing it, you may return a verdict in

23   favor of the plaintiff.  So you got to find that before you can

24   return a verdict of -- in favor of the -- of the plaintiff.

25   But you also -- as I said before, you're going to have to find

1    that a recipient understood, when they read this supplement --

2    I should say, if a recipient read this supplement, because

3    there's no proof that one did -- that they -- they -- they

4    believed it had a defamatory effect on these plaintiffs.

5    There's no proof of that.  But a couple of things in that

6    regard.

7            First of all, on the complaint issue, Professor

8    Rudovsky, he wants to say, well, nobody is going to complain to

9    me because -- well, maybe nobody complained because nobody

10    reached that conclusion.  That's -- that's very, very possible.

11    But I'll tell you one thing, the publisher, if they put out a

12    sham publication and people were reading it and looking at it

13    and saying, this is terrible, holy God, boom, boom, don't you

14    think we would have gotten one complaint?  We didn't get one

15    complaint about 2008.

16            Also, keep in mind that how long was it out there.

17    They -- they talk about rushing it out.  Well, first of all,

18    they write us a letter and they complain about how terrible the

19    thing is, so we're going to replace it.  We -- we did put it

20    out as quickly as we could.  Of course, the testimony was that

21    we used a very, very competent person to do it.  We went to one

22    of our best and we had it reviewed by -- I think what -- what

23    the testimony was -- our senior person in that regard.  And we

24    put out the 2009.

25            Now, I guarantee you, you put two professors that

1   have nothing else to do -- you put any -- two professors on

2   anything that's in their area of expertise and we put it out,

3   they're going to find things that they can complain about.  But

4   there's no evidence of legitimacy that we didn't -- we rushed

5   it because they wanted it out, and they wanted it replaced.

6   And we did it in good faith, as fast as we could.  No good dead

7   goes unpunished.  I don't know, it really wasn't a good deed,

8   because we had to do that.  Once it was brought to our

9   attention and what was in it and we looked at it, we did what

10  any responsible publisher would do.  We replaced it as quickly

11  as we possibly could.

12          But my point is, no complaints from anyone.  And if

13  there -- this is really as horrendous as the -- as the

14  professors said, wouldn't you think there would be at least one

15  between -- between whenever it happened and today?  But there's

16  another reason -- there's an explanation for this, and it's not

17  -- you know, it's not rocket scientist.  This is the hard

18  cover.  This is the supplement.  You know, when you get your --

19  if -- if we had put in a daily newspaper Professor Rudovsky and

20  -- and Professor Sosnov are -- write inaccurate and out-of-date

21  text, that would be libel as per se.  And if somebody got it

22  and they read it and they said, hmm, that's not good.  These

23  guys, they put out -- but now we've got to -- in order for you

24  to find for them, we've got to find that somebody read this and

25  so concluded.  And you heard the testimony -- Mr. George, which

1          I'll have a little bit more to say about later on --

2     that's not the way people use supplement.  They -- or -- or use

3     these books.  First of all, we got 400 of them out here.  It's

4     out there for three-and-a-half months.  We have no idea, and

5     there certainly is no proof, as to anybody -- how many people

6     actually pulled it off the shelf and even looked at this.  Now,

7     when they look at this, it is appropriate to then go here and

8     see if there's anything that updated from whatever is in the

9     hard cover to the supplement.

10          So first of all, we don't know if anybody read it and

11     then went to the supplement.  And if they did read it, 90

12     percent of this was written by whom?  By them.  So we don't

13     know whether they went to any of the spots that may have had a

14     case missing are one of the things that they -- that they

15     complained about.  We don't even know if that happened.  And if

16     it did happened, that person then had to read it and go, hmm,

17     this thing is false and inaccurate.  It's a sham, based upon

18     going to one thing.

19          Then he -- if he -- if he does what everybody in this

20     case says he should do, he goes and he key cites or Shepardizes

21     -- Shepardized the competitive product, so that's why we like

22     to say key cite.  But that's what they do, they go and they do

23     that.  And what do they find?  If they find another case, and

24     then go back and go, hmm, boy, those -- that Professor Rudovsky

25     and Professor Sosnov, they missed that case, I think less of

1    them.  Maybe if they did it 20 times or ten times or three or

2    two times, maybe.  But -- so in -- in strong contrast to taking

3    something like this, a newspaper, what somebody reads that has

4    something in it, there's a lot of steps that you have to go

5    through before you're able to get to the point of -- of

6    determining that any recipient had the understanding of a

7    defamatory meaning that's claimed in this case.  (Pause)

8        Let me -- let me quickly move to -- to actual malice

9    and -- as I said before, there's no question -- and Ms. Maess

10   -- you know, we said it in the opening, we said it every time,

11   we certainly said it -- once -- once we made the determination

12   that this was not good and we were going to put it out, it's

13   deficient.  It -- it was not what it should have been.  All

14   right.  But in order for you to find actual malice, now you

15   also have to go to, well, it was deficient, but did people

16   actually know that it was deficient?

17       Now, think about a couple of things.  What is the

18   motivation of West to put out a deficient product?  There's

19   absolutely no -- you know, one of the things that -- you know,

20   I -- I guess we -- we think about what this case is, the

21   plaintiffs like to say -- and think about the testimony about

22   that.  I'm still not sure what the testimony was.  People do

23   read the -- the page -- the front page of the supplement when

24   it's this exhibit, but when it's the exhibit -- the second --

25   the replacement supplement and -- then -- then nobody looks at

1    it, the one that says that they had nothing to do with it.

2         I -- I -- you know, she seemed to switch back and

3    forth, depending upon which one they wanted -- they wanted

4    people to -- you know, we're damaged if they -- so they got to

5    -- they got to look at this, because it's damages.  But the

6    other one that says they had nothing to do with it, well, now

7    nobody looks at that.  But they like to think about us putting

8    something out with -- that -- that we thought was not up to our

9    standards.

10        Now, that's their names.  Remember the -- and that's

11   the publisher's staff.  And remember how they kept on talking

12   about how the publish -- their names is much bigger than the

13   publisher's staff?  Whose name is the biggest on there?  Whose

14   got the most at stake here?  West.

15        We have no motivation to put out anything that's

16   terrible.  It's the last thing in the world we're going to do.

17   And -- and to -- to claim that we did it knowfully -- knowingly

18   and intentionally is just -- it make -- it just makes no -- it

19   makes no sense at all.

20        I will move this through this -- I won't go through

21   each one of the -- each part of the testimony of -- of these

22   people.  I think it's your recollection of that testimony that

23   really matters anyway.  But I think it's fair to say that,

24   yeah, Sarah Redzic should not have been allowed to do that

25   without supervision.  But she didn't do anything intentionally.

1    And the people who supervised her should have supervised her

2    better.  She volunteered for something.

3         You know, and this is a second example of no good

4    deed goes unpunished, I guess.  She volunteered for something

5    that didn't turn out well for her.  And it didn't turn out well

6    for West.  And it didn't turn out well for the professors

7    either, because it has resulted in the end of what was and

8    could still have been a good longstanding relationship with

9    good authors.  But it happened as a result of maybe negligence,

10   but not with knowing falsity.  And certainly not with -- and

11   I'm going to say it one more time, and I ask you to -- to

12   listen to it when the Judge -- when the Judge -- if the Judge

13   gives this in -- in his instruction -- not with a high degree

14   of awareness of probable falseness.

15        Now, very -- I -- I was going to put it on the

16   screen, the customer letter, the withdraw, the new -- I'm not

17   going to do that.  I think you remember that.  We sent it out

18   timely.  They complain that it's not adequate.  It certainly

19   advised people they had nothing to do with it.  I don't know

20   what we could have said.  I mean, I suppose we could have --

21   you know, you could have bought a billboard, we could have put

22   it on -- you know, we could have spent $10 million putting it

23   on the news.  We did what was a reasonable response and what we

24   thought was appropriate.  They didn't have anything to do with

25   it, and we're going to get you a new supplement.

Rittinger - Closing Argument                    83

1          One thing I should say is that there's a lot of

2     discussion in this about the subscribers and how the

3     subscribers paid for something they didn't -- well, they got a

4     -- they got a new supplement.  But plaintiffs are not here to

5     recover for the subscribers.  The subscribers can take care of

6     themselfs.  And by the way, at West, if they want a refund for

7     anything, they can get a refund.  A lot of claim about all this

8     damage that went to the subscribers.  It's not part of this

9     case.

10         THE COURT:  I don't know that there's any evidence on

11    that subject.  Would you please stick to the evidence.

12         MR. RITTINGER:  Let me talk a little bit about

13    damages.  If you could prove damages by coming in to a jury --

14    you know, it's one thing you come into a jury, you got a broken

15    arm, you know, you got brain damage, I don't know, somebody

16    breached a contract and you lost X number of dollars.  But

17    that's not what they did.  They're coming in, and they testify

18    at length, I was humiliated.  I really was humiliated.

19         Now, it's about as self-serving a statement as you

20    can make without any proof at all.  I guess the way I would

21    describe it is sort of like this.  This is -- this is what his

22    pitch to you is.  The plaintiffs are humiliated.  I want you to

23    presume damages.  And by the way, West is a big company.

24    Really punish them and -- and -- and award a big fat sum of

25    money against them.  Oh, whose the money go to?  The two

1    professors.  That's what this case is about.  And I'm going to

2    ask you to think about something.  Nobody else came in to back

3    up anything that they said about how bad it was or how they've

4    been damaged, except the professors themselves.  Self-serving,

5    call it ipsy-dipsing (phonetic).  They say it.  But one thing

6    did happen in this trial that I think is -- I think was

7    interesting, and it was -- it was a witness that was only on

8    for a minute or two, that was Paul George.  He was the

9    librarian from the University of Pennsylvania Law School.

10           Now, when you're measuring the credibility of how bad

11   this thing is, I want you to think about his testimony for a

12   moment.  He got on the stand and he talked about how a treatise

13   is used.  And quite frankly, you know, he was pretty accurate.

14   And -- and you know, it's secondary law, etcetera, etcetera.

15   Then he talked about how -- which I didn't understand.

16           He talked about how sometimes the -- the students do

17   know or sometimes the students don't know.  But at one point --

18   and then he got -- then he sat down and I -- we asked him --

19   the -- the chronology is what you remember better, because I'm

20   not sure I remember the chronology exactly correct.  But at

21   some point during my cross-examination I said to him, first of

22   all, "Do you have a subscription -- do you still have your

23   subscription to the treatise?  And he said, "No."  And I think

24   that ended the exam for a while and I think there was some

25   further questions.  And I went over to Mr. Zeisler, and Mr.

1    Zeisler said, ask him about whether the University of

2    Pennsylvania has this subscription.  I said, I thought I did,

3    but I guess I didn't because I said to you -- and so his answer

4    was correct.  And then I got up and I said, does the University

5    of Pennsylvania -- no, I think, actually, I said, "You've

6    talked to Professor Sosnov and Professor Rudovsky about how bad

7    the book is, haven't you?"  And he said, "Yes."  He was fully

8    aware how bad the book was, because he had talked to his

9    friends and they told him how bad it was.  And then we said,

10   "Do you still have a subscription to the University -- from the

11   University of Pennsylvania?"

12           Remember, his direct testimony, what he was talking

13   about was protecting the students and making sure the students

14   were properly educated.  Now he's got this book in his library

15   that has the supplement that's so bad, and he's still

16   subscribing to it.  So then we said to him, have you done

17   anything -- have you taken the 2000 -- remember, he was

18   complaining you still go the 2009 supplement.  "Do you still

19   have it?  Do you have any sticker in it?"  You know what his

20   answer was?  Do you remember?  His answer was, "Oh, I better go

21   back and do that right now."

22           Well, ladies and gentlemen, if he really believed

23   what he had been told by professors that this book was really

24   as bad as he said, wouldn't the librarian at the University of

25   Pennsylvania Law School, the very school that Professor

1   Rudovsky teaches at, wouldn't he have seen that those students

2   were not damaged by this?

3          Again, that's -- that's something for your

4   determination.  But I do think that when you -- when you

5   juxtapose that with what they say, contrast that to their own

6   witness, that it -- it speaks volumes.

7          I think the -- I'm not -- I'm -- I'm going to do

8   about three more minutes, I think, is all I have.  I want to

9   sum up on damages.  All right?  Here is where we are in

10  damages, I -- I think.  First -- first of all, a lawyer always

11  has a dilemma as to whether or not he should talk to a -- a

12  jury about damages, because we don't want the jury -- you don't

13  want the jury to think, well, if he's talking about damages,

14  that means he thinks they've -- they've established liability.

15         I don't think that they've established liability.  I

16  don't think they can establish liability, because -- and I

17  think they failed utterly to establish liability because they

18  were not able to show that anybody read that and thought as you

19  will be instructed.  But if they did establish liability, I ask

20  you to keep in mind the following.  And I've said it before, so

21  I don't have to say it again, but it is important to keep in

22  mind.

23         First of all, they couldn't bring in one person to be

24  able to say that they read this and concluded that there was

25  anything wrong with it.  Not one.  Second of all -- and they do

1    have excellent reputations.  There's no doubt about that.  But

2    they haven't been able to bring in one person.  What -- what a

3    libel case is, is about is damage to reputation.  And they

4    haven't been able to bring in one person who says that their

5    reputation was damaged.  And a libel case also will compensate

6    you if you lost money as a result.  And they have acknowledged

7    that they have not lost one red cent.

8         I ask you to keep that in mind.  I ask you to keep in

9    mind what the dollars and cents here are.  It may have been

10   very -- it may have been a lot easier for West -- I could tell

11   you one thing.  They would have been a lot better off if they

12   paid them the 5,000 bucks.  We wouldn't be here today.  I mean

13   -- but West did not want to pay ransom for the public

14   disclosure of this.  It just wouldn't do it.  And they're

15   betting that you guys will pay that ransom.  Not -- they'll pay

16   the ransom to them that West wouldn't pay because they weren't

17   damaged.

18        I want to thank you again.  You know, one thing about

19   this trial is that the lawyers involved, I guess we -- we've

20   all -- we've all been doing this for a long time.  And we do

21   appreciate your time, again, I say.  My practice is not at the

22   end of a summation to ask you to return a verdict for the

23   defendant.  I certainly hope you do.  But I'm not going to ask

24   you to do that.  Instead, I'm going to ask you to listen to the

25   Judge's instructions and go back and do what's right.  Because

1     if you do what's right, that's what a jury is supposed to do.

2     Thank you very, very much for your -- your time.

3                THE COURT:  You may have a brief rebuttal.

4                MR. BAZELON:  It will be brief rebuttal, Your Honor.

5     If it wasn't clear to you before, members of the jury, I

6     suggest to you it is clear now that West major presentation to

7     you is that this is the fault of the plaintiffs.  They tell you

8     that Mr. Sosnov believed that this was his baby.  He should do

9     pocket part.  It doesn't matter if you pay him $2,500 or zero.

10    It doesn't matter if it takes him hundreds of hundreds of

11    hours.  He should have done it.  His fault.

12               They tell you that they shouldn't have gone to

13    consult with a lawyer.  It's their fault.  They tell you that,

14    basically, if there was a single theme to Mr. Mittinger's (sic)

15    -- Mr. Rittinger's remarks to you, it was to suggest to you

16    that Professors Rudovsky and Sosnov are moneygrubbers.  Why

17    should they be coming here and be concerned about their

18    reputation and asking for money?  It's their fault.  You should

19    know that jurors -- juries only determine money damages.  They

20    do not get involved in other issues in the case, such as

21    injunctive relief.

22               The fact that you are being asked to award damages

23    does not mean there are not other requests for relief in this

24    case.  And that the only thing that the plaintiffs have sought

25    in this case is money.  And you also know that Professors

1    Rudovsky and Sosnov do not take lightly coming into court and

2    asking for damages.  They have never in their lives ever done

3    that before.  And indeed, Mr. Rittinger even went so far as to

4    describe Professors Rudovsky and Sosnov as two professors with

5    nothing to do.  It's their fault.  It's their fault.  It's not

6    West's fault.  It's their fault.

7         Now, there is one major issue of law in this case

8    that I respectfully ask you to pay very careful attention to

9    when you hear the Judge's charge.  Mr. Rittinger told you that

10   you have to find that a recipient did understand that the

11   pocket part was defamatory.  I believe that that is a

12   misstatement of the law.  What you have to define -- you have

13   to decide is whether the intended -- the intended audience

14   would find -- in other words, assume that an intended audience

15   reads this and understand it, what would -- they would

16   conclude.  You're not asked to make a factual finding of what,

17   in fact, anyone concluded.  And that was a misstatement of the

18   law.

19        And Mr. Rittinger said to you, what motive could West

20   have possibly had to do this?  The motive, the plaintiffs

21   suggest, could not be more clear.  It was all about profit.

22   Make your budget projections.  Do it in the cheapest way you

23   can.  That was the motive.

24        And Mr. Rittinger said something else that I found

25   very interesting.  He says, West owns this product.  It's ours.

Colloquy                                    90

1    It's not theirs, it's ours.  And yet, he says, don't think that

2    we know anything about it.  Don't think that we have any

3    knowledge of it.  Don't think that we would know that it's

4    false or should know it's false.  Don't think that there is a

5    degree -- we know that there is a -- a high degree that it's

6    probably false, even though we did it, under our policies, with

7    our people.  And we own it, and it's ours.  I suggest that

8    those two things are totally inconsistent.  You can't own it,

9    it can't be yours, and then say, we have no responsibility.

10           I now want to suggest to you that there are things

11   that West did not say in its closing which are very important.

12   West never said in its closing, it never said on the stand, it

13   has never said we're sorry.  Simple, isn't it?  You do

14   something that's seriously wrong, we're sorry.  Never.  And

15   West made no statement to you as to what it intends to do in

16   the future; what lessons it has learned, how it's going to

17   remedy this situation, how it will prevent this from happening

18   in the future.  Nothing.  Thank you very much for your

19   attention.

20           THE COURT:  Members of the jury, I think you're

21   getting probably hungry now.  We'll recess for lunch, and we'll

22   try to make it back here by 1:45.  Okay.  Recess till 1:45.

23                    (Lunch recess)

24           THE COURT:  All right.  Good afternoon.

25           MR. BAZELON:  Good afternoon, Your Honor.  (Pause)

1    Your Honor, you had stated at the beginning of our session this

2    morning that the verdict form would be as it had been discussed

3    or as you handed out yesterday.  And --

4              THE COURT:  That was my intention.

5              MR. BAZELON:  And I -- I had neglected to raise with

6    you at that time that we had discussed the possibility of

7    adding a question.

8              THE COURT:  And what might that turn out to be?

9              MR. BAZELON:  That would have been, Your Honor, if

10   you -- if the jury finds damages on both defamation and false

11   light, what is the cumulative or total amount you award to

12   Rudovsky and separately to Sosnov?  And the reason we had

13   considered that was that there might be overlap, and that it

14   might be appropriate, therefore, to -- to get a total amount.

15             COURTROOM CLERK:  That was the change that was made.

16             MR. BAZELON:  I didn't -- because I didn't see the

17   form, I don't know if you did it.  That's the only question I'm

18   raising, Judge.  You -- you may have done it.

19             THE COURT:  I don't know.  Did we?

20             COURTROOM CLERK:  Yeah, that was the change that we

21   made, Judge.

22             THE COURT:  Okay.

23             MR. BAZELON:  There's one other matter, Judge.  I

24   think there is an error.

25             THE COURT:  Oh, no.

Colloquy                                    92

1          MR. BAZELON:  And I -- and I apologize for not

2     catching this before -- that the beginning of three you say --

3     or the form says, "If you answered yes to questions one or two,

4     then you may award punitive damages."  The law is -- and -- and

5     I'm pretty sure this is in your instruction -- that you don't

6     need to award compensatory damages to award punitive damages.

7          THE COURT:  Well, that doesn't tell me --

8          MR. BAZELON:  So in other words, they should be a

9     separate -- I think it should simply say do you award punitive

10    damages?  And then if so, what's the amount?

11         THE COURT:  Well, excuse me, but if they answered yes

12    to one, they would say that you established that you were

13    defamed.  And if you answer yes to two, it be established that

14    you were held in false light.  Nothing about compensatory

15    damages.

16         MR. BAZELON:  Well, Your Honor, that -- you're --

17    you're right about that.  The only -- the problem is that one

18    also includes damages.  So

19         COURTROOM CLERK:  Not anymore.

20         MR. BAZELON:  Oh, it doesn't?  Well, I guess -- may

21    we see the form, Your Honor?  You probably already corrected it

22    and --

23         THE COURT:  I've got several forms here.  I don't

24    know which one is which.  Just a minute.  Here we are.  The

25    copy I'm looking at doesn't say anything about that.

1      MR. BAZELON:  All right.  I'm sorry.  I was looking

2   at the one you handed out yesterday, Judge.

3      THE COURT:  I must have taken it back into chambers.

4   See if you can find it in there.  While -- while we're waiting,

5   there's one point I want to get clear.  The -- based on the

6   closing arguments of counsel and, in fact, throughout the

7   trial, there's been a general lumping together of defamation as

8   false.  And it seems to me that there's no dispute about the

9   fact that defendant falsely represented that the plaintiffs had

10  prepared this supplement, right?  That is -- that is a -- a

11  false statement, to tell the public that this pocket part was

12  prepared by Rudovsky and -- pardon?

13     MR. RITTINGER:  Did we -- that we concede that?

14     THE COURT:  Yes.

15     MR. RITTINGER:  No.

16     THE COURT:  Well, they didn't -- you're not

17  contending that they prepared the supplement?

18     MR. RITTINGER:  They wrote 90 percent of it.

19     THE COURT:  Pardon?

20     MR. RITTINGER:  They wrote 90 percent of it.

21     THE COURT:  Of the pocket part?

22     MR. RITTINGER:  Yes.  (Pause)  Well, the -- on the

23  front page it says that this pocket part was prepared by them,

24  right?

25     MR. RITTINGER:  Right.  95 percent of it was.

1              THE COURT:  It's not the one that they prepared, is

2      it?

3              MR. RITTINGER:  I'm sorry, Your Honor?

4              THE COURT:  It's not the pocket part that they

5      prepared is it, the 2 -- 2008?

6              MR. RITTINGER:  Well, they prepared 95 percent of it,

7      Your Honor.  They -- they didn't do the update.

8              THE COURT:  Well, the update is the pocket part,

9      isn't it?

10              MR. RITTINGER:  No.  No.  The update is -- 95 percent

11      of the 2008 supplement is the 2007 supplement.  Or 90 percent,

12      I don't know.

13              MR. BAZELON:  They did not prepare the update, which

14      is --

15              MR. RITTINGER:  No, to the -- to the extent that

16      there are updates in it between '07 and '08, that was prepared

17      by staff.  To the -- the rest -- the vast, vast majority of

18      that was prepared by the plaintiffs.

19              THE COURT:  I see what you mean.  Okay.

20              MR. BAZELON:  Your Honor, we don't agree with that.

21      The whole point of an update is that it -- you are saying that

22      this is what is new from the time of the prior pocket part.

23      And the representation that what was part of the update since

24      the last pocket part, the attribution of Dr. Rudovsky and

25      Sosnov is factually -- there's no question that that's false.

1          THE COURT:  Right.

2          MR. RITTINGER:  I didn't hear what he said.  I'm

3     sorry, but it's -- if you want to correct it.

4          THE COURT:  The -- getting back to the verdict form,

5     all it says is -- in question number three, "If you answered

6     yes to question number one or two, then do you award punitive

7     damage against the defendant?"  That's the punitive damages

8     question.

9          MR. BAZELON:  Yes, Your Honor, I think that suffices.

10    Let me just --

11         THE COURT:  Yes.

12         MR. BAZELON:  I think that works

13         MR. RITTINGER:  Your Honor, I don't think -- I don't

14    think there should be a separate award of punitive damages for

15    both of them.  I understand the separate award for compensatory

16    damages.

17         MR. BAZELON:  I don't understand the -- what's the --

18    what's the objection?

19         THE COURT:  He thinks it should be punitive damages,

20    it should be not awarded separately.  They should be a lump

21    sum.

22         MR. BAZELON:  Your Honor, I -- punitive damages

23    definitely should be awarded separately.  It's --

24         THE COURT:  Why is that?

25         MR. BAZELON:  Well --

Colloquy                                                         96

1          THE COURT:  If we're dealing --

2          MR. BAZELON:  Can I consult with my client, Your

3    Honor?

4          THE COURT:  You certainly can.

5          MR. RITTINGER:  Your Honor, I think -- I'm pretty

6    sure that the way they submitted their form was only one for

7    punitive anyway.  (Pause)

8          MR. BAZELON:  Your Honor, that's -- if -- we can --

9    we're happy to go either way on that, Judge.

10         THE COURT:  And you want them not awarded separately?

11         MR. RITTINGER:  Right.

12         THE COURT:  Are they supposed to fight over it if

13   they get -- or should it be divided equally or what?

14         MR. RITTINGER:  I don't know, Judge.  There will be

15   an appeal before we have to worry about that.  But that -- but

16   Your Honor, punitive damages are not -- they're not -- they --

17   they have nothing to do with an individual.  All it is, is two

18   numbers to write down, which is prejudicial to us.  When they

19   submitted their own form, I'm pretty sure they -- they

20   separated the plaintiffs.  And I understand that.  We didn't do

21   that, and we -- and we should have.  But -- but the punitives,

22   they never asked for it separately.

23         MR. BAZELON:  Your Honor, I apologize but we think

24   that the way you have it here is correct.  And that -- and we

25   would -- we want to keep it that way.

1          THE COURT:  What makes you think that?

2          MR. BAZELON:  I'm sorry?

3          THE COURT:  What makes you think that?

4          MR. BAZELON:  Well, first of all, punitive should be

5     awarded separately to each plaintiff.  It's a separate item.

6     And -- and --

7          THE COURT:  That's what I'm asking, why should that

8     be?

9          MR. BAZELON:  Because it's a violation of each

10    plaintiff's rights, just as -- just as, Your Honor, an award of

11    compensatory damages is a violation of their rights.

12         THE COURT:  And if they awarded different amounts to

13    each plaintiff, what would be the result?

14         MR. BAZELON:  I -- the result would be that each

15    plaintiff would -- would be entitled to a different amount of

16    punitive damages.

17         THE COURT:  And -- and you wouldn't be filing a

18    motion for a new trial based on that?

19         MR. BAZELON:  No, Your Honor, I don't -- I don't see

20    how I could.

21         MR. RITTINGER:  Your Honor, he -- he's wrong when he

22    says they're two -- to each individual.  It's a -- it's too --

23    the purpose of punish -- of punitive damages are to deter West

24    and to punish West.  And that has nothing to do with indiv --

25    the individual plaintiffs.

1              THE COURT:  But it is conceivable, is it not, that

2       they might find that -- that the defamation as to one was much

3       greater than as to the other.

4              MR. RITTINGER:  I don't know how they could find that

5       based on the evidence in this, but --

6              THE COURT:  I don't either.  Right.

7              MR. BAZELON:  Well --

8              MR. RITTINGER:  -- anything is conceivable.

9              MR. BAZELON:  I'm not sure I understood whether --

10      whether -- whether that was in reference to compensatories or

11      punitives or both?

12             THE COURT:  Both.

13             MR. BAZELON:  That I agree with, Your Honor.

14             MR. RITTINGER:  Well, I -- I agree with compensatory.

15      I agree with compensatory.  But not as to punitive.  I mean --

16             THE COURT:  I'm going to leave it the way it is.  You

17      can fight it out later.

18             MR. RITTINGER:  Your Honor, for purposes of -- we

19      have -- we have two additional requests that -- that we didn't

20      talk about.

21             THE COURT:  What might they be?

22             MR. RITTINGER:  Well, one was that we didn't notice

23      this morning that I think in the punitive damage section there

24      ought to be a reference that punitive damages have to have some

25      reasonable relationship to the -- to the harm caused.  That's a

1    Supreme Court case.  The -- I would say it's <u>BMW</u>, I think,

2    right --

3              UNIDENTIFIED COUNSEL:  It's <u>B</u> -- yeah, <u>BMW</u>.

4              MR. RITTINGER:  That's a Supreme Court.  That there

5    has to be some reasonable relationship.  And there's no --

6              THE COURT:  So you -- you want to increase the amount

7    of compensatory damages so that the jury can award what they

8    want to award on punitive -- punitives, right?

9              MR. RITTINGER:  No, that's not what I'm looking for,

10   Your Honor.

11             THE COURT:  That's one thing --

12             MR. RITTINGER:  I'm looking for that instruction,

13   because I think it's the law.

14             THE COURT:  Yes.  Okay.

15             MR. BAZELON:  But -- but it's not the law for -- in

16   -- in at least one important respect.  And that is that the

17   jury can award punitives without rewarding compensatories if it

18   finds liability.  So that, that would not be appropriate and it

19   would be misleading.  If we end up with a situation where the

20   defendants believe that a punitive damage award cannot be

21   entered as a judgment because of Constitutional concerns,

22   presumably, they would raise that in post-trial motions, and

23   Your Honor would rule.

24             THE COURT:  I never heard of the notion that they had

25   to be related to the amount of compensatory damages.

1            MR. RITTINGER:  Well, Your Honor, it's <u>BMW North</u>

2    <u>America versus Gore</u>.  It's 517 US Supreme Court 559.  The

3    principle of that exemplary damages must bear a reasonable

4    relationship to compensatory damages as a long pedigree.

5    That's the Supreme Court saying that.

6            THE COURT:  As a long pedigree?

7            MR. RITTINGER:  Yes.  That -- so that means it had a

8    long pedigree going back as far as 1996.

9            THE COURT:  Do they think it still is the law?

10            MR. RITTINGER:  Oh, it's definitely still a law, Your

11    Honor.  That case is still a law.  It's --

12            THE COURT:  What do I do with -- you want me to

13    overrule the Supreme Court or what?

14            MR. BAZELON:  No, Your Honor, because it's not a

15    correct statement of the law.  The -- what we have in our

16    standard -- what we have suggested, and -- and I -- it's

17    consistent with your jury charge, it is not necessary that you

18    award compensatory damages to the plaintiffs in order to assess

19    punitive damages against the defendants, as long as you find in

20    favor of plaintiffs and against defendants on the question of

21    liability.  That is the law.

22            There is nothing in the Supreme Court that -- there's

23    -- there is nothing in the Supreme Court cases that is contrary

24    to that.  And the Pennsylvania -- our authority on that that we

25    cite, the -- the standard Pennsylvania jury charges discuss the

1    Supreme Court law and conclude that it is unaffected by Supreme

2    Court law.  So an instruction --

3              MR. RITTINGER:  Well --

4              THE COURT:  Pennsylvania --

5              MR. BAZELON:  -- that they are requesting -- I'm

6    sorry?

7              THE COURT:  The Pennsylvania Supreme Court doesn't

8    care what the United States Supreme Court says?

9              MR. BAZELON:  No, but -- no, the law in Pennsylvania

10   is that you -- that you can -- that -- and it has been the law

11   for many years since the Supreme Court's judgments --

12             THE COURT:  It has a long pedigree, yes.

13             MR. BAZELON:  Yes, it has, right -- that you could --

14   that a jury finding of a liability can award punitive damages

15   even if they have not awarded compensatory damages.  And there

16   is -- there is no authority to the contrary, Supreme Court or

17   otherwise.  And it's clearly the law in Pennsylvania.

18             THE COURT:  That's nice.

19             MR. RITTINGER:  That doesn't mean he doesn't have to

20   bear some relationship, Your Honor.  They can't overrule the

21   Supreme Court that says there's got to be some relationship.

22             THE COURT:  Well, what --

23             MR. BAZELON:  But the way the Courts deal with that

24   is to look at it after the jury comes back and after there's a

25   verdict, and determine whether there's a relation -- it's a

1    judicial question as to what the bounds of that are.  It's not

2    a jury question.

3                THE COURT:  I'm not going to do anything about.

4    We'll just take our chances with what the jury does.  Okay.

5                MR. RITTINGER:  Your Honor, we accept that.  Just for

6    purposes of the record and Rule 51, it's our position that we

7    object to the instructions to the extent that they don't follow

8    the ones that we last set -- sent in.  And we object to the

9    lack of a special verdict form, Your Honor, for the record.

10               THE COURT:  What do you mean the lack of a special

11   verdict form?

12               UNIDENTIFIED COUNSEL:  What we have there is a

13   special verdict.

14               MR. RITTINGER:  No, for the -- for the -- to the

15   extent that it doesn't follow the -- the special verdict that

16   we last submitted to the Court.  I want to -- I just want that

17   on the record, Your Honor, for Appellate purposes.

18               THE COURT:  He just wants it on the record.  (Pause)

19   In other words -- well, Your Honor, I -- I think what I'm being

20   asked now, or being told is that we wanted a -- a -- at least a

21   specific inquiry or question about actual malice in the -- in

22   your --

23               UNIDENTIFIED COUNSEL:  In the special verdict form.

24               MR. RITTINGER:  -- verdict -- in your special verdict

25   form.

1          THE COURT:  That's going to be covered by the charge.

2   That will be covered by the charge.  I don't think we need a

3   special question on that.  Do we?

4          COURTROOM CLERK:  Bring in the jury?

5          THE COURT:  Pardon?

6          COURTROOM CLERK:  Bring in the jury, Judge?

7          THE COURT:  That's what we have them out there for,

8   yes.

9          MR. BAZELON:  Judge, I take it that -- that we will

10  have a sidebar after the -- you instruct the jury, and that

11  they are -- and that they leave to deliberate?

12         THE COURT:  You have -- yes, if you need one.  But

13  you have all the exhibits ready to go out?

14         MR. BAZELON:  We have all the exhibits ready to go

15  out.  And Your Honor, just for the -- just so I don't forget, I

16  just want to remind Your Honor that we do have a request for

17  injunctive relief in this case, which, in our view doesn't go

18  to the jury.  But I didn't want to be deemed to have waived it

19  by not reminding Your Honor.

20         THE COURT:  Would you be inclined to agree that we

21  await the jury's finding on liability before we consider

22  injunctive relief?

23         MR. BAZELON:  Yes, Your Honor, I do.  Thank you.

24         THE COURT:  Okay.

25         COURTROOM CLERK: All rise.

1                        (Jury in)

2          THE COURT:  Good afternoon.

3          JURY PANEL:  Good afternoon.

4          THE COURT:  Be seated, please.  I'm sorry.  You've

5     heard the evidence and the closing arguments of counsel, and

6     it's now my job to discuss with you what -- what the law is.

7     You must take as correct the law given to you by the Court,

8     whether you agree with it or not.  If I make a mistake, that

9     will be corrected by a higher Court.  But you shouldn't try to

10    correct it by disagreeing with what I say.

11          As you have gathered by this time, the plaintiffs are

12    suing West Publishing Company for damages for alleged

13    defamation of their characters and false light -- holding them

14    in a false light to the public.  In any such case -- in fact,

15    in any civil case, the burden of proof is on the plaintiffs.

16    And they must -- in order to recover a verdict, they must

17    convince you beyond -- to -- it's is more likely than not that

18    they are entitled to a verdict.

19          So that you -- in the ordinary -- most of the issues

20    in this case, they have the burden of proving by a

21    preponderance of the evidence, which means the fair weight of

22    the evidence.  And as to those issues, you simply put the

23    evidence favorable to the plaintiffs on one side of the scale

24    and balance it in convincing power with the evidence in favor

25    of the defendants.  And if the scale tips in favor of the

1      plaintiffs, however slightly, they would win.

2              As to certain other issues, which I will discuss with

3      you in a few minutes, they have the burden of proving their

4      case by clear and convincing evidence, which is a higher

5      burden.  They must convince you that it's beyond any

6      significant doubt that -- that they're entitled to recover as

7      to those issues.

8              Now, the -- as you know, the -- the gist of this

9      action is that the plaintiffs are law professors who had

10     prepared a treatise on Pennsylvania criminal law and

11     procedures.  And the treatise was put out by West Publishing

12     Company.  And they had a -- a deal with West Publishing Company

13     that they would put a supply of annual updates, annual -- what

14     are called pamphlet parts.  And this went on for some time.

15     The two professors were being paid $5,000 each for their work

16     in preparing and submitting the pamphlet -- the pocket parts.

17             There came a time when the defendant West Publishing

18     Company decided that they didn't want to pay the professors as

19     much as they had been paying and only offered them $2,500

20     apiece.  And that was not satisfactory to the professors, and

21     so they declined to enter into any further -- further contract

22     for the 2008 pocket part.

23             It is the position of the defendants that,

24     notwithstanding the -- their refusal to prepare the pocket part

25     for 2008, that the defendant West Publishing Company went ahead

1    and put the 2008 pocket part out, published it, and asserted in

2    the pocket part that the pocket part had been prepared by the

3    plaintiffs, whereas, actually, the plaintiffs had nothing to do

4    with it and it was prepared entirely by staff of West

5    Publishing.  And you heard the evidence as to what members of

6    the staff did the actual work.

7            It is the position of the plaintiffs that the pocket

8    part in question -- the 2008 pocket part was -- they call it a

9    sham, that it was totally inadequate.  They did not update the

10   Pennsylvania Law, did not refer to a large number of

11   Pennsylvania Supreme Court decisions that had been rendered.

12   It did not, in other words, constitute a -- an annual update of

13   the law of Pennsylvania on the subjects in question.  And there

14   is no question about the fact that the 2008 pocket part was put

15   out by West Publishing Company, and that it did say that the

16   plaintiffs were the authors of the pocket part.

17           It is the position of the defendant that where it's

18   true that the professors did not have anything to do with the

19   preparation of that pocket part, that since the pocket part for

20   2008 included a lot of stuff that had been in earlier pocket

21   parts for earlier years, that, in effect, the plaintiffs did

22   prepare a good bit of the content of the 2008 pocket parts, or

23   a supplement, as we call it.  It is the plaintiff's position,

24   of course, that since they had nothing to do with the

25   preparation of the pocket part, they should not have been --

1    their names should not have been associated with it in any way.

2         The issue for you to decide is whether the -- in

3    total, these circumstances rendered the defendant guilty of

4    defamation in putting out the pocket part, and whether its

5    issuing was defamatory.  A publication is defamatory -- well,

6    put it this way.  In order to prove that the -- what the

7    defendant put out was defamatory as to the plaintiffs, the

8    plaintiff must prove that the communication in question was

9    published by the defendants.  That's not in dispute.  That it

10   does apply to the plaintiffs.  That's not in dispute either,

11   since their names were on it.  That the -- among the people who

12   received the publication -- the persons who received it would

13   understand or believe that the defendants -- that the

14   plaintiffs had -- had published it.  And whether recipients of

15   the publication would understand its defamatory meaning.  In

16   other words, that the average subscriber, upon receiving this

17   pocket part, would -- whenever he or she looked it over, would

18   conclude that the plaintiffs had prepared what was in it, and

19   would learn sooner or later that the update was not an adequate

20   update of Pennsylvania law.

21        A -- a publication like this or a communication is

22   defamatory if any part of it tends to harm the reputation of a

23   person, so as to lower him or her in the estimation of the

24   community, or to deter a third persons from associating or

25   dealing with them.  It's not necessary that the defamatory

1        statement be the primary focus of the communication.  In other

2        words, the primary focus of the pocket part communication was,

3        at least in theory, to update readers as to recent developments

4        in Pennsylvania law.  And the primary purpose was not

5        necessarily to -- to identify the authors.  But if in context

6        the communication stated or implied a meaning that it is -- was

7        defamatory, then that would be defamatory as to the plaintiffs.

8            A communication is defamatory of a person if it tends

9        to so harm the reputation of that person as to lower him or her

10       and the estimation of the community, or to deter a third person

11       from associating or dealing with him or her.  Words are not

12       defamatory merely because they are annoying or embarrassing to

13       the person referred to in the communication.  But a

14       communication is defamatory if, taken as a whole, it's

15       implication is defamatory.

16           Now, the plaintiffs argument and position is that

17       taken together, the statement that the pocket part was prepared

18       by the plaintiffs, when, in fact, they had nothing to do with

19       it, and given its inaccuracy and inadequacy as an updated

20       Pennsylvania law that the -- taken as a whole, it's implication

21       is -- was defamatory as to the plaintiffs.  And another way of

22       putting it is to say that the test of determining the truth or

23       falsity of a defamatory statement is whether the alleged

24       statement as published would have a different affect on the

25       mind of the reader from that which the truth would have

1    produced.

2            Now, if the West Publishing Company had stated that

3    this was -- the 2008 supplement was prepared by its internal

4    staff, and that the plaintiffs had nothing to do with it, and

5    that it was inadequate as an update -- they left out a lot of

6    cases -- would that have produced a different affect on the

7    minds of the reader from what the reader would have believed

8    after having seen the 2008 pamphlet part that was actually

9    produced.

10           Now, as I said, there are two theories on which

11   plaintiffs are seeking damages.  One is this notion of

12   defamation that I've just been discussing.  The other is, is

13   the statute in Pennsylvania which provides for liability for

14   somebody who issues a statement to the public about another

15   person which casts that person in a false light.  And to make a

16   long story short, if you find that the communication in

17   question, the 2008 supplement as it was actually issued was

18   false, and that it would reasonably have been understood by

19   those other than the plaintiffs as defamatory of the

20   plaintiffs, then you may return a verdict in favor of the

21   plaintiffs and against the defendants.

22           If, on the other hand, you're not satisfied with that

23   by the fair weight of the evidence, then the plaintiffs would

24   lose, and you don't return a verdict in favor of the

25   plaintiffs.

1          The other aspect of it, as I said, was the plaintiffs

2     contend that West Publishing Company invaded their privacy and

3     publicly placed them in a false light when the -- when it

4     published the pocket parts.  The elements of that which the

5     plaintiff must prove by a preponderance of the evidence are

6     that publicizing manner of this kind about a reasonable person

7     would be highly offensive to that reasonable person, and that

8     they person giving the publicity acted with knowledge of the

9     falsity or reckless disregard, whether it was true or not.

10    Conduct that is highly offensive to a reasonable person is

11    conduct that a reasonable person in similar circumstances would

12    find very objectionable or that a reasonable person in similar

13    circumstances would -- could be expected to -- to take serious

14    offense of such an accusation.

15          Now, if you find that the defendant placed plaintiffs

16    before the public in a false light, then it is an invasion of

17    privacy and you may award any damages if you find the plaintiff

18    suffered for the harm to their interest and privacy, mental

19    distress suffered as a result of the invasion of their privacy

20    or any other injuries the plaintiffs have suffered as a result

21    of their privacy.

22          Now, if you find that plaintiffs have established by

23    the fair weight of the evidence that defamation occurred and

24    that they're entitled to recover under the false light statute,

25    you must also determine, for the purpose of calculating

1    damages, whether the defendants acted intentionally or

2    recklessly.  In other words, whether the defendants acted with

3    actual malice.

4            Actual malice is a legal term used in defamation and

5    false light cases that is not quite the same as, and should not

6    be confused with, malice in criminal cases.  For the purposes

7    of this case, actual malice means that at the time the

8    statement was made -- that is at the time the pocket part was

9    issued, the party making the statement, namely West Publishing

10   Company, acted with knowledge that the statement was false, or

11   acted with reckless disregard whether the statement was false

12   or not.  In other words, the plaintiff must demonstrate that

13   the defendant, in fact, entertained serious doubts as to the

14   truth of the publication, or acted with a high degree of

15   awareness of probable falsity.  Mere negligence does not

16   suffice.

17           Serious doubt or the possession of a high degree of

18   awareness of probable falsity may be inferred from relevant

19   circumstantial evidence of the state of mind of the person who

20   published the defamation.  Testimony by that person denying a

21   serious doubt and/or high awareness of its probable falsity

22   does not necessarily defeat proof of recklessness, but is to be

23   weighed with all the other evidence to that person's state of

24   mind.

25           Now, in order to find actual malice, you must -- the

1    plaintiffs must prove their case by a clear and convincing

2    evidence, which is a higher standard, as I said, than

3    preponderance of the evidence.  The clear and convincing

4    evidence standard requires evidence so clear, direct, weighty

5    and convincing as to enable the trier of fact to come to clear

6    conviction without hesitation as to the truth of the facts at

7    issue.

8            Now, at this point we'll discuss the subject of

9    damages.  If -- you may find from the evidence, depending on

10   how you assess it, that the defendants defamed the plaintiffs

11   if the intended audience of the pocket part would reasonably

12   conclude that the plaintiffs authored an inaccurate and out-of-

13   state supplement to the treatise.  If you find that the

14   publication defamed the plaintiffs in this way or placed them

15   in a false light, then the plaintiffs are entitled to be fairly

16   and adequately compensated for the harm they suffered as a

17   result.

18           And you may presume that they suffered this harm

19   because of the nature of the defamation.  Therefore, you may

20   award damages for any actual harm the plaintiffs -- to the

21   plaintiffs' reputation that you find resulted from the

22   defendants' conduct.  You may also award damages for any

23   emotional distress, mental anguish or humiliation that the

24   plaintiffs suffered as a result of defendants' conduct and any

25   other damages that you find plaintiffs sustained.

1          In -- in determining the amount of an award for

2    presumed injury to the plaintiffs' reputation and the emotional

3    distress and humiliation, you should take into account the

4    standing and reputation of the plaintiffs in their community,

5    the character of the defamatory communication, the extent and

6    duration of the publication, and the probable effect the

7    defendants' conduct had on the plaintiffs' trade, business or

8    profession, and the harm that may have been sustained by

9    plaintiffs as a result.

10          Now, so much for compensatory damages.  Under certain

11   circumstances, you may also award punitive damages.  If you

12   find that the conduct of the defendants was malicious, wanton,

13   willful or oppressive, or showed reckless indifference to the

14   interest of others, such as the plaintiffs, then you may award

15   punitive damages in addition to any compensatory damages.  And

16   the purpose of punitive damages is to punish the defendants and

17   deter them and others from repeating that kind of conduct.

18          If you decide that the plaintiffs are entitled to an

19   award of punitive damages, you must decide on an amount of such

20   damages.  In doing so, you may consider the character of the

21   defendant's act, nature and extent of the harm to the

22   plaintiffs; the wealth of the defendants insofar it is relevant

23   in fixing the amount -- an amount that will punish them and

24   deter others from similar conduct in the future.  In reaching

25   your decision, you must keep in mind that both individuals and

1      corporations stand equal before the law and are to be as

2      equals.

3              On another subject, you have heard deposition

4      testimony of certain witness's testimony given by deposition.

5      It is to be entitled to the same consideration as if the

6      witness testified in court.  And finally, there is no -- that

7      in reaching your decision, you should not draw any negative

8      inference from the fact that any party might have sought legal

9      counsel in connection with the matters in dispute.  To the

10     extent that counsel have argued that somehow it was improper

11     for the plaintiffs to consult with counsel, they are in error,

12     and you should disregard that.

13             Now, I've prepared a verdict form which will help, I

14     hope, to get -- to keep these issues separate and decide them

15     correctly.  The verdict form is in the form of a questionnaire

16     simply asking you questions, and you answer them either yes or

17     no or with an amount.  And once you've answered all these

18     questions, you will have returned a verdict.

19             The first question is, "Did plaintiffs Leonard Sosnov

20     -- Sosnov and David Rudovsky establish that they were defamed

21     by the defendants?"  Now, for some reason or other, their names

22     are in reverse order there, but they're the same no matter

23     what.  And you answer that question either yes or no.

24             The second question, "Did the plaintiffs Leonard

25     Sosnov and David Rudovsky establish that the defendants invaded

1    their privacy by publish -- publicly placing them in a false

2    light?"  You answer that question either yes or no.  And if

3    your answer to questions numbers one or two is yes, then what

4    amount of compensatory damages, if any, do you award to each of

5    them, David Rudovsky and Leonard Sosnov?"  And if you answered

6    yes to those questions, that is to say if you award -- find

7    there that defendants are libel for compensatory damages, the

8    next question is, "Do you award punitive damages against the

9    defendant?"  And you answer that either yes or no.  And if your

10   answer is yes, then you state the amount of punitive damages to

11   be awarded to each of the plaintiffs.

12           As I said, you can't award punitive damages unless

13   you find that there -- defendants acted with malice.  Which

14   means that at the time the communication was issued by the

15   defendant, defendant acted with knowledge that the statement

16   was false, or acted with reckless disregard of whether the

17   statement was false or not.  And in short, the defendant had

18   serious doubts as to the truth of the publication, or acted

19   with a high degree of awareness of probable falsity.

20           May I see counsel at sidebar, please.

21                       (Sidebar begins)

22           THE COURT:  See, now that's what happens when I have

23   a written form, I mess it up.  What can you do?  What can I do

24   for you to correct it?

25           MR. BAZELON:  Well, Your Honor, we -- we are

1    concerned that Your Honor's charge the first time talks

2    about --

3              THE COURT:  Be concerned a little louder.

4              MR. BAZELON:  Sure.  The first time you talked about

5    clear and convincing evidence that -- that the -- you said that

6    -- that there was no significant doubt which has a tendency to

7    confuse with the criminal standard beyond a reasonable doubt.

8    The second time you said it, you said it correctly.  But I'm --

9    I'm concerned --

10             THE COURT:  I can't hear a word you're saying.  I'm

11   sorry.

12             MR. BAZELON:  I'll speak to the jury and testify --

13             THE COURT:  No.  No, they're coughing.

14             MR. BAZELON:  All right.  I get it.  The first --

15   when -- when you instructed as to the meaning of clear and

16   convincing evidence --

17             THE COURT:  Right.

18             MR. BAZELON:  -- you said that it needs no

19   significant doubt.  Our concern is that that confuses with the

20   criminal standard of no reasonable doubt.

21             THE COURT:  It does.

22             MR. BAZELON:  So I would appreciate a clarification.

23   Or we ask for a clarification and -- and otherwise maintain our

24   objection.  The -- Your Honor had said that you would -- at the

25   charging conference that you were going to --

1              THE COURT:  Would you like a recess briefly, whoever

2       is doing all the coughing?

3              JUROR:  No, I'm fine.  Thank you.

4              THE COURT:  Okay.

5              MR. BAZELON:  You had said at the charge conference

6       you were going to give our charges 19 and 20.

7              THE COURT:  Yes.

8              MR. BAZELON:  Which have to do with --

9              THE COURT:  I couldn't find it.  What does it say?

10             MR. BAZELON:  You want to take mine?

11             THE COURT:  Yes.

12             MR. BAZELON:  It's 19 and 20.

13             MR. RITTINGER:  Wait a minute.  Could I see them?

14             MR. BAZELON:  Yeah, sure.

15             THE COURT:  Wait till I see if I can find it here.

16             MR. RITTINGER:  Your Honor, these are redundant of

17      what you -- you gave.  I mean, except for not --

18             THE COURT:  There is no such thing as your request

19      for charge.  Let's see what 19 and 20 says.

20             UNIDENTIFIED COUNSEL:  Your Honor, I don't think

21      there's any necessity to get those now.

22             THE COURT:  Yes, we're going to leave it alone.  I've

23      changed my mind.

24             MR. BAZELON:  And we're taking objection to it --

25             THE COURT:  Yes.

Colloquy                                                            118

1                    MR. BAZELON:  -- not being able to propose 19 and 20.

2          And -- and the other matter we're concerned about is, we asked

3          that you give -- make it clear that malice only applies to

4          presumed damages and punitives.

5                    THE COURT:  Yes.

6                    MR. BAZELON:  It does not apply to actual damages.

7                    THE COURT:  I'll try to --

8                    MR. BAZELON:  Okay.  Which would include emotional

9          damages.

10                   MR. RITTINGER:  I'm not sure which --

11                   THE COURT:  Emotional distress.

12                   MR. BAZELON:  Right.

13                   UNIDENTIFIED COUNSEL:  Punitives apply to presumed

14         damages.

15                   THE COURT:  Presumed damages.

16                   MR. RITTINGER:  Yeah.  I have no problem with that.

17         I -- I think it was clear, but I have no problem with it.  Your

18         Honor, I --

19                   THE COURT:  I'll mess it up.  What do you -- what can

20         I do for you?

21                   MR. RITTINGER:  Your Honor, I -- I think this -- I

22         think this should be read.  I -- you know, these -- these are

23         the elements of page 1.  And I don't know, somehow that didn't

24         -- those did not get read, and they're part of the --

25                   THE COURT:  I'll read it.

1          MR. RITTINGER:  They're the five elements of -- of a

2     libel.

3          MR. BAZELON:  Thank you, Your Honor.

4          THE COURT:  I think I've messed it up enough.  I'll

5     see you.

6          UNIDENTIFIED COUNSEL:  Thank you, Judge.

7                    (Sidebar ends)

8          THE COURT:  I've been requested to clarify some

9     matters.  I'll do my best.  In order to establish defamation,

10    plaintiffs must establish that the communications, publication

11    by the defendants -- that was not disputed, they did do that --

12    that the publication applied to the plaintiffs, then that the

13    recipient would understand its defamatory meaning, and the

14    recipient would understand it was intended to be applied to the

15    plaintiffs.

16         And finally, the falsity of the publication -- I

17    think I went over that before, but apparently somebody didn't

18    hear it.  If the plaintiffs establish by the fair weight of the

19    evidence that the -- that the -- they were defamed by the

20    plaintiff (sic) -- by the defendant, I'm sorry -- then they are

21    automatically entitled to what are called presumed damages;

22    namely, it would be presumed that -- withdraw that.

23         Let's start over again.  The plaintiffs are entitled

24    to recover damages for emotional distress if they were defamed.

25    And it would be presumed that they suffered damage to their

1   reputations without further detailed proof of that.  And I have

2   that covered somewhere here.  (Pause)  I'll re -- restate that

3   again.  I think I -- I want to make sure I get it -- did it

4   correctly.  That if you conclude that the plaintiffs have

5   established that they were defamed by the defendant, that is to

6   say that the defendant was libel for intentionally issuing a

7   publication which was, in fact, false, and applied to the

8   defendant (sic) -- to the plaintiffs, they're entitled to be

9   fairly and adequately compensated for the harm they suffered.

10          And you may presume that they suffered this harm

11   because of the nature of the defamation.  In other words, the

12   law would presume that if they were defamed, they suffered some

13   harm to their reputations.  And in addition, to the extent that

14   you find from the evidence that they suffered emotional

15   distress, mental anguish and humiliation and so forth, that

16   should also be included in your compensation of the package.

17          In determining the amount of an award for presumed

18   injury to the plaintiffs' reputation and the emotional distress

19   and humiliation, you should take into account the standing of

20   the repu -- of the plaintiffs in their community, the character

21   of the defamatory communication, the extent and duration of the

22   publication, and the probable effect defendant's conduct had on

23   the plaintiffs' trade, business or profession, and the harm

24   that may have been sustained by the plaintiffs as a result.  I

25   think I covered that before.

1          I think that coupled with the verdict form, you must

2     by now understand what you're -- what you're deciding.  I want

3     to make clear that I have not intended in these instructions or

4     at any time throughout the trial to express a personal opinion

5     as to what your verdict should be.  And I hasten to add that

6     even if I had expressed a personal opinion as to what your

7     verdict should be, you should disregard it because you are the

8     people who decides the case.

9          I now commit the case to you for your careful

10    consideration.  And when you fill out the verdict form, it gets

11    signed by the foreperson, and you will have concluded your

12    service.  You want to give -- give this to the jury, please.

13    Oh, you have one.  Okay.  We'll give you two copies of the

14    form, in case you mess one up, you'll have an extra one.

15    Here's one.  You'll get a chance in a minute.

16              MR. RITTINGER:  Your Honor, I think we want a sidebar

17    before -- or maybe --

18              THE COURT:  I'll give you one in a minute.  Let's

19    take the -- oh, okay.  Come on.

20                         (Sidebar begins)

21              THE COURT:  Now I've messed it up enough.  Why do you

22    have to mess it up?

23              MR. RITTINGER:  Well, I -- Your Honor, I don't agree

24    with -- at one point you said they were automatically entitled

25    upon a finding of defamation.  I mean, that's -- that's --

1      that's devastating to us.  They're not automatically --

2                  THE COURT:  Devastating?

3                  MR. RITTINGER:  Well, in -- in the overall context of

4      this case, I --

5                  THE COURT:  How about presumed damages?

6                  MR. RITTINGER:  Yes, but that has to do with -- that

7      has to -- that has to do -- I think what Rick had said was, and

8      I think he's correct, and it has to be made clear that they --

9      they have to -- they have to find actual malice for both

10     presumed damages and punitive damages.  And I don't think

11     that's come across.

12                 UNIDENTIFIED COUNSEL:  Okay.  Okay.  Okay.

13                 UNIDENTIFIED COUNSEL:  But not for distress.

14                 UNIDENTIFIED COUNSEL:  Right.

15                 MR. RITTINGER:  And -- and the damages without that

16     are not automatic.

17                            (Sidebar ends)

18                 THE COURT:  One of the problems, members of the jury,

19     with charging you in installments is that I sometimes miss what

20     I should have done or think I did it and I didn't.  I just want

21     to make clear that to the extent that plaintiffs have

22     established by the fair weight of the evidence that they were

23     defamed, the law presumes that certain damages to their

24     reputation occurred if the -- if they establish that the

25     defendant acted with malice or reckless disregard, as I

1      discussed earlier.

2              The plaintiffs would still be entitled to recover

3      damages for emotional distress that they suffered, if you

4      accept their testimony.  But they would not be entitled to

5      damages to their reputation or -- as I say, presumed damages --

6      or to punitive damages, unless they establish by fair and

7      convincing evidence that the defendant acted with malice.

8      Okay?

9              MR. RITTINGER:  Thank you, Your Honor.

10             MR. BAZELON:  Thank you, Your Honor.

11             THE COURT:  I hope that doesn't change your minds.

12     You may take -- follow that young lady.

13             COURTROOM CLERK:  All rise.

14             THE COURT:  And we will eagerly await your response.

15                     (Jury out for deliberations)

16             THE COURT:  And the charge as given is accepted to by

17     every lawyer in the room --

18             MR. RITTINGER:  Yes, Your Honor.

19             THE COURT:  -- and so noted.

20             MR. BAZELON:  Thank you.

21             THE COURT:  Recess till we get a verdict.

22                             (Recess)

23             COURTROOM CLERK:  All rise.

24             THE COURT:  Bring in the jury.  The jury has

25     submitted a question, which I assume you've received, have you?

1          UNIDENTIFIED COUNSEL:  Actually, two, I believe,

2     Judge.

3          THE COURT:  Two of them, yes.  I propose to answer

4     the questions.  (Pause)

5                          (Jury in)

6          COURTROOM CLERK:  All rise.

7          THE COURT:  Good afternoon.  Be seated, please.  I

8     will note for the record that the jury has entered a couple of

9     questions.  The first question, which should have been made

10    clear by the Court before but wasn't, is, quote, does a

11    majority determine a yes or no response to one or two?  Or must

12    it be unanimous?  In order to answer any of these questions,

13    you must all agree on the answer.  It's all things are

14    unanimous.  There's not a majority vote.

15         Then you asked in the second question, "Could a --

16    could malice versus reckless disregard versus negligence be

17    clarified once more?  Could a written explanation be provided?"

18    I don't think we can provide a written explanation today, but I

19    will try to make it a little more clearer than I did before.

20         JUROR:  Is it possible for you to speak a little

21    louder?  I -- I can't hear you back here in the second row, I'm

22    sorry.

23         THE COURT:  I'll try very hard.

24         JUROR:  Thank you.

25         THE COURT:  Is that better?  (No audible response)

1    The only kind of damages that you can award that do not require

2    a finding of actual malice are damages for humiliation,

3    emotional distress.  All the other damages require a finding of

4    actual malice.  That is to say for purpose of considering

5    whether to award presumed or punitive damages, you must find a

6    fact -- make a finding of actual malice.  And that means that

7    at the time the statement was made, West Publishing Company

8    acted with knowledge that the statement was false, or acted

9    with reckless disregard of whether the statement was false or

10   not.  The defendant (sic) -- the -- the plaintiff must

11   demonstrate that the defendant, in fact, entertained serious

12   doubts as to the truth of the publication, or acted with a high

13   degree of awareness of probable falsity.  Does that answer your

14   question?  Probable not.

15        If you find that the statement was false and that

16   plaintiffs were defamed, plaintiffs would be entitled to

17   recover damages for emotional distress.  They've testified that

18   they were -- felt humiliated and embarrassed and so forth.

19   That kind of damage you can award without any showing that the

20   defendants acted with actual malice.

21        But if you find that the defendant acted with actual

22   knowledge that the communication was false -- in other words,

23   if the defendant knew, number one, that the pocket part had not

24   been prepared -- first of all, that they knew that the issuing

25   of the pocket part constituted a representation to the readers

1    that this was an update of Pennsylvania law and that it had

2    been prepared by the plaintiffs, if they knew that was false or

3    acted with reckless disregard as to whether it was false or

4    not, they would be -- they would be guilty of actual malice,

5    and that would enable you to award damages for any other

6    consequences that you find that plaintiffs may have suffered.

7             Does that -- have I cleared that up or made a -- a

8    mess of it?

9             MR. BAZELON:  That's -- that's satisfactory, Your

10   Honor.

11            THE COURT:  Pardon?

12            MR. BAZELON:  That's satisfactory.

13            THE COURT:  Fine.  Thank you.

14            But you must be unanimous in order to enter any of

15   these questions.  Okay?  You may retire to the jury room and

16   quick reach a verdict.

17            COURTROOM CLERK:  All rise.

18                (Jury out for deliberations)

19            THE COURT:  I will assume for the record that all the

20   lawyers in the courtroom object to what I just said.  And you

21   will be able to raise it on appeal.  (Pause)

22            MR. RITTINGER:  Yeah, Your Honor, I'm wondering if it

23   makes sense, since they wanted a written, we'd -- we'd just

24   agree on the definition of actual malice right here and give it

25   to them?

1          THE COURT:  I'm not going to give them one.  I don't

2     have one convenient -- in a convenient form.  Recess until we

3     get a verdict.

4          MR. BAZELON:  Your Honor, I would -- with respect to

5     what Your Honor just said, we are concerned that the last -- in

6     your last part of the formulation that you said that if there

7     -- the jury found malice, that they could award damages for

8     injury actually suffered.  And I may not have that exactly --

9          THE COURT:  I hope I didn't say that, did I, the word

10    actually?

11          UNIDENTIFIED COUNSEL:  No.  No, you did not say that.

12    For anything they suffered.

13          MR. BAZELON:  For anything they suffered.  For

14    anything they suffered.  And the problem is that presumed

15    damages, they don't have to make a finding of actual suffering.

16          THE COURT:  I thought I --

17          UNIDENTIFIED COUNSEL:  Well, I think -- I think -- I

18    think --

19          THE COURT:  -- told they can presume damages, didn't

20    I?  Let's hope for the best.  Let's see what happens.

21          MR. BAZELON:  All right.  Thank you.

22                        (Recess)

23          THE COURT:  How can I answer the question for the

24    jury when the jury is not here?  We have a question -- two

25    questions.  I think they're self-explanatory.  The word

Colloquy                                    128

1       established means prove.  And what do you want me to say about

2       the determinings of damages?

3              MR. RITTINGER:  Well, it's not arbitrary, Your Honor,

4       that's for sure.

5              THE COURT:  They -- they distinguish guidelines

6       versus arbitrary.

7              MR. RITTINGER:  Well, Your Honor, they have to prove

8       by a preponderance of the evidence that they have been damaged.

9              THE COURT:  I'm not talking about the first one.

10              MR. RITTINGER:  Well, I'm -- I'm talking about both,

11       though, Your Honor.  The guidelines would be that they have to

12       establish proof.  The only proof that they have is proof of

13       humiliation.  I mean --

14              THE COURT:  Well --

15              MR. BAZELON:  That's --

16              THE COURT:  -- that's up to the common sense of the

17       jury.  Bring in the jury.

18              MR. BAZELON:  But Your Honor, may we be heard just

19       one moment?

20              THE COURT:  Wait a minute.

21              MR. BAZELON:  The -- Your Honor, it seems to me that

22       the first question goes beyond equating determining with --

23       with proving.  Because there's a further question.  And they

24       say, "Are we still working under the idea of presuming that at

25       least one person could have the thought -- could have thought

1    less than either Professor Rudovsky or Professor Sosnov?"   I

2    think the answer to that question is yes.

3              MR. RITTINGER:  Presuming?

4              MR. BAZELON:  Yes, that --

5              MR. RITTINGER:  No, that --

6              MR. BAZELON:  That's -- the idea of presuming --

7              THE COURT:  If -- if they -- if it's -- if --

8              MR. BAZELON:  -- is could somebody have thought that.

9              THE COURT:  If you've approved actual malice.

10             UNIDENTIFIED COUNSEL:  Right.

11             MR. BAZELON:  That's correct.

12             THE COURT:  You don't get -- yes.  Okay.

13             MR. BAZELON:  That's correct.

14             THE COURT:  Okay.

15             MR. BAZELON:  And I think that -- and I think the --

16   the essence of two is that you have to use your judgment, given

17   the fact --

18             THE COURT:  I do, too.

19             MR. BAZELON:  Thank you, Your Honor.  I'm sorry, to

20   say the obvious.

21             THE COURT:  Bring them in.  Should I inform the jury

22   that it's snowing and they better hurry up?

23             MR. BAZELON:  No, Your Honor, I would prefer that we

24   -- maybe that's inconsistent with other things I've said in

25   this case about full disclosure.  I don't know.

1                MR. CHARLSON:  I can attest to the truth of that

2       statement, though.

3                UNIDENTIFIED COUNSEL:  I made it back, Your Honor.

4                UNIDENTIFIED COUNSEL:  Mr. Charlson is our good luck.

5       (Pause)

6                COURTROOM CLERK:  All rise.

7                          (Jury in)

8                THE COURT:  Good afternoon.  Be seated, please.  I

9       will note for the record that we have two more questions you've

10      sent in.  And I'll try to dispose of them.  The first question

11      is, "In number one of the verdict form, the word 'establish' is

12      used.  Are we determining whether proof was provided?  Or are

13      we still working under the idea of presuming that at least one

14      person could have thought less about either Professor Rudovsky

15      or Professor Sosnov?"

16               As I've tried to make clear earlier -- first of all,

17      the word established means to prove.  So in order to answer the

18      question yes, you must all agree that it is more likely than

19      not on the basis of the evidence that yes is the correct

20      answer.  And that involves the analysis of the evidence, which

21      is the proof.  But to answer your question specifically, as I

22      thought I made clear earlier, but maybe I didn't, if you find

23      that the plaintiffs were defamed, the defendant issued a

24      defamatory communication, then they are entitled to damages for

25      emotional distress that find esta -- they established by the

1    evidence.

2           But if they also show that the defamation occurred --

3    that the defendant West Publishing Company actually knew that

4    it was false or had -- or acted in reckless of disregard of

5    whether it was true or false, then they would be entitled to

6    presumed damages.  And there isn't much difference, but it --

7    it would -- the law says that if the defendant acted with

8    actual malice, it's presumed that the defendants (sic) suffered

9    -- that the plaintiffs suffered some damage to their

10   reputation.  And you don't get -- don't have to have any actual

11   proof that their reputations were -- that somebody else thought

12   less of them.  It's presumed that that happened if there was

13   actual malice.  And in order to have def -- defamation of any

14   kind, you would have to show that the intended reader would

15   probably have concluded that -- that the plaintiffs wrote the

16   supplement and that the supplement was, to some extent, less

17   than adequate.

18          Now, the second question is, "Are the determinings of

19   plaintiffs dictated by any guide -- of damages, I'm sorry --

20   dictated by any guidelines?  Or are such determinations --

21   determinings arbitrary?"  The answer is, there are no specific

22   guidelines.  We leave that up to the common sense and good

23   judgment of the jury as to what would be a fair and reasonable

24   amount to award as damages.  That does not make them arbitrary.

25   We leave them up to the good judgment and common sense of the

Colloquy                                    132

1    jurors.  That's what jurors are for.  Okay?

2              UNIDENTIFIED COUNSEL:  Thank you, Your Honor.

3              THE COURT:  We'll see you soon, I hope.

4                   (Jury out for deliberations)

5              THE COURT:  Everybody has objections.  They're all

6    noted on record.  We'll recess till we get a verdict, I hope.

7              MR. RITTINGER:  Your Honor, I -- we have an

8    objection.

9              THE COURT:  Pardon?

10             MR. RITTINGER:  I said, we have an objection, or a

11   comment --

12             THE COURT:  I said, I just noted you had an

13   objection, I assumed.

14             MR. RITTINGER:  I know, but -- well, I -- I thought

15   Mr. Bazelon was going to go.  Your Honor, it seems -- it seems

16   to me that we've now -- the last two definitions of actual

17   malice have not included the second sentence, which is so

18   important in this case.  That's that the plaintiffs must

19   demonstrate -- in order to define reckless disregard, that the

20   plaintiffs must demonstrate that the defendant, in fact,

21   entertained serious doubts.

22             THE COURT:  Oh, I did that often enough, I think.

23                        (Recess)

24             COURTROOM CLERK:  Court is now in session.

25             THE COURT:  Good afternoon.  Or evening.  I

1    understand you've reached a verdict.  Is that true?

2                   JUROR:  Yes.

3                   JUROR:  We have, Your Honor.

4                   THE COURT:  Would you fill out the slip and hand it

5    to this young lady.  Be seated, please.  I will now read the

6    verdict slip and see if you all agree on it.  First question,

7    "Did plaintiffs Leonard Sosnov and David Rudovsky establish

8    that they were defamed by defendant?"  The answer is, "Yes."

9    And the second question is also answer yes, the false light

10   question.  And the next question, "If your answer to one or two

11   is yes, by -- then what amount of compensatory damages, if any,

12   do you award to David Rudovsky and Leonard Sosnov?"  And you've

13   answer $90,000 to each.

14               The next question is, "If you answered yes to

15   questions one or two, then do you award punitive damages

16   against the defendants?"  And you say, "Yes."  And the final

17   question, "If your answer to number three is yes, then please

18   state the amount of punitive damages awarded against defendants

19   to" -- and for David Rudovsky you say, $2,500,000.  And for

20   Leonard Sosnov, $2,500,000.  You all agree on those answers?

21                   JURY PANEL:  Yes.

22                   THE COURT:  Okay.  You're now -- that constitutes

23   your verdict.  And you're now excused with the thanks of the

24   Court.  The fact that you served on the jury this week means

25   that you can't be required to serve again in this court for at

1     least two years.  But if the computer strikes again, I hope

2     you'll come back to see us.  I hesitate to mention that earlier

3     there was some snow going out there.  The -- but it had stopped

4     some time ago, and the traffic seems to be moving, so I hope

5     you don't have any problems.  Drive carefully.

6                JURY PANEL:  Thank you.

7                THE COURT:  Thank you.  Anything from counsel?

8                MR. RITTINGER:  Well, Your Honor, I'd like to poll

9     the jury, please.

10               THE COURT:  Oh.  Before you leave -- you have a list

11    of jurors?  Could you poll the jury?  Do you agree on the

12    verdict and the answers to the verdict slip as I've read them

13    to you?

14               COURTROOM CLERK:  Juror number one, Warren Masker?

15               JUROR #1:  Yes, I do, Your Honor.

16               COURTROOM CLERK:  Juror number two, Deborah Catoggio?

17               JUROR #2:  Yes, I do agree.

18               COURTROOM CLERK:  Juror number three, Debra Thompson?

19               JUROR #3:  Yes, I do agree.

20               COURTROOM CLERK:  Juror number four, Lisa Ortiz?

21               JUROR #4:  Yes, I do.

22               COURTROOM CLERK:  Juror number five, Anne Huff?

23               JUROR #5:  I agree.

24               COURTROOM CLERK:  Juror number six, Leslie Rindone?

25               JUROR #6:  I agree, also.

1          COURTROOM CLERK:  Juror number seven, Lisa Driscoll?

2          JUROR #7:  I agree.

3          COURTROOM CLERK:  And juror number eight, Kevin

4     Grugan?

5          JUROR #8:  Yes, I do agree.

6          COURTROOM CLERK:  Thank you.

7          THE COURT:  Thank you.  They all answered that they

8     did agree with the answers.  You're -- you're now excused.

9     Thank you very much.  And have a safe trip home.  And I'm

10    assuming there won't be any post-trial motions or anything.

11    We'll see you later.

12         MR. RITTINGER:  Yeah, we'll do it on paper, Your

13    Honor.

14         THE COURT:  Pardon?

15         MR. RITTINGER:  We'll do the motions on paper.

16         THE COURT:  Oh, yes, sure.

17         MR. RITTINGER:  Well, I do want to move to set aside

18    the verdict, yes, Your Honor.

19         THE COURT:  I thought maybe you might.  I wasn't

20    sure, but I thought we'd better check.  It might be of interest

21    to know the amount of the verdict which the Court had suggested

22    and the amount which the defendant was willing to pay.  Did you

23    find -- find those out earlier?

24         UNIDENTIFIED COUNSEL:  No, Your Honor.

25         THE COURT:  Do you have any objection to our telling

Colloquy                                                      136

1        them?

2                    MR. RITTINGER:  No.  No, Your Honor.

3                    THE COURT:  I think the -- you

4                    MR. BAZELON:  Your Honor --

5                    THE COURT:  -- offered what, seventeen-five each?

6                    MR. RITTINGER:  Yes, Your Honor.

7                    THE COURT:  And my figure was 15,000.  So

8        congratulations to somebody.  I'm not sure who.  We'll see you

9        later.

10                   MR. RITTINGER:  Your Honor, you'll -- you'll take

11       motions to set aside on paper then?  Is that --

12                   THE COURT:  You don't have to, but if you want to

13       file such motions, you may do it.

14                   MR. RITTINGER:  Well, I think -- I think we probably

15       should under the circumstances.

16                   THE COURT:  You may do it any time you want within

17       the time limit specified.

18                   MR. RITTINGER:  Within the 28 days.  Thank you, Your

19       Honor.

20                   THE COURT:  Okay.  Good night, all.

21                   UNIDENTIFIED COUNSEL:  Thank you, Your Honor.

22                           (Briefly off the record)

23                           (Audio begins here)

24                   MR. BAZELON:  -- relief.  The -- the request for

25       injunctive relief.

Colloquy                                                   137

1          THE COURT:  Oh, well, I'm not going to hear it

2   tonight.

3          MR. BAZELON:  Right.  I just wanted to bring it -- I

4   didn't want to waive it by not raising it.

5          THE COURT:  What -- what kind of injunctive relief

6   could there --

7          MR. BAZELON:  Your Honor, we seek injunctive relief

8   that with respect to advertising of the treatise, that there be

9   disclosure.

10         THE COURT:  Well, when do you want to do that.

11  Whenever it's convenient, I'll hear that.

12         MR. BAZELON:  Okay.  Well, Your Honor, I'm -- we're

13  at the Court's disposal.  Do you want to --

14         THE COURT:  Pardon?

15         MR. BAZELON:  We're at the Court's disposal.

16  Whenever the Court wishes to schedule it.

17         THE COURT:  Okay.  How about next week -- early next

18  week?

19         MR. BAZELON:  That would be fine, Your Honor.

20         THE COURT:  We have something in the morning, but I

21  think --

22         MR. RITTINGER:  But Your Honor, we'll -- we'll pull

23  it.  We don't care, we'll pull it.

24         THE COURT:  Pardon?

25         MR. RITTINGER:  Whatever -- if he wants to pull -- if

1    he wants the advertisement pulled, we'll pull it.  We won't

2    mail the supplement out.  It doesn't matter.

3            MR. BAZELON:  Well, I -- I'm still requesting

4    injunctive relief, Your Honor.

5            THE COURT:  Well, let me know in writing what you

6    want.  Okay?

7            MR. BAZELON:  Yes, indeed.

8            THE COURT:  And we'll hold a hearing if need be.

9            MR. BAZELON:  Okay.  Thank you, Your Honor.

10           THE COURT:  Okay.

11               (Proceedings concluded at 4:58 p.m.)

12                       *  *  *  *  *

13

14                 C E R T I F I C A T I O N

15

16       I, Brenda Boulden, court approved transcriber, certify

17   that the foregoing is a correct transcript from the official

18   electronic sound recording of the proceedings in the above-

19   entitled matter.

20

21   _____        _____

22   DATE                            BRENDA BOULDEN

23

24

25